# EXHIBIT 1



A-ALLL

Comptroller of the Currency
Administrator of National Banks

# Allowance for Loan and Lease Losses

## Comptroller's Handbook

### Narrative - June 1996, Procedures - May 1998



Assets

1

# Allowance for
# Loan and Lease Losses          Table of Contents

## Introduction
Background ............................................................................ 1
Risks Associated with the Allowance .............................................. 2
Establishing an Adequate Allowance ............................................. 3
Statement of Financial Accounting Standards 114 ...................... 5
A Suggested Analytical Framework ................................................ 7
Provisions for Individual Classified Loans ....................................... 8
Provisions for Pools of Similar Loans............................................... 9
Methodologies for Analyzing Pools of Loans................................ 10
Adjusting Historical Loss Experience.............................................. 12
Analyzing Coverage for Pools of Loans ........................................ 13
International Lending ..................................................................... 14
Ratio Analysis of the Allowance..................................................... 15
Estimating the Total Allowance ..................................................... 17
Management's Responsibility for the Allowance ......................... 17
Examiners' Review of the Bank's Process...................................... 17
Adjustments to the Allowance ...................................................... 18
Regulatory Reporting and Accounting Requirements.................18
Exhibit:  Sample Worksheet: Allowance Calculation .................. 25
Exhibit:  Chart Illustrating the Relationship Between
        Decisions About Loan Classification,
        Nonaccrual Status, and Provisions to the ALLL.................... 26

## Examination Procedures ........................................................ 27

## Appendix
Interagency Policy Statement on the Allowance
        for Loan and Lease Losses ....................................................... 38

## Glossary ................................................................................. 48

## References ............................................................................. 51

# Allowance for
# Loan and Lease Losses                    Introduction

## Background

The allowance for loan and lease losses, which was originally referred to as the "reserve for bad debts," is a valuation reserve established and maintained by charges against the bank's operating income.  As a valuation reserve, it is an estimate of uncollectible amounts that is used to reduce the book value of loans and leases to the amount that is expected to be collected.

Few banks provided reserves for bad debts until the Internal Revenue Service (IRS) allowed the additions to such reserves to be deducted on a bank's tax return.  Although such deductions have been allowed since the passage of the Revenue Act of 1921, no clear-cut guidelines for the amount to be deducted were established until 1965, when the IRS issued Revenue Ruling 65-92.  Under this ruling, a bank could make tax-deductible additions to its loan loss reserve until the reserve totaled 2.4 percent of eligible outstanding loans (as defined).

In 1969, the OCC issued regulations requiring a provision for possible loan losses to be included in operating expenses.  The regulations provided that the minimum provision charged to operating expense could not be less than the amount computed under one of three permissible methods to be selected by the bank and followed consistently beginning in 1969.  Under the 1969 regulation, a bank's loan loss reserve balance consisted of three distinct elements:  the valuation portion, a contingency portion, and a deferred tax portion.

Beginning with the reports of condition and income for December 31, 1976, the valuation portion of the bank's reserve was required to be reported as a deduction from total loans.  The deferred tax portion was to be included with other liabilities, and the contingency portion was to be included in the equity capital section of the balance sheet.  In addition, the provision for possible loan losses could no longer be based on a minimum amount as computed under one of the three methods established in 1969.  Instead, all banks with more than $25 million total assets were required to provide, through charges to income, the amount considered necessary by management to bring the valuation portion of the reserve to an adequate level to absorb expected loan losses based on its knowledge of the bank's loan portfolio.

Since 1976, the OCC's guidance to banks and examiners on the determination of an adequate level for the allowance for loan and lease losses has been updated several times.  Banking Circular 201 on the allowance, which was first issued in May 1985, was substantially expanded and refined in February 1992.  This handbook booklet incorporates the substance of Banking Circular 201.  The discussion covers the requirements for the allowance, the responsibilities

3

of bank management and examiners in evaluating it, and reporting and accounting considerations that affect the allowance. The "Interagency Policy Statement on the Allowance for Loan and Lease Losses," dated December 12, 1993, is included in the Appendix, to supplement this discussion.

## Risks Associated with the Allowance

For purposes of the OCC's discussion of risk, examiners assess banking risk relative to its impact on capital and earnings. From a supervisory perspective, risk is the potential that events, expected or unexpected, may have an adverse impact on the bank's capital or earnings. The OCC has defined nine categories of risk for bank supervision purposes. These risks are: *credit, interest rate, liquidity, price, foreign exchange, transaction, compliance, strategic, and reputation*. These categories are not mutually exclusive and the bank may be exposed to multiple risks. For analysis and discussion, however, the OCC identifies and assesses the risks separately.

Banks must establish an allowance for loan and lease losses because there is credit risk in their loan and lease portfolios. The allowance, which is a valuation reserve, exists to cover the loan losses that occur in the loan portfolio of every bank. *As such, adequate management of the allowance is an integral part of a bank's credit risk management process.* The risks associated with the various types of lending, and the management of those risks, are discussed elsewhere in the *Comptroller's Handbook* (see, for example, "Commercial Real Estate and Construction Lending"). The risks usually directly associated with the maintenance of the allowance are compliance risk and reputation risk. These risks are discussed more fully in the following paragraphs.

## Compliance Risk

Compliance risk is the risk to earnings or capital arising from violations of, or nonconformance with, laws, rules, regulations, prescribed practices, or ethical standards. Compliance risk also arises in situations where the laws or rules governing certain bank products or activities of the bank's clients may be ambiguous or untested. Compliance risk exposes the bank to fines, civil money penalties, payment of damages, and the voiding of contracts. Compliance risk can lead to a diminished reputation, reduced franchise value, limited business opportunities, lessened expansion potential, and lack of contract enforceability.

A misstated allowance for loan and lease losses misrepresents both the earnings and the condition of the bank and may constitute a violation of the 12 USC 161 requirement that national banks file accurate reports of condition. Filing a significantly inaccurate report of condition may also subject the bank to a civil money penalty. In addition, because of its concern about the accuracy of disclosures to investors, the Securities and Exchange Commission (SEC) has shown considerable interest in cases in which a bank's allowance for loan and lease losses may have been misstated. An SEC required amendment and

republication of the bank's financial statements can be damaging to the bank's reputation and may expose it to shareholder lawsuits. In egregious cases, the bank may also be subject to prosecution for violation of securities laws.

## Reputation Risk

Reputation risk is the risk to earnings or capital arising from negative public opinion. This affects the bank's ability to establish new relationships or services, or continue servicing existing relationships. This risk can expose the bank to litigation, financial loss, or damage to its reputation. Reputation risk exposure is present throughout the organization and is why banks have a responsibility to exercise an abundance of caution in dealing with their customers and community. This risk is present in activities such as asset management and agency transactions.

The level and trends in the balance of the allowance for loan and lease losses are routinely tracked by financial analysts. Adverse trends in the level of the allowance and its relationship with publicized measures of asset quality, such as the level of nonperforming loans, can subject the bank to unfavorable commentary.

## Establishing an Adequate Allowance

Every national bank must have a program to establish and regularly review the adequacy of its allowance. The allowance must be maintained at a level that is adequate to absorb all estimated inherent losses in the loan and lease portfolio as of its evaluation date. (See the Glossary for a discussion of the term inherent loss.) A bank that fails to maintain an adequate allowance is operating in an unsafe and unsound manner.

The allowance must cover inherent losses in all outstanding loans, leases, and, to the extent that they are expected to be funded, any binding commitments to advance additional funds. If they are not provided for in a separate liability account, it should also include a provision for inherent losses arising from other off-balance sheet commitments, such as standby letters of credit.

> [**Note:** Banks may also establish separate reserve or liability accounts to protect against some potential losses. For example, recourse obligations for loan transfers that were accounted for as sales for regulatory reporting purposes, should be covered by a liability account separate and distinct from the allowance.]

The allowance should reflect all significant, existing conditions affecting the ability of borrowers to repay. The availability of bank income, whether ordinary or nonrecurring, should not be a factor in determining an appropriate level for the allowance.

To establish and maintain an adequate allowance, a bank must:

- • Understand the purpose of the allowance.
- • Be able to recognize its problem loans in a timely manner.
- • Have a sound analytical process for estimating the amount of inherent loss in its loan portfolio.

## Purpose of the Allowance

The allowance is a valuation reserve maintained to cover losses that are **probable** and **estimable** on the date of the evaluation.  The allowance is not a cushion against *possible* future losses; that protection is provided by capital.

Although in establishing its allowance a bank considers the inherent losses in individual loans and categories of similar loans, the allowance is a **general reserve** available to absorb all credit losses in the portfolio.  No part of the allowance is segregated for, or allocated to, any particular asset or group of assets.

## Recognizing Problem Loans

To establish an adequate allowance, a bank must be able to recognize when loans have become a problem.  An effective loan review system and controls that identify, monitor, and manage asset quality problems in an accurate and timely manner are essential.  These systems and controls must be responsive to changes in internal and external factors affecting the level of credit risk and ensure the timely chargeoff of loans, or portions of loans, when a loss has been confirmed.

To be effective, loan review systems must respond not only to the obvious indicators of a problem, such as delinquency.  They must also recognize more subtle warnings of conditions that may affect the ability of borrowers to repay on a timely basis, such as deterioration in a borrower's financial statements or adverse market developments.  Refer to the "Loan Portfolio Management" section of the *Comptroller's Handbook* for a more complete discussion of loan review systems.

Generally, the conditions and events that cause a loan to be classified by a bank's loan review system, or by examiners, also indicate that an inherent loss exists in the loan.  It is these inherent, but as yet unconfirmed, losses that must be recognized and provided for in the bank's allowance.  Because the allowance is a general reserve for **unconfirmed losses**, however, it is imperative that any **confirmed losses** in the portfolio be charged off as soon as they are identified.

