# EXHIBIT 3

*EITF Abstracts*, Appendix D

Topic No. D-80

**Topic:**  Application of FASB Statements No. 5 and No. 114 to a Loan Portfolio

**Date Discussed:**  May 19-20, 1999

The staff of the Securities and Exchange Commission (the staff) understands that in the development of the Financial Accounting Standards Board (FASB) Viewpoints article entitled, "Application of FASB Statements 5 and 114 to a Loan Portfolio" (the *Viewpoints* article), a draft was circulated among members of the Emerging Issues Task Force, the AICPA's Allowance for Loan Losses Task Force, and others for review and comment.  The staff has recently received some inquiries regarding transition for the guidance in the *Viewpoints* article which was issued on April 12, 1999.  The staff notes that this guidance is part of generally accepted accounting principles (GAAP) and should be applied by all creditors.

Compliance with the conclusions in the *Viewpoints* article could result in a change in the application of generally accepted accounting principles, for some entities, for which transition may be appropriate.  The SEC staff has no views one way or the other with respect to the need for transition; however, if an SEC registrant identifies a material adjustment as a result of complying with the conclusions in the *Viewpoints* article, the registrant should report and disclose the adjustment like a cumulative effect of a change in accounting principles as described in paragraph 20 of APB Opinion No. 20, *Accounting Changes*, in the first fiscal quarter ending after May 20, 1999.  Financial statements for periods prior to May 20, 1999 may not be restated.

In the March 10, 1999 Joint Interagency Letter to Financial Institutions (Joint Interagency Letter) issued by the SEC, Federal Deposit Insurance Corporation, Federal Reserve Board, Office of the Comptroller of the Currency, and Office of Thrift Supervision (the Agencies), the Agencies stated that they would encourage and support the FASB process of providing additional guidance regarding the accounting for allowances for loan losses.  The *Viewpoints* article represents such additional guidance from the FASB staff.  Also in the Joint Interagency Letter, the Agencies noted their support for the AICPA's Allowance for Loan Losses Task Force which is developing more specific guidance on techniques of measuring credit loss and "how best to distinguish probable losses inherent in the portfolio as of the balance sheet date—the guidepost agreed to by the Agencies for reporting allowances in accordance with GAAP—from possible or future losses not inherent in the balance sheet as of that date."  In addition, the senior staff of the Agencies continue to meet and are currently working together in order to provide parallel guidance regarding (a) appropriate supporting documentation of the allowance in addition to that currently required by SEC Financial Reporting Release No. 28, *Accounting for Loan Losses by Registrants Engaged in Lending Activities*, under the heading *Procedural Discipline in Determining the Allowance and Provision for Loan Losses to be Reported*, and (b) enhanced disclosures regarding allowances for credit losses.

The Task Force requested that the *Viewpoints* article (Exhibit D-80A), as well as the Federal Reserve Board's guidance to supervisors and bankers regarding the *Viewpoints* article, be included with this announcement. The SEC Observer indicated that the SEC staff has reviewed the Federal Reserve Board's guidance and that the SEC staff very much supports the fundamental concepts in that guidance.

The Federal Reserve Board's guidance to supervisors and bankers regarding the *Viewpoints* article as follows:

BOARD OF GOVERNORS
OF THE
FEDERAL RESERVE SYSTEM
WASHINGTON, D.C. 20551

DIVISION OF BANKING
SUPERVISION AND REGULATION

SR 99 - 13 (SUP)
May 21, 1999

TO THE OFFICER IN CHARGE OF SUPERVISION AND APPROPRIATE
  SUPERVISORY AND EXAMINATION STAFF AT EACH FEDERAL
  RESERVE BANK AND TO DOMESTIC BANKING ORGANIZATIONS
  SUPERVISED BY THE FEDERAL RESERVE

**SUBJECT: Recent Developments Regarding Loan Loss Allowances**

**Introduction**

On March 10, 1999, the federal banking agencies and the Securities and Exchange Commission (SEC) issued a joint letter to financial institutions to announce new initiatives of the agencies and the accounting profession relating to the loan loss allowance. These projects are expected to result in enhanced guidance on loan loss allowance issues over a one- to two-year time horizon.

This letter addresses the allowance for loan losses in the context of existing accounting standards. As outlined in this letter and in view of the increased complexities and risks facing the banking industry in the last several years, it is expected that recent accounting developments will have only a limited impact on allowance levels in the industry. Indeed, as noted in the March 10th joint letter, the SEC and the federal banking agencies stated, "We recognize that today instability in certain global markets, for example, is likely to increase loss inherent in affected institutions' portfolios and consequently require higher allowances for credit losses than were appropriate in more stable times."