Regardless of whether a loan is unsecured or collateralized, banks must promptly charge off the amount of any confirmed loan loss.  For unsecured loans, bankruptcy or protracted delinquency may confirm the fact of a loss and require a chargeoff.  For troubled, collateral-dependent loans, loss-confirming events may include an appraisal or other valuation that reflects a shortfall between the value of the collateral and the book value of the loan, or a

deficiency balance following the sale of the collateral.  A discussion of the "loss" classification and guidance on its application to specific types of loans can be found in the "Classification of Credits" section of the *Comptroller's Handbook.*

## Estimating Inherent Losses

One of the OCC's examination objectives is to evaluate the soundness of the bank's allowance determination process.  Much of what follows in this booklet is devoted to a discussion of an analytical framework for estimating inherent losses and an adequate level for the allowance for loan and lease losses.

## Statement of Financial Accounting Standards 114

An understanding of the requirements of Statement of Financial Accounting Standards 114 (FAS 114), "Accounting by Creditors for the Impairment of a Loan," is a prerequisite for any discussion of the allowance determination process.  FAS 114 requires that lenders explicitly consider the time value of money when determining the level of reserves necessary for loans that fall within the scope of that standard.

FAS 114 applies to all loans except:

- Large groups of smaller-balance homogeneous loans that are collectively evaluated for impairment (such as credit card, residential mortgage, and consumer instalment loans) and which have not been restructured as troubled debt.  However, FAS 114 does specifically require that its provisions be applied to any "smaller balance homogeneous loan" that has undergone a troubled debt restructuring.

  As a practical matter, some banks interpret "groups of smaller balance homogeneous loans" to be only those pools of loans monitored and managed solely on the basis of delinquency.  The OCC considers this to be a reasonable and appropriate interpretation of the standard.

- Loans that are recorded at fair value or at the lower of cost or fair value (e.g., loans held for sale).

- Leases.

- Debt securities.  Debt securities must be accounted for in accordance with Statement of Financial Accounting Standards No. 115, "Accounting for Certain Investments in Debt and Equity Securities."

Even when the specific requirements of FAS 114 do not apply, banks remain responsible for ensuring that all loans and leases are adequately provided for in the allowance.  To ensure adequate reserves, banks must make a good faith evaluation of the collectibility of contractual principal and interest on all loans and leases in their portfolios.

7

## Definition of an Impaired Loan

Under FAS 114, a loan is impaired when it is probable that the bank will be unable to collect all amounts due (including both interest and principal) according to the contractual terms of the loan agreement.  Generally, a loan is impaired for purposes of FAS 114 if it exhibits the same level of weaknesses and probability of loss as loans (or portions of loans) classified doubtful or loss.

In practice, some banks consider a loan impaired if it would be reported as a nonaccrual loan on the report of condition and income.  This is a reasonable and appropriate application of the standard.  (See the exhibit, Chart Illustrating the Relationship Between Decision About Loan Classification, Nonaccrual Status, and Provisions to the ALLL, on page 23 of this booklet.)

FAS 114 specifies that an insignificant delay or insignificant shortfall in the amount of payments does not require a loan to be considered impaired.  A loan is also not considered to be impaired during a period of delay in payment if the bank expects to collect all amounts due including interest accrued at the contractual interest rate for the period of delay.  By way of example, the statement indicates that a demand loan or other loan with no stated maturity is not impaired if the bank expects to collect all amounts due including interest accrued at the contractual interest rate during the period the loan is unpaid.  Similarly, the OCC does not consider a loan with a specified maturity to be impaired simply because it is past due and/or is expected to be renewed beyond its original maturity.

## Determining the Amount of Impairment

For loans that are within the scope of FAS 114, banks must include the "time-value of money" when measuring the extent of a loan's impairment.  Ordinarily, this would be accomplished by discounting the expected future cash flows from the loan to their present value using the loan's effective interest rate, and comparing that amount with the carrying value of the loan.   However, as practical expedients, FAS 114 also permits the use of two alternative methods for measuring impairment.  Impairment may also be measured based on the loan's observable market price or, if the loan is collateral dependent, based on the fair value of the collateral.  (See the Glossary for discussions of "effective interest rate" and "collateral dependent."

When foreclosure is probable, FAS 114 requires that the measure of impairment be based on the fair value of the collateral.  However, regardless of whether foreclosure is probable, the OCC expects that reserves for all impaired, collateral dependent loans will be based on the fair value of the collateral for purposes of regulatory reports.  If repayment or satisfaction of the loan is dependent upon the sale of the collateral, FAS 114 requires that the fair value of the collateral be adjusted to consider estimated costs to sell.

If the value of an impaired loan (using one of the methods just described) is

8

less than its recorded balance, the bank must recognize the impairment that was not previously provided for through a provision to its allowance for the difference and a corresponding bad debt expense.

## A Suggested Analytical Framework

The OCC encourages banks to segment their loan and lease portfolios into as many components as practical. Those components, which usually have similar characteristics, such as risk classification, past due status, type of loan, industry, or collateral, should be separately analyzed and provided for in the allowance.

The components in one analytical framework that might be used, follow. However, each bank should determine the most efficient and effective way to segment and analyze its portfolio. Examples of possible allowance components include:

- Significant credits classified doubtful (or the bank's equivalent) that are individually analyzed.

- All other significant credits that are analyzed individually. (If no allocation can be determined for such credits on an individual basis, they should be provided for as part of an appropriate pool.)

- All other loans and leases not analyzed individually, that are delinquent or are classified (e.g., pools of delinquent loans, and smaller classified commercial and industrial, real estate, and consumer loans, lease financing receivables, etc.).

- Homogeneous loans that are not analyzed individually or that are not delinquent or classified (e.g., pools of direct consumer loans, indirect consumer loans, credit card loans, home equity lines of credit, residential real estate mortgages, etc.).

- All other loans that have not been considered or provided for elsewhere (e.g., pools of special mention loans, commercial and industrial and real estate loans that have not been classified, standby letters of credit, and other off-balance sheet commitments to lend).

To determine an appropriate level for the allowance, a bank must analyze its entire domestic and international loan and lease portfolio, including all classified loans and all loans rated special mention and "pass." Pass credits, by definition, present no inherent loss. But, even in banks with loan review systems that generally provide timely problem loan identification, a lack of information or misjudgment will sometimes result in a failure to recognize adverse developments affecting a pass credit. Banks must provide for these probable but unidentified losses by providing an allowance portion for pass loans.

9

## Provisions for Individual Classified Loans

The classification of a loan reflects a judgment about the risks of default and loss associated with the loan.  Loans have inherent loss when existing facts, conditions, and values suggest it is probable that the bank will not collect some or all of its exposure to the borrower.  The provision to the allowance for loans analyzed individually must be sufficient to cover the inherent loss that probably exists based on the facts and circumstances of the loan as of the evaluation date.

The allowance provision for all individually analyzed loans must be based on a reasonable and well documented estimate of the amount of the loss involved. Examiners should look closely at individually analyzed loans that are provided for at a rate that is below the historical loss rate for pools of similar loans (see the discussion of pool analysis beginning on page 10).  Decisions to diverge from the bank's historical experience for pools of similar loans must be clearly supported by the nature of the collateral or other circumstances that distinguish the loan from similarly classified credits.

## Loans Classified Loss

Loans or portions of loans are classified as loss and charged off because they are determined to be uncollectible and unbankable assets.  Ordinarily, a bank should have already identified the probable but unconfirmed loss in such loans and made adequate provisions to the allowance.  However, any chargeoff that exceeds the amount that has already been provided for that loan may require an additional provision to cover the shortfall and restore the allowance to a level that is adequate for the remainder of the portfolio.

## Loans Classified Doubtful

By definition, any loan classified as doubtful is impaired and has inherent loss that must be adequately provided for in the allowance.  Based on existing facts, conditions, and values, the weaknesses perceived in loans classified doubtful make their collection or liquidation in full highly questionable and improbable. However, the precise amount of the loss and chargeoff will depend upon the occurrence of a likely future event.

Banks should individually analyze all significant doubtful credits (or the equivalent under the bank's rating system) to estimate the inherent loss associated with each, based on existing facts, conditions, and values.  For split classifications (i.e., loans with portions classified differently),  the provision to the allowance should represent the bank's best estimate of the inherent loss on the entire loan balance.

Except for occasional situations in which the value of the collateral is uncertain (e.g., pending the receipt of a new appraisal or other information), a 100 percent reserve against loans, or portions of loans, classified doubtful is ordinarily not warranted.  If the allowance attributable to an individual loan

classified doubtful is too large in comparison to the outstanding loan amount, examiners should question whether the loan has been properly classified and if some greater portion of the loan should be classified loss and charged off immediately.

## Loans Classified Substandard

The risk of default on individual loans classified substandard is less than for loans classified doubtful.  Nevertheless, experience has shown that there are inherent losses associated with aggregated substandard loans that must be provided for in the allowance.  A pooled analysis based on historical experience is useful for such credits because there is generally not sufficient information to reach loan-by-loan conclusions about the exposure to loss on substandard credits.

Although a pooled analysis of substandard loans is the more usual and preferred approach, some banks analyze and make allocations for their larger substandard credits on a loan-by-loan basis.  As long as full collection of principal and interest is expected, such loans need not be placed on nonaccrual.  However, if full payment of principal and interest is not expected, it may be necessary to reconsider the classification of the loan and to take the loan off accrual status.  Further, the loan should probably be considered to be impaired and subject to the requirements of FAS 114.

A bank that analyzes individual substandard loans should do so to provide more adequately for different degrees of exposure to loss within the substandard category (e.g., the exposure to loss on a large, unsecured substandard loan may be substantially greater than on a similarly sized substandard loan that is secured by real estate).

## **Provisions for Pools of Similar Loans**

Generally, it is not practical or necessary for banks to analyze and provide for their smaller and less severely classified credits on an individual, loan-by-loan basis.  It is also not possible to provide for special mention and pass credits on a loan-by-loan basis.  Instead, banks may provide for such credits as part of a pool of similar loans, using historical loss experience for such loans, adjusted for current conditions.