Last month, the Financial Accounting Standards Board (FASB) staff issued an article in the FASB's "Viewpoints" publication that provides guidance on certain issues regarding the allowance. Much of the guidance provided in the article is consistent with current practice and the banking agencies' policies on the allowance. The article does not purport to address comprehensively many key issues that relate to the allowance, such as what level of documentation is necessary to support allowance estimates or how to distinguish between inherent losses, the guidepost for reporting allowances under generally accepted accounting principles (GAAP), and future losses. The banking agencies, the SEC, and the American Institute of Certified Public Accountants (AICPA) intend to develop further guidance on important issues not addressed in the Viewpoints article. In addition, the article does not change

certain fundamental concepts with respect to the allowance that are discussed in this letter, including the need for institutions to maintain conservative reserve levels within a reasonable range of probable credit losses, consistent with management's best estimate. This letter includes background information on such concepts that has emerged in discussions between the SEC and the Federal Reserve.

Institutions should consider the FASB guidance and this background information in developing their allowance estimates. Moreover, in view of the information in this letter and the work underway pursuant to the March 10th joint letter, it is expected that changes in allowance levels, if any, as a result of the Viewpoints article will be substantially limited.

**Discussion and Background Information**

Over the last year, the topic of loan loss allowances has been an increasingly important one to the banking industry and regulators. In light of increased volatility and banking risks in recent years, the banking industry has appropriately maintained robust reserving practices and levels. From a safety and soundness perspective, the Federal Reserve and other bank regulators have expected institutions to maintain strong loan loss reserves that are conservatively measured. In carrying out its responsibilities, the SEC has emphasized the need for financial statements and reported earnings to be transparent and, therefore, for allowances to be adequate but not excessive. Enhanced transparency has also been a critical objective of bank regulators, both domestically and internationally.

The SEC and the federal banking agencies agreed to work together to provide additional guidance to the banking industry, and to that end, issued a Joint Interagency Statement on loan loss allowances in November 1998. The statement outlined certain concepts in GAAP and in SEC and banking agency guidance that would provide a foundation for further joint projects in this area. Since January, the federal banking agencies have entered into high-level dialogue with the SEC on bank allowance policy issues. This has included meetings between the principals of the SEC and the banking agencies, and meetings of their chief accountants. This dialogue has helped the SEC and the banking agencies to achieve a better understanding of how to address these issues.

These discussions also led the SEC and the banking agencies to issue a joint interagency letter to financial institutions on March 10, which announced new initiatives relating to the loan loss allowance. The joint letter discussed the agencies' plans to gain a better understanding of sound bank allowance practices and use this knowledge to develop enhanced guidance on appropriate methodologies, disclosures, and supporting documentation for loan loss allowances. In addition, the agencies also stated that they would support and encourage the processes of the accounting standards setters as they seek to clarify key loan loss allowance accounting issues.[1] Most importantly, the letter indicated that the agencies will meet together periodically to discuss

---

[1] This includes providing input to the FASB on allowance issues and participation in the AICPA Loan Loss Allowance Task Force as the task force seeks to clarify such concepts as probable loss, future losses, and loss triggering events. The AICPA project is expected to result in final guidance in about two years. The AICPA was also asked to consider the impact of recently developed portfolio credit risk measurement and management techniques in the determination of the allowance.

important matters that affect bank transparency and will focus on enhancing allowance practices going forward.

With the issuance of the March 10 letter, the banking agencies and the SEC formed a Joint Working Group (JWG) to oversee the interagency project to develop enhanced guidance on internal documentation and public disclosures about the allowance. The target date for the issuance of this guidance is March 2000. A key aspect of all of these efforts will be input from the banking industry and the accounting profession on allowance policy issues. Should these efforts result in changes to current policies and practices, banking organizations will be provided a reasonable transition period prior to implementation.

There are already emerging points of agreement between the SEC and the Federal Reserve on important aspects of allowance practices. For example, there is agreement that:

- Arriving at an appropriate allowance involves a high degree of management judgment and results in a range of estimated losses.

- Institutions should maintain prudent, conservative, but not excessive, loan loss allowances that fall within an acceptable range of estimated losses. Consistent with GAAP, an institution should record its best estimate within the estimated range of credit losses, including when the best estimate is at the high end of the range.

- When determining the level for the allowance, management should always ensure that the overall allowance appropriately reflects a margin for the imprecision inherent in most estimates of expected credit losses.[2]

- Simply because a portion of the allowance is designated as "unallocated," it is not thereby inconsistent with GAAP. The important consideration is whether the allowance reflects an estimate of probable losses, determined in accordance with GAAP, and is appropriately supported.