Loans that are analyzed as part of a pool are subject to the same loss events as loans that are analyzed individually.  The most common indicator of inherent loss in pools of loans is delinquency.  Examples of other loss events are:  for commercial loans B declines in the economy, or reduced profits or future prospects; for consumer loans B loss of a job, divorce, bankruptcy, or death.

Loss confirming events should cause a chargeoff.  For consumer pools, those events are typically based on established thresholds (i.e., instalment loans that are at 120 days, or five payments, past due; credit cards that are 180 days past due after seven zero billings), rather than by specific adverse information

about the borrower.  Of course, if a bank receives adverse, borrower-specific information confirming the loss before a threshold date has passed, the chargeoff should be taken immediately.  For nonconsumer loans, the loss confirming event is usually the receipt of specific adverse information about the borrower.

Loans that have been individually analyzed and provided for in the allowance should also be included in their respective pools of similar loans when determining the bank's historical loss experience on such loans.  To avoid double counting of inherent losses, however, loans that have been provided for individually, including split classifications, should be subtracted from the pool of loans before the historical loss factor is applied to the pool to establish the appropriate provision for that pool.

## Methodologies for Analyzing Pools of Loans

Because no single approach has been determined to be the best, or appropriate, for all banks, the OCC does not require that banks use a specific method to determine historical loss experience.  The method a bank uses  will depend to a large degree upon the capabilities of its information systems.  Acceptable methods range from a simple average of the bank's historical loss experience over a period of years, to more complex "migration" analysis techniques.

In principle, the goal of any allowance methodology that applies historical loss experience to a current pool of loans should be to provide for unconfirmed losses that probably exist as of the evaluation date.  How that is accomplished, including the analysis time frames used, will depend upon the characteristics of the pool and the particular methodology.

## Historical Analysis Periods

There is no fixed, historical period of time that should be analyzed by banks to determine average historical loss experience. During periods of economic stability in the bank's markets, a relatively long period of time (e.g., five years) may be appropriate. However during periods of significant economic expansion or contraction, the bank may appropriately shorten the historical time period considered in order to more accurately estimate the bank's inherent losses in the current economic climate. Alternatively, the bank's analysis may weight recent experience more heavily.

## Migration Analysis

Migration analysis techniques, which vary widely between banks, are usually and most appropriately applied to pools of past due and/or classified loans. The past due and/or classified status of these loans reflects the fact that a loss event likely has already occurred.

The most basic forms of migration analysis focus on the classification history of a fixed population of loans that are ultimately charged off. More sophisticated forms of migration analysis track the loss experience on a rolling population of loans over a period of several years and involve the collection and analysis of a very large volume of historical data. Some of the most sophisticated analyses may factor in differences in underwriting standards between different "vintages" of loans, the geographic and demographic attributes of the loans, or the relative seasoning of the loans (e.g., variations in loss rates between auto loans that are less than one year old as compared to more seasoned auto loans).

Like the historical average approach, the purpose of a migration analysis is simply to determine, based on the bank's experience over a historical analysis period, what **rate of loss** the bank has incurred on similarly criticized or past due loans. Generally speaking, if migration analysis is being done on a fixed pool of loans, the analysis time frame should cover the resolution of all loans in the pool (i.e., the time period over which the loans are paid off, returned to performing status, or charged off). If it is a rolling analysis, the analysis time frame typically covers a much longer period.

## Historical Loss Rates

The historical rate of net losses, adjusted for current trends and conditions, is used to represent the rate of loss inherent in the current pool of similarly criticized or past due loans. It is also used to estimate the rate of loss inherent in pools of special mention and pass loans.

For pools of impaired loans subject to the requirements of FAS 114, banks may use historical statistics as a means of measuring the amount of impairment. These include average recovery period and average amount recovered, along with a composite effective interest rate.

The examiner must determine whether the bank's methodology for evaluating the allowance produces reasonable estimates of the inherent losses in its portfolio. If deficiencies in the bank's methodology appear to materially affect the estimates of inherent losses, it should be brought to the attention of management. However, examiners should not require that banks use a particular form of historical loss analysis.

## Adjusting Historical Loss Experience

Although historical loss experience provides a reasonable starting point for the bank's analysis, historical losses, or even recent trends in losses, cannot be accepted without further analysis. Regardless of the methodology used, the bank must adjust the historical loss percentage for each pool to reflect the impact of any current conditions on loss recognition. The adjustment should reflect management's best estimate of the level of chargeoffs that will be recognized. Factors that should be considered include:

- **Changes in lending policies and procedures, including underwriting standards and collection, chargeoff, and recovery practices.** A change in the bank's renewal or extension policies may affect its recognition of problem loans and, ultimately, its losses on those loans.

- **Changes in national and local economic and business conditions, including the condition of various market segments.** A recent, deteriorating trend in the local economy may adversely affect borrowers and result in the bank charging off loans at a rate higher than its historical loss experience.

- **Changes in the nature and volume of the portfolio.** A recent change in the bank's approach to soliciting credit card borrowers or increases in the level of holdback on discounted paper could change the levels of loss on those pools of loans. There will generally be a time lag between the implementation of these types of changes and their effect on portfolio loss rates.

- **Changes in the experience, ability, and depth of lending management and staff.** Improvements in the level of experience and/or training of lending and collection staff can have a positive effect on the quality of the bank's loan portfolio.

- **Changes in the volume and severity of past due and classified loans; and in the volume of nonaccruals, troubled debt restructurings, and other loan modifications.** A recent, adverse trend in delinquencies and nonaccruals can reflect loss events that have already occurred that may not be fully reflected in historical loss experience.

- **Changes in the quality of the bank's loan review system and the degree of oversight by the bank's board of directors.** A change in the

bank's loan review system can affect the volume of loans it classifies.

• **The existence and effect of any concentrations of credit, and changes in the level of such concentrations.** Concentrations of credit (e.g., to local industries, their employees, and suppliers) may affect loss experience across one or more components of the portfolio.

• **The effect of external factors, such as competition and legal and regulatory requirements, on the level of estimated credit losses in the bank's current portfolio.**

The bank should review and adjust historical loss rates for the above factors on a pool-by-pool basis. Because there is no formula for quantifying these adjustment factors, they should be based upon management's overall estimate of the extent to which the rate of loss on a pool of loans in the current portfolio will differ from historical loss experience. This difference, if any, would reflect the impact of recent trends and current conditions that management believes have not been adequately captured by the bank's historical analysis of the pool.

The likely effects of the adjustment factors on current loan losses are, by their nature, uncertain. The bank should, therefore, consider a range of possibilities (e.g., worst case/best case) when making adjustments to the historical loss rates for individual pools of loans. It is important to remember that these adjustments are highly subjective estimates that should be reconsidered in light of the information available when the bank evaluates the adequacy of its allowance each quarter.

The documentation of adjustments to historical loss rates on pools of loans will vary, depending upon the level of sophistication in the bank's allowance evaluation process. In many banks, the documentation may take the form of a simple narrative that describes recent trends and conditions and management's conclusions as to their effect on chargeoffs. In banks with greater analytical capabilities, the adjustments to historical loss experience may be based upon the results of a regression analysis or other modeling technique. In any case, the bank's documentation should reflect consideration of all relevant adjustment factors and provide reasonable support for management's conclusions about their effect on loss recognition.

## Analyzing Coverage for Pools of Loans

Many banks consider coverage of one year's losses an appropriate benchmark of an adequate reserve for most pools of loans. Except in the situations discussed below, OCC examiners should generally view this level of coverage as appropriate.

Coverage periods of less than one year are usually associated with pools of consumer instalment or credit card loans, where the OCC's classification policies require chargeoff at 120 days and 180 days respectively. Unless the bank is masking the level of problems in the pool (e.g., inappropriately "curing"

delinquencies), most banks should be able to demonstrate that something less than 12 months coverage is adequate for such pools.

On the other hand, coverage periods of more than one year may be justified if deficiencies in the bank's loan administration or review systems mask loan problems or delay their recognition.

A one-year coverage period is generally considered appropriate because the probable loss on any given loan in a pool should ordinarily become apparent in that time frame. The occurrence of a loss event, such as an individual borrower losing his job or a business borrower experiencing serious difficulties, might not be immediately known to the bank. However, the effect of those events should ordinarily become apparent within the one-year time frame through delinquency or the receipt of new financial statements or other information that triggers the classification of the loan.

## International Lending

The inherent losses arising from the transfer risk associated with a bank's cross-border lending activities require special consideration. In addition to any provisions made for credit risk in individual, or pools of, international loans, banks engaged in cross-border lending must add to the allowance based on an assessment of the probability of additional losses arising from the exposure to transfer risk. (See the Glossary for the definition of transfer risk.) This additional provision is over and above any minimum amount the Interagency Country Exposure Review Committee requires to be provided to the allocated transfer risk reserve (or charged against the allowance).

When assessing the probability of additional losses arising from the exposure to transfer risk, the bank should perform country-by-country analyses that consider the following factors:

- The bank's loan portfolio mix for each country (e.g., types of borrowers, loan maturities, collateral, guarantees, special credit facilities, and other distinguishing factors.)

- The bank's business strategy and its debt management plans for each country.

- Each country's balance of payments position.

- Each country's level of international reserves.

- Each country's established payment performance record and its future debt servicing prospects.

- Each country's socio-political situation and the effect on the adoption or implementation of economic reforms, particularly those affecting debt servicing capacity.

- Each country's current standing with multilateral and official creditors.

- Each country's relationships with bank creditors.

- The federal banking agencies' most recent country evaluations, as distributed by the Interagency Country Exposure Review Committee.

## Ratio Analysis of the Allowance

Ratios based on historical data from reports of condition and income for peer group banks are frequently used, particularly by financial analysts, to analyze and compare the adequacy of allowance balances among banks. Such ratios can also help examiners identify trends and can raise a "red flag" when analyzing the adequacy of a bank's allowance. However, ratios and comparisons with other banks are not reliable indicators of the adequacy of the allowance. Discussions with management concerning the adequacy of the bank's allowance should avoid focusing on unfavorable comparisons to peer group or industry averages.