- Allowance estimates should be based on a comprehensive, well-documented, and consistently applied analysis of the loan portfolio.

**FASB Viewpoints Article**. Recently, in a Viewpoints article issued on April 12, 1999, the FASB staff provided guidance on certain issues regarding loan loss allowances. In particular, the article addresses the application of FASB Statements No. 5 and 114 (FAS 5 and FAS 114, respectively[3]) to a loan portfolio and how these statements interrelate. The article also provides a

---

[2] More guidance, including the level of support needed for this margin for imprecision, should be forthcoming from the JWG and AICPA projects. When reflecting the margin for imprecision and supporting such estimates, an institution should take into account all available information existing as of the balance sheet date, including credit quality, current trends, existing environmental factors (e.g., industry, geographical, economic, and political factors), and the range of estimated losses on loans.

[3] FASB Statement No. 5, "Accounting for Contingencies," and FASB Statement No. 114, "Accounting by Creditors for Impairment of a Loan."

general overview of existing GAAP that relates to the allowance. The article is available on the FASB's Internet website.[4]

Banking organizations should consider the points noted above when evaluating the impact of the guidance in the article on their overall allowance levels. In addition, other important factors to consider in establishing appropriate allowance levels include the following:

- Most guidance that has preceded the recent FASB article has discussed the allowance in the context of a range of reasonable estimates of probable losses. The article, while not explicitly addressing this topic, is not intended to be inconsistent with this important concept.

- The article recognizes that some loans that are specifically identified for evaluation may be individually impaired, while other loans, that are not impaired individually pursuant to FAS 114, may have specific characteristics that indicate that there would be probable loss in a group of loans with those characteristics. Loans in the first category must be accounted for under FAS 114 and loans in the second category should be accounted for under FAS 5. Under FAS 5, a loss is accrued if characteristics of a loan indicate that it is probable that a group of similar loans includes some losses even though the loss could not be identified with a specific loan.[5] When appropriate, this will permit institutions to use information derived from their internal grading systems and migration analyses in determining the inherent loss in loans in the second category.

- In assessing whether loans are fully collateralized and thus whether there is a need for an allowance on those loans, institutions should consider the reliability and timing of appraisals or other valuations to ensure that the values used for any allowance calculations are realistically and reliably measured. An institution should ensure that an appraisal of collateral reflects a realistic estimate of fair value, which takes into consideration the time it will take the institution to realize the value of the collateral and current market conditions for selling the collateral.

- The FASB article provides clarifying guidance on the interaction between FAS 5 and FAS 114. Allowance estimates under FAS 114 may be based on the expected future cash flows of an impaired loan, which are uncertain and involve significant judgment by an institution. Institutions should take into account all available information existing as of the measurement date (i.e., financial statement date), including credit quality, current trends, existing "environmental" factors (e.g., industry, geographical, economic, and political factors), and the range of estimated losses on such loans. Institutions may need to increase their FAS 114 allowance estimates if management's prior estimates have not appropriately taken into account all of the available information that affects the collectibility of such loans.[6]

---

[4] The FASB's Internet website can be accessed at www.fasb.org. The Viewpoints article is entitled, *Application of FASB Statements 5 and 114 to a Loan Portfolio.*

[5] Moreover, current GAAP and the FASB article emphasize that the loss does not have to be virtually certain in order to be recognized.

[6] Banking organizations are also reminded that they should continue to classify and charge off loans in accordance with the policies of the federal banking agencies.

- Consistent with current guidance and the FASB article, if an institution has impaired loans with common risk characteristics that are individually impaired, the organization may *measure* impairment under FAS 114 on those loans on an aggregate basis (e.g., using average recovery periods, average amounts recovered, and a composite effective interest rate).

**Other Matters**

As mentioned above, this letter addresses the allowance for loan losses in the context of existing accounting standards. Looking ahead over the longer term, and given the fundamental changes that have taken place in credit risk management in recent years, a broader reexamination of accounting standards for loan loss allowances by the banking agencies and accounting standards setters would appear appropriate. The Federal Reserve intends to play an active role in promoting and participating in such an effort to ensure that allowance levels remain conservative and prudent, consistent with safety and soundness considerations.


Richard Spillenkothen
Director

**Exhibit D-80A**

**Title:** APPLICATION OF FASB STATEMENTS 5 AND 114 TO A LOAN PORTFOLIO

**Issued:** April 1999
**Revised:** September 1999; September 2001
**Authored by:** Sean Leonard, Tim Lucas, and Leslie Seidman[*]

The FASB issued Statements No. 5, Accounting for Contingencies, and No. 114, *Accounting by Creditors for Impairment of a Loan*, in 1975 and 1993, respectively. Those Statements provide the general principles a creditor should apply to account for impairment in a loan portfolio. FASB Statement No. 118, *Accounting by Creditors for Impairment of a Loan—Income Recognition and Disclosures*, was issued in 1994. Statement 118 amends Statement 114 to allow a creditor to use existing methods for recognizing interest income on an impaired loan and to require disclosure about the recorded investment in certain impaired loans and about how a creditor recognizes interest income related to those impaired loans.