Ratio analysis can appropriately be used as a check of the reasonableness of management's estimate of an adequate level for the allowance. It can also be most helpful in identifying divergent trends in the level of the bank's allowance as compared to its own loan portfolio and loss experience. Examples of such ratios and their uses follow.

**Allowance to Total Loans and Leases** – Differences among banks in the composition of their loan portfolios, in their underwriting and collection policies and practices, and in their chargeoff practices make comparison of this ratio among banks an unreliable indicator of reserve adequacy. However, for an individual bank, an up or down trend in this ratio may be a red flag indicating that the examiner should investigate why the relationship is changing.

**Allowance to Net Losses** – For the reasons listed above, comparing this ratio among banks is also an unreliable indicator of reserve adequacy. Even within a bank, chargeoff rates may vary widely from year-to-year, and comparisons of the relationship between the bank's current allowance and short-term averages of its net losses could be misleading. Examiners may find it useful, however, to compare the relationship between the allowance and the bank's long-run averages for net losses, considering the bank's current economic environment, as well as its current management and loan origination practices. If the bank's allowance has been stable or declining while its net loan losses have been trending upward, the adequacy of the allowance may be suspect.

**Earnings Coverage of Net Losses** – Regardless of whether or not earnings are sufficient to cover losses and replenish the allowance, when the bank's annual net chargeoffs exceed the balance in the allowance, it should raise questions about whether the allowance was adequate during previous reporting periods.

**Allowance to Nonaccrual Loans and Leases** *and* **Allowance to Noncurrent Loans and Leases** – The volume of noncurrent and nonaccrual status loans indicates the level of problem loans in the bank's portfolio, but the volume of subsequent losses on those loans will vary between banks.  However, if the volume of a bank's noncurrent and nonaccrual status loans has been growing at a faster rate than the balance in the allowance, the adequacy of the bank's allowance may have eroded.

**Recoveries to Average Total Loans and Leases** *and* **Recoveries to Prior-Period Losses** – These ratios are affected by the bank's chargeoff policy because more aggressive chargeoff policies typically result in higher recovery rates, while low recovery rates may be a sign that the bank is slow to charge off losses.  The ratios provide no information relating to the adequacy of the allowance, but can give examiners some insight into whether, and how effectively, the bank works to recover on its charged-off loans.

**Allowance to Industry Averages for Loans by Risk Rating Category** – These ratios are discussed in more detail in the "Interagency Policy Statement on the Allowance for Loan and Lease Losses," which is included as an Appendix to this booklet.  Examiners must remember that comparisons to industry averages are not a reliable indicator of allowance adequacy because they do not take into account any unique factors that may be important in estimating inherent credit losses at a particular bank.

## Use of Ratios in Report Comments

Ratios can be helpful tools for evaluating the reasonableness of management's conclusions about an adequate level for the allowance.  Nonetheless, because ratios or comparisons to industry averages in the report of examination may be misinterpreted by management, they should be avoided in that context.  Citing ratios or comparisons with industry averages as a basis for judging the adequacy of the allowance may suggest that such "rules-of-thumb" can be substituted for a full analysis of the allowance.  If the examiner determines a bank's allowance is inadequate, comments in the report of examination should focus on the weaknesses in the bank's allowance evaluation process, rather than on any resulting, unfavorable ratios and comparisons.

## Estimating the Total Allowance

Although for pools of loans, coverage of one year's losses is often adequate, there is no fixed period of losses that the allowance must be able to absorb to be considered adequate for the total portfolio. The allowance must cover the bank's best estimate of the inherent losses in the entire portfolio as of the evaluation date. To arrive at the total allowance, the bank should combine its estimates of the reserves needed for each component of the portfolio, including loans analyzed individually, loans analyzed on a pool basis, and any additions for transfer risk on international loans.

## Management's Responsibility for the Allowance

Bank management must evaluate the adequacy of the allowance at least quarterly and report its findings to the board of directors before preparing the bank's report of condition and income. Regulatory reports and other financial statements must accurately reflect the operating results and financial condition of the bank for the reporting period. A significantly misstated allowance misrepresents the bank's financial condition on its report of condition and income and is a violation of 12 USC 161.

The bank must document its evaluation process sufficiently to establish that the methods used and the factors considered by the bank provide a satisfactory basis for determining an adequate level for the allowance. At a minimum, the bank must document the bases for provisions for individually analyzed loans and for historical loss percentages used for pools of loans (including any subjective adjustments for current conditions). If large or unusual provisions are made to the allowance, the bank should be able to document that the need for the provision arose in the current period, and did not result from inadequate provisions in prior periods.

## Examiners' Review of the Bank's Process

Examiners should review the bank's allowance evaluation process and the adequacy of the allowance balance. Examiners should accept management's estimates of an adequate level for the allowance if the following conditions are satisfied:

- The bank has maintained effective systems and controls for identifying, monitoring, and addressing asset quality problems in a timely manner.

*and*

- The bank has established an acceptable allowance evaluation process that analyzes in a reasonable manner all significant factors that affect the collectibility of the portfolio.

However, if the bank's allowance evaluation process is deficient or is based on

---

the results of an unreliable loan review system, the examiner will have to prepare an estimate of the amount of an appropriate allowance, based on available information.  The examiner's estimate should be based on an analysis of the bank's loan portfolio using the evaluation process described in this Handbook section.  A "Sample Worksheet:  Allowance Calculation" on page 22 of this booklet outlines a suggested framework for preparing the estimate.

Any significant deficiencies in the bank's process for determining the level of the allowance should be clearly detailed in the report of examination.  Report comments should emphasize that the bank's management is responsible for implementing an effective internal process that will ensure maintenance of an adequate allowance.  Report comments also should include a recommendation for corrective action that will improve the bank's processes.

## Adjustments to the Allowance

The examiner's estimate of an appropriate level for the allowance should be used to determine whether there has been a significant misstatement of the operating results and the financial condition of the bank.   (See the Glossary for guidance on determining what is considered "significant.")   If the allowance is determined to be significantly misstated, the examiner should determine whether it has been reviewed by an external auditor performing an audit.  If so, the examiner should discuss his or her findings concerning the allowance with the external auditor to ensure that all available information has been considered.

[**NOTE:**  Although the AICPA's publication, "Auditing the Allowance for Credit Losses of Banks," does not use the terms "inadequate" or "excessive," it implies that the existence of either condition is inconsistent with generally accepted accounting principles for the allowance. Specifically:

"The CPA should determine if management's calculation of the allowance for credit losses is *within a range acceptable to the CPA's assessment of materiality* to the financial statements taken as a whole.  If the calculation is outside the acceptable range, the CPA should ask management to provide additional information that the CPA can use to reassess his evaluation.  *If management's calculation is still outside the acceptable range, the CPA should attempt to persuade management to make an appropriate adjustment.*  If the client fails to make an appropriate adjustment, the CPA should consider qualifying the opinion of the financial statements." *[emphasis added]*]

If, after considering all available information, the examiner concludes that the allowance has been significantly misstated, bank management should be requested to make the necessary adjustments to bring the allowance to an appropriate level.

## Regulatory Reporting and Accounting Requirements

The bank must charge off loan and lease losses in the period when the loans, or portions of loans, are deemed uncollectible and of such little value that their continuance as bankable assets is not warranted. If the allowance is determined to be significantly misstated, the bank must make the necessary adjustments in the quarter the determination is made. If it is clear that significant losses or provisions should have been recognized in a prior period, the report of condition and income for that period must be amended and refiled.

The following information from the appendix section of the "Instructions for Preparation of Consolidated Reports of Condition and Income" may help explain the regulatory reporting requirements for the allowance.

## Changes in the Balance of the Allowance

Adjustments to the allowance resulting from the bank's evaluation of its adequacy must be made through charges or credits to the "Provision for loan and lease losses" in the report of income. All chargeoffs must be applied directly to the allowance, and any recoveries on loans or leases previously charged off must be credited to the allowance. Under no circumstances can loan or lease losses be charged directly to the undivided profits and capital reserves accounts.

The allowance can never have a debit balance. If losses charged off exceed the amount of the allowance, a provision sufficient to restore the allowance to an adequate level must be charged to expenses immediately. A bank must not increase the allowance by transfers from the "Undivided profits" account or any segregation thereof.

## Recognition of Losses in Connection with Foreclosures

When a bank forecloses on a loan or lease, it must recognize a loss equal to the difference between the current fair value of the assets received in the foreclosure or similar settlement and the current carrying value of the loan or lease. That loss must be charged to the allowance at the time of foreclosure or repossession.

When an asset is sold after being received in a foreclosure or repossession, differences between the estimated loss and the actual loss must be accounted for as follows:

- **If the asset is sold soon after foreclosure or repossession (usually not more than 90 days), *and* the market price for it has not changed while it has been held**, the value received in the sale must be substituted for the fair value estimated at the time of foreclosure or repossession and adjustments made to the loss charged against the allowance.

- **If the value has been affected by a change in the market since the**

**foreclosure or repossession,** *or* **if the asset is held for more than a short period of time**, any additional losses in value or any gains or losses from the sale or disposition of the asset is not a recovery or credit loss and must not be debited or credited to the allowance. Such additional changes must be reported net on the report of income as "Other noninterest income" or "Other noninterest expense," as appropriate.

When a loan is charged off, any accrued but uncollected interest on the bank's books from both current and prior periods should be charged against current earnings. The one exception is when specific provisions have been made to the allowance for uncollectible accrued interest. In that case, the accrued interest should be charged to the allowance. For discounted loans, the unearned portion of the loan balance should be charged against the unearned discount account.

## Bad Debt Deductions for Tax Purposes

The examiner should make every effort to understand fully a bank's accounting for the allowance and the related deferred income tax accounts. Toward that end, it may be helpful for the examiner to confer with bank management and any outside accountant or auditor that has advised management about that accounting.