Recently, the FASB staff has received questions about the detailed application of those Statements to a loan portfolio. Part 1 of this staff announcement describes the requirements of Statements 5 and 114 and how they relate to each other.

This staff announcement also updates a 1993 FASB *Highlights* article (refer to Part 2-Updated Questions). The FASB staff hopes that dissemination of these views will assist constituents in applying the standards in the manner the Board intended.

*Overview of Generally Accepted Accounting Principles (GAAP) for Loan Impairment*

- Statement 5 has provided GAAP on recognition of losses on receivables (including loans) since 1975. Statement 114 (effective in 1995) amends Statement 5 "to clarify that a creditor should evaluate the collectibility of both contractual interest and contractual principal of all receivables when assessing the need for a loss accrual."
- It is usually difficult, even with hindsight, to identify any single event that made a particular loan uncollectible. However, the concept in GAAP is that impairment of receivables should be recognized when, based on all available information, it is probable that a loss has been incurred based on past events and conditions existing at the date of the financial statements.
- Losses should not be recognized before it is probable that they have been incurred, even though it may be probable based on past experience that losses will be incurred in the future. It is inappropriate to consider possible or expected future trends that may lead to additional losses. Recognition of losses should not be deferred to periods after the period in which the losses have been incurred.

---

[*] At the date of issuance of this implementation guide, Sean Leonard was a practice fellow at the FASB. Tim Lucas was the Board's director of research and technical activities. Leslie Seidman was the assistant director of research and technical activities at the FASB. The positions and opinions expressed in this implementation guide were theirs. Revisions to this implementation guide have been made by current members of the FASB staff. Official positions of the FASB are determined only after extensive due process and deliberation.

78

- GAAP does not permit the establishment of allowances that are not supported by appropriate analyses. The approach for determination of the allowance should be well documented and applied consistently from period to period.
- Under Statement 5, the threshold for recognition of impairment should be the same whether the creditor has many loans or has only one loan. Statement 5, paragraph 22, states, "If the conditions [of paragraph 8] are met, accrual shall be made even though the particular receivables that are uncollectible may not be identifiable."
- Statement 114 is more specific than Statement 5 in that it requires certain methods of measurement for loans that are individually considered impaired, but it does not fundamentally change the recognition criteria for loan losses.

*Part 1-Relating Statement 5 and Statement 114*

1. Q—In general, how do Statement 5 and Statement 114 fit together?
   A—Statement 5 provides the basic guidance for recognition of impairment losses for all receivables (except those receivables specifically addressed by other accounting literature, such as debt securities). Statement 114 provides more specific guidance on measurement and disclosure for a subset of the population of loans. That subset consists of loans that are identified for evaluation and that are individually deemed to be impaired (because it is probable that the creditor will be unable to collect all the contractual interest and principal payments as scheduled in the loan agreement). It also includes all loans that are restructured in a troubled debt restructuring involving a modification of terms, except for those loans that are excluded from the scope of Statement 114 in paragraphs 6(b)-6(d) (refer to Question 2).

2. Q—What loans are not subject to the accounting and disclosure requirements of Statement 114?
   A—Statement 114 excludes from its scope the following:

   a. Large groups of smaller-balance homogeneous loans that are collectively evaluated for impairment. Those loans may include but are not limited to credit card, residential mortgage, and consumer installment loans.
   b. Loans measured at fair value or at the lower of cost or fair value, for example, in accordance with FASB Statement No. 65, *Accounting for Certain Mortgage Banking Activities*, or specialized industry practice.
   c. Leases as defined in FASB Statement No. 13, *Accounting for Leases*.
   d. Debt securities as defined in FASB Statement No. 115, *Accounting for Certain Investments in Debt and Equity Securities*, including contracts within the scope of paragraph 14 of FASB Statement No. 125, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities*. [Revised 9/01.]

   A creditor needs to apply judgment based on individual facts and circumstances to determine what represents large groups of smaller-balance homogeneous loans in (a) above. Statement 5 would apply to those groups of smaller-balance loans as well as loans that are not identified for evaluation or that are evaluated but are not individually considered impaired.

3. Q—Does Statement 114 amend Statement 5?
   A—Yes. Statement 114 amends Statement 5 to clarify that a creditor should evaluate the collectibility of both contractual interest and contractual principal of *all* receivables when assessing the need for a loss accrual. Statement 114 does not change the basic recognition principles in Statement 5.