To the extent that the bad debt deduction for tax purposes in any year is greater than or less than the "Provision for loan and lease losses" for that year, the difference is referred to as a timing or temporary difference. The tax effect of such a timing or temporary difference must be accounted for and reported as a deferred income tax credit or debit component of "Applicable income taxes" in the report of income and flows through to the net deferred income tax account in "Other liabilities" if it is a credit balance, or in "Other assets" if it is a debit balance. Any cumulative timing difference between book and tax records can be eliminated only through subsequent, opposite differences between the tax bad debt deduction and the "Provision for loan and lease losses" in the report of income (i.e., a reversal of the timing difference).

Statement of Financial Accounting Standards 109, "Accounting for Income Taxes," provides guidance about the circumstances under which banks may carry such an asset on their reports. Limitations on the amount of such deferred tax assets that may be included in capital are addressed in 12 CFR 3, Appendix A, Section 2 (c)(1).

# Sample Worksheet: Allowance Calculation[1]

| Component | Principal Amount of Loan Pool [2] | Method of Estimating Loss | Estimated Allowance[3] |
|---|---|---|---|
| Significant credits classified doubtful (or the bank's equivalent) that are individually analyzed. | — | Bank's best estimate of the inherent loss that exists in each credit, including a provision for the time value of money, without regard to when that portion of the loan might be deemed uncollectible and actually be charged off. | — |
| All other significant credits that are analyzed individually. | | Same as above. However, if no allocation can be determined for the credit on an individual basis, it should be provided for as part of an appropriate pool. | |
| All other loans and leases that are delinquent or are classified but are not included in the population of loans analyzed individually, including for example, separate pools of:<br><br>• Smaller, doubtful C&I loans<br>• Substandard C&I loans<br>• Smaller, doubtful RE loans<br>• Substandard RE loans<br>• Classified consumer loans<br>• Classified lease financing receivables | | Loss experience as determined through an analysis of the historical loss rate for each pool over an appropriate period of time. The historical loss percentage must be adjusted for changes in current conditions that have probably affected the existence of losses in the pool. For pools of loans subject to FAS 114, the historical loss rate must take into consideration the time-value-of-money. | |
| Homogeneous loans that have not been analyzed individually, or are not delinquent or classified, including, for example, separate pools of:<br><br>• Direct consumer loans<br>• Indirect consumer loans<br>• Credit card loans<br>• Home equity lines of credit<br>• Residential real estate loans | | Adjusted historical loss experience as described above. If practical, further subdivision and analysis by type of collateral and past due status would be desirable. | |
| All other loans that have not been considered or provided for elsewhere, including, for example, pools of:<br><br>• Unclassified C&I loans<br>• Special mention loans<br>• Binding commitments to lend Standby letters of credit | | Adjusted historical loss experience as described above. If practical, further subdivision and analysis by industry, type of collateral, past due status, etc., would be desirable. | |
| Inherent loss arising from the transfer risk associated with cross-border lending. | | See the discussion in the introduction for the factors to be considered when estimating additions to the allowance for transfer risk. | |

**Estimated Total Allowance Required**

=======

---

[1] Adapted from Exhibit 4.1, "Worksheet for Estimating Allowance for Credit Losses," Auditing the Allowance for Credit Losses of Banks, American Institute of Certified Public Accountants.

[2] To avoid double counting of reserves, loans that have been allocated for individually should be excluded from any pool of similar loans.

[3] In some cases, the bank may identify a range of possible losses or loss percentages (e.g., worst case and best case). FASB Interpretation No. 14 makes it clear that the ability to estimate a range of loss is sufficient to satisfy FAS 5 conditions that the amount of an inherent loss is reasonably estimable. In any case, the bank's conclusions about the most appropriate provision for each pool of loans must be based on a well-documented analysis.

**Chart Illustrating the Relationship Between Decisions About Loan
Classification, Nonaccrual Status, and Provisions to the ALLL
(for loans within the scope of FAS 114)**



# Allowance for
# Loan and Lease Losses          Examination Procedures

## General Procedures

These procedures are designed to determine the adequacy of a bank's Allowance for Loan and Lease Losses (ALLL) policies, procedures, practices and internal controls, which will be used to assess and quantify the level and direction of ALLL risk.  The extent of examining, testing and performing certain examination procedures should be based on the examiner's overall assessment of the level and direction of ALLL risk.  This assessment should consider the work performed by other regulatory agencies, internal/external auditors, other internal compliance units, management's adherence to formal and informal policies and procedures, the effectiveness of internal controls, and management information systems.

Objective: Determine the scope of the examination of the allowance for loan and lease losses.

1.    Review the following to ascertain if previously identified problems require follow-up.  Determine if planned corrective action was effected, and if not, why not.

☐ Bank correspondence involving the ALLL.
☐ EIC's scope memorandum.
☐ Supervisory strategy.
☐ Core Knowledge.
☐ Previous examination report and work papers.
☐ Audit reports and Loan Review reports and related work papers as necessary.

2.    From the EIC, obtain the results of the followings analyses and identify any concerns, trends, or changes in loan and lease activity that might impact allowance for loan and lease losses analysis, including off balance sheet credit related exposure:

☐ UBPR.
☐ BERT.
☐ Other OCC reports.

---

3.    Obtain or compute the following allowance related balance sheet related ratios and levels and review as a preliminary check of the reasonableness of the bank's allowance and as an aid in identifying any divergent trends in the allowance as compared to the bank's loss experience.

☐ Allowance to Total Loans and Leases
☐ Allowance to Net Losses
☐ Earnings Coverage of Net Losses
☐ Allowance to Nonaccrual Loans and Leases
☐ Allowance to Noncurrent Loans and Leases
☐ Recoveries to Average Total Loans
☐ Recoveries to Prior Period Losses
☐ Allowance to Industry Averages for Loans by Risk Rating Category
☐ Level of off balance sheet credit related exposure

4.    Obtain and review reports used by management to supervise the ALLL. Examples include:

☐ General and subsidiary ledger(s).
☐ Reconciliation of ALLL since the last exam.
☐ Most recent internal/external audit, regulatory compliance, and loan review reports.

5.    Obtain and review the documentation supporting bank management's quarterly review of the ALLL, including documentation to support historical loss adjustment "factors".

6.    Obtain a listing of internal/external audit deficiencies noted in the latest review from the examiner assigned "Internal and External Audits," or from the bank if Audit is not part of the scope of this examination. Determine if appropriate corrections have been made.

7.    Determine if any material changes in lending activity have occurred since the last examination that could impact analysis of the ALLL.

8.    Determine the following from discussions with management:

•    How management supervises the ALLL.
•    If there have been any significant changes in ALLL policies, procedures, practices, internal controls, or personnel responsible for

managing the ALLL or the bank's lending function.
- If any additional internal or external factors exist that could affect the ALLL.

9.  Based on the completion of the general procedures and discussions with the bank EIC, set the objective(s) and scope of the examination.

    **Select specific examination procedures necessary to meet examination objectives from the following examination procedures. All examination procedures are seldom required in an examination.**

# Quantity of Risk

**Conclusion:** The quantity of risk is (high, moderate, or low).

Objective: Determine the adequacy of the allowance for loan and lease losses and the attendant effect on the level of credit, compliance and reputation risk to the bank.

1.  Obtain or have the bank prepare a reconcilement of the allowance for loan and lease losses and the related deferred tax accounts for the period from the last examination to the current one. Compare beginning and ending balances to the general ledger, review the appropriateness of changes in those accounts, and determine whether it is necessary to perform any verification procedures. Determine the following:

    - Does the bank's internal or external audit program include the verification of charge-offs and recoveries?

2.  Review the bank's most recent evaluation of the allowance in light of the general guidance provided in the "Allowance for Loan and Lease Losses" booklet to determine if the following conditions are satisfied.

    - The bank maintains effective systems and controls for identifying, monitoring, and addressing asset quality problems, including off balance sheet exposure, in a timely manner.

      The bank's loan review system can be relied on to identify problem loans in an accurate and timely manner.

      ***and***

    - The bank has established an acceptable allowance evaluation process that analyzes in a reasonable manner all significant factors that affect the collectibility of the portfolio.

      If these two conditions are satisfied, examiners should accept management's estimate of an adequate level for the allowance.

3.  If both conditions considered in the prior activity are not satisfied, prepare an estimate of the amount of an appropriate allowance. The

"Sample Worksheet: Allowance Calculation" in the Appendix of the "Allowance for Loan and Lease Losses" booklet outlines a suggested framework for preparing the estimate.

When preparing the estimate, the following information should be obtained from the examiner assigned to review the bank's loan portfolio management.

- Management's list of problem loans as of the examination date, i.e., loans that are or may become less than 100 percent collectible, possess more than the normal degree of credit risk, are past due, or require more than normal management supervision.

- The detailed list of OCC classified loans identified in the various loan departments.

4.  Determine if there is a material error in the bank's Reports of Condition and Income by comparing the OCC prepared estimate of an adequate allowance with the current balance in the bank's allowance for loan and lease losses.  If the bank's allowance for loan and lease losses appears to be materially misstated, determine whether it has been reviewed by an external auditor.  If so, discuss the examination findings concerning the allowance with management and the external auditors to ensure that all available information has been considered.  Consider:

- When dealing with the recognition and measurement of events and transactions in the Reports of Condition and Income, amended reports may be required if a bank's primary federal bank supervisory authority determines that the reports as previously submitted contain errors that are material for the reporting bank.  Materiality is a qualitative characteristic of accounting information which is defined in FASB Concepts Statement No. 2 as "the magnitude of an omission or misstatement of accounting information that, in light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or misstatement."  (From *Instructions -- Consolidated Reports of Condition and Income*)

5.  If verification procedures are determined to be necessary:

- Agree the total charged off loans since the last examination date as

recorded in the charge off ledger to the total debit entries in the allowance for loan and lease losses for the same period.