4. Q—How should a creditor identify loans that are to be individually evaluated for collectibility under Statement 114?
   A—A creditor should apply its normal review procedures in making that judgment. Statement 114 does, however, identify some sources of information that are useful in identifying loans for evaluation including a specific materiality criterion, regulatory reports of examination, internally generated "watch lists," and management reports of total loan amounts by borrower (footnote 1). This process is subjective and requires a creditor to exercise a great deal of judgment.

*Recognition*

5. Q—When should an impairment loss be recognized under Statement 5?
   A—Statement 5 requires recognition of a loss when (a) information available prior to issuance of the financial statements indicates that it is probable that an asset has been impaired at the date of the financial statements and (b) the amount of the loss can be reasonably estimated. The criteria for recognition under Statement 5 provide that ". . . accrual shall be made even though the particular receivables that are uncollectible may not be identifiable" (paragraph 22). However, "double counting" by applying Statement 114 and then applying Statement 5 to *measure* the same loss again is inappropriate (refer to Questions 11 and 12).

6. Q—What does *can be reasonably estimated* mean under Statement 5?
   A—Whether the amount of loss can be reasonably estimated will normally depend on, among other things, the experience of the creditor, information about the ability of individual debtors to pay, and appraisal of the receivables in light of the current economic environment. In the case of a creditor that has no experience of its own, reference to the experience of other enterprises in the same business may be appropriate. In all cases, Statement 5 requires a reasonable basis for quantifying the amount of loss.

7. Q—When is a loan impaired under Statement 114?
   A—A loan is impaired when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement. *All amounts due according to the contractual terms* means that both the contractual interest payments and contractual principal payments will be collected as scheduled in the loan agreement. Existing "environmental" factors (for example, existing industry, geographical, economic, and political factors) should be considered as part of *current information and events* when assessing a loan that has been identified for evaluation under Statement 114.

8. Q—What does probable mean?

80

A—The term *probable* is used with the same meaning in both Statements. Statement 5 defines probable as a condition where the future event is "likely to occur." As part of the project that led to Statement 114, the Board considered whether the loss threshold for recognition of loan impairment should be changed from the Statement 5 definition of probable to some other threshold. Some suggested that probable had come to mean *virtually certain* and that the loss threshold should be changed to *more likely than not*. The Board recognized that application of the term probable in practice requires judgment, and to clarify its intent the Board reiterated the guidance in Statement 5 that probable does not mean virtually certain. Probable is a higher level of likelihood than "more likely than not."

9. Q—How should a creditor determine it is probable that it will be unable to collect all amounts due according to the contractual terms of a loan under Statement 114?
A. The Board decided not to specify how a creditor should determine that it is probable that it will be unable to collect all amounts due according to a loan's contractual terms. A creditor should apply its normal loan review procedures in making that determination.

10. Q—If a creditor concludes that an individual loan specifically identified for evaluation is *not impaired* under Statement 114, may that loan be included in the assessment of the allowance for loan losses under Statement 5?
A—Yes, but only if specific characteristics of the loan indicate that it is probable that there would be an incurred loss in a group of loans with those characteristics. Characteristics or risk factors must be specifically identified to support an accrual for losses that have been incurred but that have not yet reached the point where it is probable that amounts will not be collected on a specific individual loan. A creditor should not ignore factors and information obtained in the evaluation of the loan's collectibility. For example, if an individual loan specifically identified for evaluation is fully collateralized with risk-free assets, then consideration of that loan as sharing characteristics with a group of uncollateralized loans is inappropriate. Under Statement 5, a loss is recognized if characteristics of a loan indicate that it is probable that a group of similar loans includes some losses even though the loss could not be identified to a specific loan. However, a loss would be recognized only if it is probable that the loss has been incurred at the date of the financial statements and the amount of loss can be reasonably estimated. Refer to Boxes D, E, and F in the flowchart at the end of this article.

11. Q—If a creditor concludes that an individual loan specifically identified for evaluation is *impaired*, may the creditor establish an allowance in addition to one measured under Statement 114?
A—No. The allowance provided for a specific loan under Statement 114 may not be supplemented by an additional allowance under Statement 5. The Statement 114 allowance should be the sole measure of impairment for that loan. Refer to Boxes C and G in the flowchart at the end of this article.

12. Q—Would the answer to Question 11 above be different if the measurement under Statement 114 of a loan that is deemed to be impaired results in no allowance or loss recognition?