- Select charged off loans and:
  - Examine supporting documentation.
  - Trace approval by the directors, as evidenced in the minutes of board meetings.
  - Send positive confirmation requests to the borrower.  (There should be no indication to the borrower that the accounts have been charged off.)
  - Determine whether any charged off loans are extended to foreign government officials or other persons or organizations covered by the Foreign Corrupt Practices Act or the Federal Election Law.
- Select recovery entries in the charge off ledger since the last examination and compare to credit entries in the allowance account.

# Quality of Risk Management

---

**Conclusion:** **The quality of risk management is (weak, acceptable, or strong).**

---

## Policy

Conclusion: The board (has/has not) established an effective policy governing the allowance for loan and lease losses.

Objective: Assess the adequacy of the policy for the allowance for loan and lease losses.

1.  Determine if the board, consistent with its duties and responsibilities, has established an adequate policy governing the allowance for loan and lease losses.  The policy should provide for the following:

    - A comprehensive and well documented process for maintaining an adequate allowance.
    - An effective loan review system that will identify, monitor, and address asset quality problems in an accurate and timely manner.
    - Procedures for the timely charge off of loans that are determined to be uncollectible.
    - Defined collection efforts to be continued after a loan is charged off.

## Processes

Conclusion: Management and the board (have/have not) established effective processes to ensure the maintenance of an adequate allowance for loan and lease losses.

Objective: Determine if there is an effective allowance evaluation process.

1.  Obtain a description of the process used by management to determine an appropriate level for the allowance, along with the supporting documentation for the most recent evaluation.  Determine if the process is sound, based on reliable information, and well documented.

    - Does the bank have a written description of the process and methodology used by management to determine the adequacy of the

---

allowance?
- Is the process adhered to?
- Does management review the adequacy of the allowance and make necessary adjustments at least quarterly?
- Are findings concerning the adequacy of the allowance reported to the board of directors before preparing the report of condition and income?
- Does management retain documentation of its review of the adequacy of the allowance?
- Is the documentation adequate to support management's conclusions?

Objective: Determine if there is an effective loan charge off process.

1.    Determine if processes relating to loan chargeoffs ensure the accuracy of subsidiary records, security of notes, appropriate review and approval, and effective collection efforts.

- Is the preparation and posting of any subsidiary records of loans charged off performed or reviewed by persons who do not also:
  - Issue official checks and drafts singly?
  - Handle cash?
- Are all loans charged off reviewed and approved by the board of directors as evidenced by the minutes of board meetings?
- Are notes for loans charged off maintained under dual custody?
- Are collection efforts continued for loans charged off until the potential for recovery is exhausted?
- Are periodic progress reports prepared and reviewed by appropriate management personnel for all loans charged off for which collection efforts are continuing?

## Personnel

Conclusion: Management (does/does not) have the skills and knowledge necessary to ensure the maintenance of an adequate allowance for loan and lease losses.

Objective: Given the size and complexity of the bank, assess management's ability to properly analyze the adequacy of the allowance for loan and lease losses.

1.    Evaluate management's understanding of the principles and methods for

estimating inherent losses and maintaining an adequate level for the allowance for loan and lease losses.

- Does management have a working knowledge of the principles of Statement of Financial Accounting Standards No. 5 and No. 114?
- Does management demonstrate an understanding of methods for estimating inherent losses on individual classified loans and pools of similar loans?

## Control Systems

Conclusion: Management and the board (have/have not) implemented effective control systems.

Objective: Determine the effectiveness of the loan review system and the quality of the audit function as it relates to the allowance for loan and lease losses.

1. In conjunction with the examiner assigned "Loan Portfolio Management," determine if the bank's application of the loan review system provides timely recognition of when loans have become a problem.

   - Is the loan review system responsive to changes in internal and external factors affecting the level of credit risk?
   - Does the loan review system ensure the timely charge off of loans, or portions of loans, when a loss has been determined?

2. Determine the adequacy of internal audit or internal loan review procedures for the allowance for loan and lease losses.

   - Is the scope of the internal audit or loan review evaluation of the adequacy of the ALLL sufficient?
   - Are those reviews of the ALLL adequacy frequent enough?

3. Obtain a listing of audit deficiencies noted in the latest review done by the internal/external auditors from the examiner assigned "Internal and External Audits" or from management if no examiner assigned.

   - Has management appropriately corrected noted deficiencies.

# Conclusion

**Objective:** To communicate findings and initiate corrective action when policies, procedures, processes, or controls are deficient or when violations have been noted.

1. Prepare a memo for the EIC summarizing your conclusions concerning the allowance for loan and lease losses, including:

   - The quantity of risk.
   - The quality of risk management.
   - Any concerns or recommendations.
   - The adequacy of policies, procedures, processes, and controls.
   - How bank officers conform to established policy and practices.
   - Adverse trends.
   - Significant internal control deficiencies.
   - Any recommended corrective actions needed to address deficiencies.
   - The quality of departmental management.
   - The adequacy of MIS and reporting.
   - Any other matters of significance.

2. Evaluate the effect of the adequacy of the allowance for loan and lease losses on the overall assessment of risk for the bank. When making this evaluation, examiners should refer to the separate guidance provided for the OCC's large and community bank risk assessment programs.

3. Determine if any concerns regarding the allowance for loan and lease losses are significant enough to merit bringing them to the board's attention in the report of examination. If so, prepare comments for inclusion in the report under the heading Matters Requiring Attention (MRA).

   - MRA should cover practices that:
     – Deviate from sound fundamental principles and are likely to result in financial deterioration if not addressed.
     – Result in substantive noncompliance with laws.
   - MRA should discuss:
     – Causative factors contributing to the problem.
     – Consequences of inaction.

     &minus;   Management's commitment for corrective action.
     &minus;   The time frame and person(s) responsible for corrective action.

4.     Review the following items with appropriate management personnel, or prepare a memo to other examining personnel for their use in reviewing with management:

- A significantly misstated allowance for loan and lease losses. Bank management should be requested to make the adjustments necessary to bring the allowance to an appropriate level.
  - If it is clear that significant losses or provisions are applicable to a prior period, request that the bank amend and refile its report of condition and income for that period.
  - Provide information to the examiner assigned responsibility for the review of regulatory reports.
- Any significant deficiencies in, or noncompliance with, the bank's policies, practices, and procedures for determining the level of the allowance.
- Internal control exceptions.
- Uncorrected audit deficiencies.

5.     Prepare comments for the report of examination regarding the allowance for loan and lease losses. Any significant deficiencies in the bank's process for determining the level of the allowance should be clearly detailed, along with recommendations for correction. If agreement has not been reached with bank management on an appropriate level for the allowance, the report of examination should reflect the examiner's estimate of an appropriate level for the allowance.

6.     Prepare a memorandum or update the work program with any information that will facilitate future examinations.

7.     Update the OCC's electronic information system and any applicable report of examination schedules or tables.

8.     Organize and reference working papers in accordance with OCC guidance.

# Allowance for
# Loan and Lease Losses                              Appendix

### Interagency Policy Statement
### on the Allowance for Loan and Lease Losses

December 21, 1993

This policy statement applies to all depository institutions insured by the Federal Deposit Insurance Corporation except for federally insured branches and agencies of foreign banks.  Federally insured branches and agencies of foreign banks continue to be subject to any separate guidance that has been issued by their primary supervisory agency.

For savings associations, the ALLL is included in "general valuation allowances" (GVAs).  GVAs may also be required on assets other than loans and leases.

## Nature and Purpose of the ALLL

Federally insured depository institutions ("institutions") must maintain an ALLL at a level that is adequate to absorb estimated credit losses associated with the loan and lease portfolio, including all binding commitments to lend.

> [**Note:** In the case of binding commitments to lend and off-balance sheet credit instruments, such losses represent the amount of loans and leases that will likely not be collected (given facts and circumstances as of the evaluation date) and, thus, will be charged off.  For purposes of this policy statement, the loan and lease portfolio, binding commitments to lend and off-balance sheet credit commitments are referred to as "loans," "loans and leases," the "loan and lease portfolio" or the "portfolio."]

To the extent not provided for in a separate liability account, the ALLL should also be sufficient to absorb estimated credit losses associated with off-balance sheet credit instruments such as standby letters of credit.

> [**Note:** Recourse liability accounts (that arise from recourse obligations for any transfers of loans that are reported as sales for regulatory reporting purposes) should be reported as liabilities that are separate and distinct from the ALLL.]

For purposes of this policy statement, the term "estimated credit losses" means an estimate of the current amount of the loan and lease portfolio (net of unearned income) that is not likely to be collected; that is, net chargeoffs that are likely to be realized for a loan or pool of loans given facts and circumstances as of the evaluation date.  These estimated credit losses should meet the criteria for accrual of a loss contingency (i.e., a provision to the

ALLL) set forth in generally accepted accounting principles (GAAP). When available information confirms specific loans and leases, or portions thereof to be uncollectible, these amounts should be promptly charged off against the ALLL.

Estimates of credit losses should reflect consideration of all significant factors that affect the collectibility of the portfolio as of the evaluation date. For individually analyzed loans, these estimates should reflect consideration of the facts and circumstances that affect the repayment of such loans as of the evaluation date. For pools of loans, estimated credit losses should reflect consideration of the institution's historical net chargeoff rate on pools of similar loans, adjusted for changes in trends, conditions, and other relevant factors that affect repayment of the loans in these pools as of the evaluation date. Methodologies for the determination of the historical net chargeoff rate on a pool of loans can range from a simple average of an institution's net charge-off experience over a relevant period of years B coupled with appropriate adjustments as noted above for factors that affect repayment B to more complex techniques, such as migration analysis.

As discussed more fully below, for analytical purposes, an institution may attribute portions of the ALLL to individual loans or groups of loans. However, the ALLL is available to absorb all credit losses that arise from the loan and lease portfolio and is not segregated for, or allocated to, any particular loan or group of loans.

## Responsibility of the Board of Directors and Management

**Adequate ALLL Level.** It is the responsibility of the board of directors and management of each institution to maintain the ALLL at an adequate level.