81

A—No. For a loan that is impaired no additional loss recognition is appropriate under Statement 5 even if the measurement of impairment under Statement 114 results in no allowance. For example, a creditor might conclude for a collateral-dependent loan that it is impaired (because it is probable that the creditor will be unable to collect all the contractual interest and principal payments as scheduled in the loan agreement). The creditor might measure the impairment using the fair value of the collateral, which could result in no allowance if the fair value of the collateral is greater than the recorded investment in the loan. Another example would be when the recorded investment of an impaired loan has been written down to a level where no allowance is required.

13. Q—Under Statement 114, after a loan has been individually identified for evaluation, may a creditor aggregate loans with common risk characteristics when assessing whether loans are impaired?
A—No. Only if a creditor can identify which individual loans (if any) are impaired (because it is probable that the creditor will be unable to collect all the contractual interest and principal payments as scheduled in the loan agreement) should an allowance be measured for individual loans under Statement 114 (refer to Question 10).

14. Q—May a creditor simply increase (or not decrease) the allowance for loan losses in "good" economic times to provide for losses expected to occur in the future?
A—No. Under generally accepted accounting principles losses should not be recognized before they have been incurred, even though it may be probable based on past experience that losses will be incurred in the future. It is inappropriate to recognize a loss today for possible or expected future trends that may lead to a loss in the future.

*Measurement*

15. Q—What is the next step after a creditor determines that a loan is impaired under Statement 114?
A—When a creditor determines that a loan is impaired, the creditor measures impairment based on the expected future cash flows discounted at the loan's effective interest rate. As a practical expedient, Statement 114 permits a creditor to measure impairment based on the fair value of the collateral of an impaired collateral-dependent loan or to measure impairment based on an observable market price for the impaired loan as an alternative to discounting expected future cash flows. Regardless of the measurement method, a creditor should measure impairment based on the fair value of the collateral when the creditor determines that foreclosure is probable.

16. Q—Should "environmental" factors be considered when measuring an impaired loan using the present value of expected future cash flows under Statement 114?
A—Yes. Statement 114, paragraphs 12-16, provides accounting guidance for measuring impairment of an impaired loan using the present value of expected future cash flows. A creditor should consider all available information reflecting past events and current conditions when developing the estimate of expected future cash flows. All available information would include existing "environmental" factors (for example, existing industry, geographical, economic, and political factors) that are relevant to the collectibility of that

82

loan and that indicate that it is probable that an asset had been impaired at the date of the financial statements (refer also to Question 26(d)).

*Disclosure and Documentation*

17. Q—When a loan is restructured in a troubled debt restructuring into two (or more) loans, should the restructured loans be considered separately or collectively when assessing the applicability of the disclosures about impaired loans that are required by Statement 114, as amended, in years after the restructuring?
A—The restructured loans should be considered separately. Refer to EITF Issue No. 96-22, "Applicability of the Disclosures Required by FASB Statement No. 114 When a Loan Is Restructured in a Troubled Debt Restructuring into Two (or More) Loans," for the EITF discussion, including the consensus reached and SEC Observer comments made.

18. Q—What guidance is provided by GAAP about the extent of documentation and analysis necessary to support the allowance for loan losses?
A—While the extent of documentation is not specifically addressed in Statement 114 or 5, GAAP (such as the AICPA Audit and Accounting Guide, Banks and Savings Institutions, and Financial Reporting Release 28 for SEC registrants) does not permit the establishment of allowances that are not supported by appropriate analyses. The approach for determination of the allowance should be well documented and applied consistently from period to period.

*Part 2—Updated Questions*

19. Q—Why did the FASB undertake Statement 114?
A—The Board accelerated part of the financial instruments project to address the specific issue of in what circumstances, if any, a creditor should measure impairment of a loan based on the present value of expected future cash flows related to the loans. Previously, some creditors recognized impairment of a loan only when *undiscounted* expected future cash flows were less than the net carrying amount of the loan. Others recognized impairment when *discounted* expected future cash flows were less than the net carrying amount of the loan. The Board did not undertake a comprehensive reconsideration of how a creditor should assess the overall adequacy of the allowance for credit losses. The Board's objective in this project was to resolve a specific inconsistency, not to perfect the guidance for loan accounting.

20. Q—Does Statement 114 require a discounted or undiscounted approach to measuring impairment on certain loans?
A—Statement 114 requires a discounted approach to measuring impairment on certain loans. The Board observed that a creditor's recorded investment in a loan at origination and during the life of the loan, as long as the loan performs according to its contractual terms, is the sum of the present values of the future cash flows that are designated as interest and the future cash flows that are designated as principal discounted at the effective interest rate implicit in the loan. The Board concluded that a loan that becomes impaired (because it is probable that the creditor will be unable to collect all the contractual interest payments and

83

contractual principal payments as scheduled in the loan agreement) should continue to be carried at an amount that considers the discounted value of all expected future cash flows in a manner consistent with the loan's measurement before it became impaired.