[**Note:** When Financial Accounting Standards Board Statement No. 114 (FAS 114), "Accounting by Creditors for Impairment of a Loan," becomes effective, an "allowance for credit losses" must be calculated on a present value basis when a loan is impaired. FAS 114 states that it "does not address how a creditor should assess the *overall adequacy* of the allowance for credit losses" *(emphasis added)*, and that, in addition to the allowance for credit losses calculated under FAS 114, a creditor should continue to recognize an ALLL necessary to comply with FAS 5, "Accounting for Contingencies." Furthermore, the guidance in FAS 114 only applies to a subset of the loan and lease portfolio as the term is used in this policy statement (e.g., the FASB standard does not apply to leases, binding commitments to lend, and large groups of smaller-balance homogeneous loans that are collectively evaluated for impairment).

In contrast, this policy statement provides guidance on assessing the overall adequacy of the ALLL. At a later date, the federal bank and thrift regulatory agencies may issue further guidance on the application of FAS 114 in the ALLL evaluation process.]

For purposes of the reports of condition and income (call report) and the thrift financial report (TFR) an adequate ALLL should be no less than the sum of the following items given facts and circumstances as of the evaluation date (after deduction of all portions of the portfolio classified loss):

(1)    For loans and leases classified substandard or doubtful, whether analyzed and provided for individually or as part of pools, all estimated credit losses over the remaining effective lives of these loans.

(2)    For components of the loan and lease portfolio that are not classified, all estimated credit losses over the upcoming 12 months.

> [**Note:** In certain circumstances, subject to examiner review, a net chargeoff horizon of less than one year from the balance sheet date may be employed for components of the portfolio that have not been classified.  For institutions with conservative chargeoff policies, a chargeoff horizon of less than one year might be appropriate for pools of loans that are neither classified, nor subject to greater than normal credit risk, and that have well-documented and highly predictable cash flows and loss rates, such as pools of certain smaller consumer instalment or credit card loans.  On the other hand, a net chargeoff horizon of more than one year for loans that have not been classified might be appropriate until an institution's loan review function and credit grading system results in accurate and timely assessments of the portfolio.  In such situations, an institution should expeditiously correct deficiencies in its loan review function and credit grading system.]

(3)    Amounts for estimated losses from transfer risk on international loans.

Furthermore, when determining the appropriate level for the ALLL, management's analysis should be conservative so that the overall ALLL appropriately reflects a margin for the imprecision inherent in most estimates of expected credit losses.  This additional margin for imprecision might be incorporated into the ALLL through the amounts attributed for analytical purposes to individual loans or groups of loans or in a portion of the ALLL that is not attributed to specific components of the loan portfolio.

> [**Note:** As discussed later in this policy statement, institutions are encouraged to  segment their loan and lease portfolios into as many components as practical when analyzing the adequacy of the ALLL.  Therefore, institutions are encouraged to reflect the margin for imprecision in amounts attributable for analytical purposes to these components of the portfolio, to the extent possible.]

The adequacy of the ALLL should be evaluated as of the end of each quarter, or more frequently if warranted, and appropriate provisions made to maintain the ALLL at an adequate level as of each call report or thrift financial report date.  This evaluation will be subject to review by examiners.

**Related Responsibilities.**  In carrying out their responsibility for maintaining an adequate ALLL, the board of directors and management are expected to:

•    Ensure that the institution has an effective loan review system and controls (which include an effective credit grading system) that identify, monitor, and address asset quality problems in an accurate and timely manner.  To be effective, the institution's loan review system and controls must be responsive to changes in internal and external factors affecting the level of credit risk in the portfolio.

•    Ensure the prompt chargeoff of loans, or portions of loans, that available information confirms to be uncollectible.

•    Ensure that the institution's process for determining an adequate level for the ALLL is based on a comprehensive, adequately documented, and consistently applied analysis of the institution's loan and lease portfolio that considers all significant factors that affect the collectibility of the portfolio and supports the range of credit losses estimated by this process.

As discussed more fully in Attachment 1 *[included as an Appendix to the Loan Portfolio Management section of the Comptroller's Handbook]*, it is essential that institutions maintain effective loan review systems, although smaller institutions would not be expected to maintain separate loan review departments.  An effective loan review system should work to ensure the accuracy of internal credit grading systems and, thus, the quality of the information used to assess the adequacy of the ALLL.  The complexity and scope of the institution's ALLL evaluation process, loan review system, and other relevant controls should be appropriate in view of the size of the institution and the nature of its lending activities, and provide for sufficient flexibility to accommodate changes in the  factors that affect the collectibility of the portfolio.

## Analysis of the Loan and Lease Portfolio

In determining the appropriate level of the ALLL, the institution should rely primarily on an analysis of the various components of its portfolio, including all significant credits on an individual basis.  When analyzing the adequacy of the ALLL, institutions should segment their loan and lease portfolios into as many components as practical.   Each component would normally have similar characteristics, such as risk classification, past due status, type of loan, industry or collateral.  A depository institution may, for example, analyze the following components of its portfolio and provide for them in the ALLL:

•    All significant credits on an individual basis that are classified doubtful (or the institution's equivalent).

•    All other significant credits reviewed individually. If no allocation can be determined for such credits on an individual basis, they should be

---

provided for as part of an appropriate pool below.

- All other loans and leases that are not included by examiners or by the institution's credit grading system in the population of loans reviewed individually, but are delinquent or are classified or designated special mention (e.g., pools of smaller delinquent, special mention and classified commercial and industrial loans, real estate loans, consumer loans, and lease financing receivables).

- Homogeneous loans that have not been reviewed individually, or are not delinquent, classified, or designated as special mention (e.g., pools of direct consumer loans, indirect consumer loans, credit card loans, home equity lines of credit, and residential real estate mortgages).

- All other loans that have not been considered or provided for elsewhere (e.g., pools of commercial and industrial loans that have not been reviewed, classified, or designated special mention, standby letters of credit, and other off-balance sheet commitments to lend).

In addition to estimated credit losses, the losses that arise from the transfer risk associated with an institution's cross-border lending activities require special consideration. Over and above any minimum amount that is required by the Interagency Country Exposure Review Committee to be provided in the allocated transfer risk reserve (or charged against the ALLL), the institution must determine that the ALLL is adequate to absorb all estimated losses from transfer risk associated with its cross-border lending exposure. (See Attachment 2 for factors to consider.)

## Factors to Consider in the Estimation of Credit Losses

As previously mentioned, estimates of credit losses should reflect consideration of all significant factors that affect the collectibility of the portfolio as of the evaluation date. Although historical loss experience provides a reasonable starting point for the institution's analysis, historical losses, or even recent trends in losses are not, by themselves, a sufficient basis to determine the appropriate level for the ALLL. Management should also consider any factors that are likely to cause estimated credit losses associated with the institution's current portfolio to differ from historical loss experience, including but not limited to:

- Changes in lending policies and procedures, including underwriting standards and collection, chargeoff, and recovery practices.

- Changes in national and local economic and business conditions and developments, including the condition of various market segments.

  [**Note:** Credit loss and recovery experience may vary significantly depending upon the business cycle. For example, an over reliance on recent credit loss experience during a period of economic growth

---

will not result in realistic estimates of credit losses during a period of economic downturn.]

• Changes in the nature and volume of the portfolio.

• Changes in the experience, ability, and depth of lending management and staff.

• Changes in the trend of the volume and severity of past due and classified loans; and trends in the volume of nonaccrual loans, troubled debt restructurings, and other loan modifications.

• Changes in the quality of the institution's loan review system and the degree of oversight by the institution's board of directors.

• The existence and effect of any concentrations of credit, and changes in the level of such concentrations.

• The effect of external factors such as competition and legal and regulatory requirements on the level of estimated credit losses in the institution's current portfolio.

Institutions are also encouraged to use ratio analysis as a supplemental check or tool for evaluating the overall reasonableness of the ALLL. Ratio analysis can be useful in identifying divergent trends (compared with the institution's peer group and its own historical practices) in the relationship of the ALLL to classified and nonclassified loans and leases, to past due and nonaccrual loans and leases, to total loans and binding commitments, and to historical gross and net chargeoffs. However, while such comparisons can be helpful as a supplemental check of the reasonableness of management's assumptions and analyses, they are not, by themselves, a sufficient basis for determining the adequacy of the ALLL. In particular, such comparisons do not obviate the need for a comprehensive analysis of the loan and lease portfolio and the factors affecting its collectibility.

## Examiner Responsibilities

Examiners will assess the asset quality of an institution's loan and lease portfolio and the adequacy of the ALLL.  In the review and classification of the loan and lease portfolio, examiners should consider all significant factors that affect the collectibility of the portfolio, including the value of any collateral.

In reviewing the adequacy of the ALLL, examiners will:

• Consider the quality of the institution's loan review system and management in identifying, monitoring, and addressing asset quality problems.  This will include a review of the institution's credit grading system and loan review function.

    [**Note:** The review of an institution's loan review system (including credit grading) by an examiner will usually include tests involving a sample of the institution's loans.  If differences noted between examiner credit grades and those of the institution's loan review system indicate problems with the loan review system, especially where the credit grades assigned by the institution are more liberal than those assigned by the examiner, the institution would be expected to make appropriate adjustments to the assignment of its credit grades to the loan and lease portfolio and to its estimate of the ALLL.  Furthermore, the institution would be expected to improve its loan review system. (Attachment 1, *which is included as an Appendix to the Loan Portfolio Management section of the Comptroller's Handbook* discusses effective loan review systems.)]

• Evaluate the ALLL evaluation process that management has followed to arrive at an overall estimate of the ALLL, and the related assumptions made by management, in order to ensure that the institution's historical loss experience and all significant factors that affect the collectibility of the portfolio (including changes in the quality of the institution's loan review function, and other factors previously discussed) have been appropriately considered.

• Review the overall level of the ALLL and the range of credit losses estimated by management for reasonableness in view of the factors discussed in the prior sections of this policy statement.