21. Q—Does Statement 114 only apply to financial institutions?
    A—No, Statement 114 applies to all creditors. The Board was unable to identify compelling reasons to suggest that different types of creditors should account for impaired loans differently or that financial statement users for a particular industry or size of entity would be better served by accounting that differs from that of other creditors.

22. Q—Why does Statement 114 address only creditors' accounting and not debtors' accounting?
    A—The Board recognized that Statement 114 introduced asymmetry between creditors' and debtors' accounting for troubled debt restructurings involving a modification of terms. However, the Board concluded that Statement 114 should address only creditors' accounting because expanding the scope to address debtors' accounting likely would have delayed issuance of the Statement.

23. Q—Statement 114 does not apply to large groups of smaller-balance homogeneous loans that are collectively evaluated for impairment. Does the amendment to Statement 5 change the way creditors measure impairment for those smaller-balance loans?
    A—No, Statement 114 does not change the established practice of using a formula approach based on various factors to estimate the allowance for loan losses related to those smaller-balance homogeneous loans. Those factors typically include past loss experience, recent economic events and current conditions, and portfolio delinquency rates. The Board recognized the established practice of using a formula approach for estimating losses related to those types of loans and does not intend for Statement 114 to change that approach.

24. Q—Suppose a debtor is late making a payment. Is that loan automatically "impaired" under Statement 114?
    A—Statement 114 indicates that an insignificant delay or insignificant shortfall in amount of payments does not require application of the Statement.

25. Q—Is a creditor required to apply the same measurement method under Statement 114 to all of its individually impaired loans?
    A—A creditor may select the measurement method on a loan-by-loan basis. However, the Board expects that the measurement method for an individual impaired loan would be applied consistently to that loan and that a change in method would be justified by a change in circumstances.

26. Q—For an individual loan that is considered impaired under Statement 114, if a creditor bases its measure of loan impairment on discounted cash flows:

    a. *How should a creditor calculate the effective interest rate?*
    A—The effective interest rate of a loan is the rate of return implicit in the loan (that is, the contractual interest rate adjusted for any net deferred loan fees or costs, premium, or

84

discount existing at the origination or acquisition of a loan). The effective interest rate for a loan restructured in a troubled debt restructuring also is based on the original contractual rate, not the rate specified in the restructuring agreement.

*b. How is the effective interest rate calculated for a loan whose stated interest rate varies based on the prime rate (or another factor)?*
A—The loan's effective interest rate may be calculated based on (1) the prime rate as it changes over the life of the loan or (2) the rate may be fixed at the rate in effect at the date the loan meets the impairment definition. Projections of changes in the factor should not be made for purposes of determining the effective interest rate or estimating the expected future cash flows.

*c. How does a creditor calculate the effective interest rate of an acquired loan?*
A—A loan may be acquired at a discount because of a change in credit quality or interest rates or both. When a loan is acquired at a discount that relates, at least in part, to the loan's credit quality, the effective interest rate is the discount rate that equates the investor's estimate of the loan's future cash flows with the purchase price of the loan.

*d. How should a creditor estimate expected future cash flows?*
A—The estimate of future cash flows should be a creditor's best estimate based on reasonable and supportable assumptions and projections. All available evidence, including estimated costs to sell if those costs are expected to reduce the cash flows available to repay or otherwise satisfy the loan, should be considered in developing those estimates. The weight given to the evidence should be commensurate with the extent to which the evidence can be verified objectively. The likelihood of the possible outcomes should be considered in determining the best estimate of expected future cash flows (refer also to Question 16).

*e. May creditors that currently calculate an allowance for loan losses for groups of similar loans on a pooled basis continue this practice under Statement 114?*
A—If impaired loans have risk characteristics in common, a creditor may aggregate those loans and use historical statistics, such as average recovery period and average amount recovered, along with a composite effective interest rate as a means of measuring those impaired loans.

27. Q—Statement 114 requires that estimated costs to sell should be reflected in estimates of expected future cash flows. What if a creditor measures impairment based on an observable market price or the fair value of the collateral?
A—Estimated costs to sell, on a discounted basis, should be considered in all measures of impairment if those costs are expected to reduce the cash flows available to repay or otherwise satisfy the loan.