• Perform a quantitative analysis (e.g., using the types of ratio analysis previously discussed) as a check of the reasonableness of the ALLL.

• Review the adequacy of the documentation that has been maintained by management to support the adequacy of the ALLL.

After analyzing an institution's policies, practices, and historical credit loss experience, the examiner should further check the reasonableness of management's ALLL methodology by comparing the reported ALLL (after the

deduction of all loans, or portions thereof, classified as loss) against the sum of the following amounts:

a)   50 percent of the portfolio that is classified doubtful;

b)   15 percent of the portfolio that is classified substandard; and

c)   For the portions of the portfolio that have not been classified (including those loans designated special mention), estimated credit losses over the upcoming twelve months given facts and circumstances as of the evaluation date (based on the institution's average annual rate of net chargeoffs experienced over the previous two or three years on similar loans, adjusted for current conditions and trends).

> [**Note:**  In cases where the institution has an insufficient basis for determining this amount, the examiner may use the industry-average net chargeoff rate for nonclassified loans and leases.]

This amount is neither a "floor" nor a "safe harbor" level for an institution's ALLL.  However, examiners will view a shortfall relative to this amount as indicating a need to more closely review management's analysis to determine whether it is reasonable and supported by the weight of reliable evidence, and that all relevant factors have been appropriately considered.

> [**Note:**  The weights of 50 percent and 15 percent for doubtful and substandard loans, respectively, are estimates of the industry's average loss experience over time on similarly classified credits.  Because they represent the average industry experience, these weights do not take into account idiosyncratic factors that may be important for estimating expected credit losses for a particular institution, such as the composition of its portfolio; the quality of underwriting, collection, and loan review systems; and current economic conditions and trends.  Nor do these weights incorporate any additional margin to reflect the imprecision inherent in estimates of expected credit losses.  Due to such institution-specific factors, including an institution's historical loss experience adjusted for current conditions and trends, in many cases an ALLL exceeding the sum of (a), (b), and (c) above might still be inadequate, while in other cases, the weight of evidence might indicate that an ALLL less than this amount is adequate.  In all circumstances, for purposes of the call report or thrift financial report, the reported ALLL should meet the standard for an adequate ALLL set forth in the section entitled "Responsibility of the Board of Directors and Management."]

In assessing the adequacy of the ALLL, it is important to recognize that the related process, methodology, and underlying assumptions require a substantial degree of judgment.  Even when an institution maintains sound loan administration and collection procedures and effective internal systems and controls, the estimation of credit losses will not be precise due to the wide range of factors that must be considered.  Further, the ability to estimate credit

43

losses on specific loans and categories of loans improves over time as substantive information accumulates regarding the factors affecting repayment prospects.  Therefore, examiners will generally accept management's estimates in their assessment of the adequacy of the ALLL when management has: (i) maintained effective systems and controls for identifying, monitoring and addressing asset quality problems in a timely manner, (ii) analyzed all significant factors that affect the collectibility of the portfolio in a reasonable manner, and (iii) established an acceptable ALLL evaluation process that meets the objectives for an adequate ALLL.

After the completion of all aspects of the ALLL review described in this section, if the examiner does not concur that the reported ALLL level is adequate or if the ALLL evaluation process is deficient or based on the results of an unreliable loan review system, recommendations for correcting these problems, including any examiner concerns regarding an appropriate level for the ALLL should be noted in the report of examination.

## ALLL Level Reflected in Regulatory Reports

The agencies believe that an ALLL established in accordance with this policy statement will fall within the range of acceptable estimates developed in accordance with GAAP.  When an institution's reported ALLL does not meet the objectives for an adequate ALLL, the institution will be required to increase its provision for loan and lease losses expense sufficiently to restore the level of the ALLL reported on its call report or TFR to an adequate level as of the evaluation date.

## Attachment 1 B Loan Review Systems  *[This attachment is included as an Appendix to the "Loan Portfolio Management" section of the Comptroller's Handbook.]*

## Attachment 2 B International Transfer Risk Considerations

With respect to international transfer risk, an institution should support its determination of the adequacy of its allowance for loan and lease losses by performing an analysis of the transfer risk, commensurate with the size and composition of the institution's exposure to each country.  Such analyses should take into consideration the following factors, as appropriate:

- The institution's loan portfolio mix for each country (e.g., types of borrowers, loan maturities, collateral, guarantees, special credit facilities and other distinguishing factors).

- The institution's business strategy and its debt management plans for each country.

- Each country's balance of payments position.

- Each country's level of international reserves.

- Each country's established payment performance record and its future debt servicing prospects.

- Each country's socio-political situation and its effect on the adoption or implementation of economic reforms, in particular those affecting debt servicing capacity.

- Each country's current standing with multilateral and official creditors.

- The status of each country's relationships with bank creditors.

- The most recent evaluations distributed by the Interagency Country Exposure Review Committee (ICERC) of the federal banking agencies.

# Allowance for
# Loan and Lease Losses                              Glossary

**Collateral-dependent** – A collateral-dependent loan relies solely on the operation or sale of the collateral for repayment.  In evaluating the overall risk associated with a loan, examiners consider a number of factors, including the character, overall financial condition and resources, and payment record of the borrower; the prospects for support from any financially responsible guarantors; and the nature and degree of protection provided by the cash flow and value of any underlying collateral.  However, as other sources of repayment become inadequate over time, the importance of the collateral's value necessarily increases and the loan may become collateral dependent.

**Effective Interest rate** – Under FAS 114, a loan's "effective interest rate" is the contractual rate of interest adjusted for any net deferred loan fees, costs, premium or discount existing at the origination or acquisition of the loan.  For a loan that has been restructured in accordance with FAS 15, the Financial Accounting Standards Board has concluded that it is appropriate to use the effective interest rate in the original loan agreement to discount the expected future cash flows.

**Fair Value** – FAS 15 defines the fair value of assets transferred to a creditor as the amount that the debtor could reasonably expect to receive for them in a current sale between a willing buyer and a willing seller, that is, other than in a forced or liquidation sale.  Fair value of assets shall be measured by their market value if an active market for them exists.  If no active market exists for the assets transferred but exists for similar assets, the selling price in that market may be helpful in estimating the fair value of the assets transferred.  If no market price is available, a forecast of expected cash flows may aid in estimating the fair value of assets transferred, provided the expected cash flows are discounted at a rate commensurate with the risk involved.

**Inherent Loss** – The OCC uses the term inherent loss to mean the amount of loss that meets the conditions of Statement of Financial Accounting Standards (FAS) 5 for accrual of a loss contingency (i.e., a provision to the allowance).  The term is also synonymous with the term "estimated credit losses" used in the "Interagency Policy Statement on the Allowance for Loan and Lease Losses" which was issued by the OCC, OTS, FDIC, and FRB on December 21, 1993.

FAS 5 is the primary, authoritative accounting document concerning the accrual of an allowance for loan and lease losses.  It defines a "loss contingency" as an existing condition, situation, or set of circumstances involving uncertainty as to possible loss that will ultimately be resolved when one or more future events occur or fail to occur.  It might seem that the conditions associated with most loans involve some degree of uncertainty about collectibility.  However, a provision to the allowance for loan and lease losses for a loss contingency associated with loans should be made only if **both** of the

following conditions of FAS 5 are met:

• Information available as of the evaluation date indicates that it is probable that the value of the loan has been impaired. (One or more future events must be likely to occur and confirm the fact of the loss.) FAS 114 clarifies this by stating:

> AIf, based on current information and events, it is probable that the enterprise will be unable to collect all amounts due according to the contractual terms of the receivable, the condition in [this] paragraph 8(a) is met. As used here, *all amounts due according to the contractual terms* means that both the contractual interest payments and the contractual principal payments will be collected as scheduled according to the receivable's contractual terms. However, a creditor need not consider an insignificant delay or insignificant shortfall in amount of payments as meeting the condition in [this] paragraph 8(a)."

***and***

• The amount of loss can be reasonably estimated. (Under Financial Accounting Standards Board Interpretation No. 14, it is not necessary to specify a single amount. The ability to estimate a range of loss is sufficient to satisfy this condition.)

An inherent loss, therefore, is an unconfirmed loss that probably exists based on information available when the evaluation is made. The amount of the loss must be subject to reasonable estimation. It should be based on the bank's current plans for collection and the realizable value of any collateral. If it is not probable that the loss exists, or if the amount of the loss cannot be reasonably estimated, no provision should be made to the allowance.

**Significant misstatement** – The handbook section on regulatory reports specifies that a "significant error" exists if its correction would result in:

• Changing any amount(s) reported in the report of condition and supporting schedules by more than 1 percent of total assets, provided the amount is greater than $50,000. This criterion must be applied to all supporting schedules of the report of condition.

• Changing any amount(s) reported in the report of income and supporting schedules by:

  – More than 1 percent of total operating income, provided the amount is greater than $5,000;

  – More than $1 million; or

  – A material effect on the amount reported as "Income before income

taxes" or on "Net income" in the report of income.  Examiner judgment should be used to determine whether the change or the aggregate of changes would affect other line items or generated ratios significantly.

**Transfer risk** C 12 CFR 20.7(h) defines transfer risk as the possibility that an asset cannot be serviced in the currency of payment because of a lack of, or restraints on the availability of, needed foreign exchange in the country of the obligor.

# Allowance for
# Loan and Lease Losses                    References

## Financial Reports

### Laws
12 USC 161, Banks and Banking, Reports to the Comptroller of the Currency

15 USC 78m(b)2-3, Securities Exchange Act of 1934, Form of report, books, records, and internal accounting; directives

### Regulations
12 CFR 18, Disclosure of Financial and Other Information by National Banks

### Statement of Financial Accounting Standards (FAS)
FAS 5, Accounting for Contingencies

FAS 15, Accounting by Debtors and Creditors for Troubled Debt Restructurings

FAS 109, Accounting for Income Taxes

FAS 114, Accounting by Creditors for the Impairment of a Loan

FAS 115, Accounting for Certain Investments in Debt and Equity Securities