28. Q—Is the measure of impairment a one-time event?
A—When an asset is carried on a discounted basis, the present value of expected future cash flows will increase from one reporting period to the next as a result of the passage of time. The present value also may change from changes in estimates of the timing or amount of expected future cash flows. Similarly, the observable market price of an impaired loan or

85

the fair value of the collateral of an impaired collateral-dependent loan may change from one reporting period to the next. Because the Board concluded that the net carrying amount of an impaired loan should be the present value of expected future cash flows (or the observable market price or the fair value of the collateral) not only at the date at which impairment initially is recognized but also at each subsequent reporting period, Statement 114 requires recognition of changes in that measure. However, the net carrying amount of the loan should never exceed the recorded investment in the loan.

29. Q—How does a creditor recognize that change in measurement in its statement of operations?
A—Statement 118 amends paragraph 17 of Statement 114 to allow a creditor to use existing methods for recognizing interest income on impaired loans. While the two income recognition methods in paragraph 17 of Statement 114 are no longer required, Statement 118 does not preclude a creditor from using either of those methods.

30. Q—What disclosures are required by Statement 114?
A—Statement 114, as amended by Statement 118, states that a creditor should disclose the following information about loans that meet the definition of an impaired loan:
- The total recorded investment in the impaired loans and (1) the amount of that recorded investment for which there is a related allowance and the amount of that allowance and (2) the amount of that recorded investment for which there is no related allowance
- The activity in the allowance for credit losses related to loans, including the balance in the allowance at the beginning and end of each period, additions charged to operations, direct write-downs charged against the allowance, and recoveries of amounts previously charged off
- The creditor's policy for recognizing interest income on impaired loans, including how cash receipts are recorded
- For each period for which results of operations are presented, the average recorded investment in the impaired loans, the related amount of interest income recognized during the time within that period that the loans were impaired, and, unless not practicable, the amount of interest income recognized using a cash-basis method of accounting during the time within that period that the loans were impaired.

31. Q—Does a creditor have to make disclosures for a loan restructured in a troubled debt restructuring that is written down and the present value of the expected future cash flows (or the observable market price or the fair value of the collateral) is equal to or greater than the recorded investment in the loan?
A—Usually, a loan whose terms are modified in a troubled debt restructuring already will be identified as impaired. However, if the creditor has written down a loan and the measure of the restructured loan is equal to or greater than the recorded investment, no impairment would be recognized in accordance with Statement 114. The creditor is required to disclose the amount of the write-down and the recorded investment in the year of the write-down but is not required to disclose the recorded investment in that loan in later years if the two criteria of paragraph 6(i) of Statement 118 are met.

**An Illustration**

Assume a bank has 20 loans (not considered smaller-balance) to businesses in a town where the principal employer is a major corporation. Some of the loans are secured by bonds or real estate, others are unsecured. The major corporation went bankrupt and fired all of its workers. The bank concludes that the loss of that employer has had a dire effect on the economic health of the community and its businesses. The bank decides to review all 20 of the loans individually.

Two of the loans are not performing, and the bank concludes that it is probable it will be unable to collect all of the cash flows on those loans as scheduled. Another five borrowers have approached the bank for a concession, but those discussions are incomplete. Based on all available information, the bank concludes that each of those five loans also is impaired. The bank is unable to identify any other individual loan among the remaining 13 where it is probable that it will not collect all of the cash flows.

*How would the bank assess impairment on the 20 loans?*

The bank would measure impairment on the seven loans that are individually impaired under Statement 114 using a method permitted by Statement 114, as appropriate for the loan. The bank would consider all available information to measure the amount of the loss including the value of any collateral. (If the value of the collateral, less selling costs, exceeds the recorded investment in the loan, no allowance would be provided.) The bank would consider its own experience or, to the extent relevant, the industry's collection experience in similar situations as part of the available information. In doing so, the bank would consider the effect of information it possesses about the current economic downturn in making its best estimate of expected future cash flows for those seven loans.

The bank would then assess whether it is probable that any loss has been incurred on the remaining 13 loans. If three of those loans are fully collateralized, no allowance should be provided under Statement 5 for those loans and they should be excluded from the assessment of the remaining 10 loans. The bank would consider the effect of the current economic downturn to assess whether a loss has been incurred in that group of loans at the balance sheet date and to estimate the amount of loss. In doing so, the bank would consider its historical loss experience in collecting loans in similar situations, such as the typical recovery rate, including amount and timing. However, the use of historical statistics alone would be inappropriate if the nature of the loans or current environmental conditions differ from those on which the statistics were based. Any allowance that is recorded under Statement 5 must be reasonably estimable and supported by an analysis of all available and relevant information about circumstances that exist at the balance sheet date.

The total allowance for the 20 loans should be the sum of the above components. A total allowance greater than the sum of the above components would be excessive. A total allowance less than the sum of the above components would be inadequate.

87

## Application of Statements 5 and 114 to a Loan Portfolio



88

89