# EXHIBIT 4

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549
## FORM 10-K/A
Amendment No. 1

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE FISCAL YEAR ENDED DECEMBER 31, 2005**
Commission File Number 1-14667
# WASHINGTON MUTUAL, INC.
(Exact name of registrant as specified in its charter)

| Washington | 91-1653725 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| 1201 Third Avenue, Seattle, Washington | 98101 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(206) 461-2000**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Litigation Tracking Warrants™ | NASDAQ |

Indicate by check mark if the registrant is a well-known seasoned issuer as defined in Rule 405 of the Securities Act. Yes ☒  No ☐.

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act. Yes ☐  No ☒.

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐.

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐.

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):  Large accelerated filer ☒    Accelerated filer ☐    Non-accelerated filer ☐.

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐  No ☒.

The aggregate market value of voting stock held by non-affiliates of the registrant as of June 30, 2005, based on the closing sale price as reported on the New York Stock Exchange:
### Common Stock – $35,345,279,226[1]
[1] Does not include any value attributable to 6,000,000 shares held in escrow.

The number of shares outstanding of the issuer's classes of common stock as of February 28, 2006:
### Common Stock – 992,254,791[2]
[2] Includes 6,000,000 shares held in escrow.
### Documents Incorporated by Reference

Portions of the definitive proxy statement for the Annual Meeting of Shareholders to be held April 18, 2006, are incorporated by reference into Part III.

Significant among these factors are the following:

*Volatile interest rates impact the mortgage banking business.*

Changes in interest rates affect the mortgage banking business in complex and significant ways. Changes in interest rates can affect loan origination volumes, gain from mortgage loans and loan servicing fees, which are the principal components of revenue from sales and servicing of home mortgage loans. When mortgage rates decline, the Company generally expects loan volumes to increase as borrowers refinance, which leads to accelerated early payoffs of mortgage loans in its servicing portfolio. As a result, when mortgage rates decline, the fair value of the Company's mortgage servicing rights ("MSR") declines and gain from mortgage loans tend to increase. When mortgage rates rise, the Company generally expects loan volumes to decrease, which generally leads to reduced payoffs in its servicing portfolio. As a result, when mortgage rates rise, the fair value of the Company's MSR increases and gain from mortgage loans decrease.

As part of its overall risk management activities, the Company seeks to mitigate changes in fair value of its MSR asset by purchasing and selling financial instruments, entering into interest rate contracts and forward commitments to purchase or sell mortgage-backed securities, and adjusting the mix and amount of such financial instruments or contracts to take into account the effects of different interest rate environments. The MSR asset and the mix of financial instruments used to mitigate changes in its fair value are not perfectly correlated. This imperfect correlation creates the potential for excess MSR risk management gains or losses during any period. The Company's management must exercise judgment in selecting the amount, type and mix of financial instruments and contracts to mitigate changes in fair value of its MSR. The Company cannot assure that the amount, type and mix of financial instruments and contracts it selects will fully offset significant changes in the value of the MSR and the Company's actions could negatively impact earnings. The Company's reliance on these risk management instruments may be impacted by periods of illiquidity in the secondary markets, which could negatively impact the performance of the MSR risk management instruments. For further discussion of how interest rate risk, basis risk and prepayment risk are managed, refer to Management's Discussion and Analysis – "Market Risk Management."

*Rising interest rates, unemployment and decreases in housing prices impact credit performance.*

The Company's assessment of its credit profile is based in part on management's evaluation of economic trends that affect the real estate lending environment, which has been generally positive in recent years. With recent increases in short-term interest rates, however, the favorable economic environment may not persist. The Company continually monitors changes in the economy, particularly unemployment rates and housing prices. If unemployment were to rise and either a slowdown in housing price appreciation or outright declines in housing prices were to occur, borrowers might have difficulty repaying their loans. As a result, the Company could experience higher credit losses in its mortgage and home equity portfolios, which could adversely affect its earnings.

*Risks related to the option adjustable-rate mortgage product.*

The Company continually monitors the credit risk inherent in its option adjustable-rate mortgage product ("Option ARM") portfolio and assesses the adequacy of its loan loss allowance in light of prevailing circumstances and the historical and current levels of negative amortization in its Option ARM portfolio. If credit risks associated with the Option ARM were to increase in severity, the Company's earnings could be adversely affected. For further discussion of the Option ARM product, refer to Management's Discussion and Analysis – "Credit Risk Management."

3

Cash Flows and Notes to the Consolidated Financial Statements as well as the tables presented herein, unless otherwise noted.

## Controls and Procedures

### Disclosure Controls and Procedures

The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report. Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, the Company's disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934.

In reaching the conclusion that disclosure controls and procedures were effective, management had considered the potential financial impact of control deficiencies associated with the matters giving rise to the restatement described in Note 2 to the Consolidated Financial Statements on page 113. Management believes this restatement is immaterial and was not the result of a material weakness in the Company's internal control over financial reporting. Accordingly, management has not changed its conclusion described above that the Company's disclosure controls and procedures were designed and operating effectively as of December 31, 2005.

Management reviews and evaluates the design and effectiveness of the Company's disclosure controls and procedures on an ongoing basis, which may result in the discovery of deficiencies, and improves its controls and procedures over time, correcting any deficiencies that may have been discovered.

### Changes in Internal Control Over Financial Reporting

Management reviews and evaluates the design and effectiveness of the Company's internal control over financial reporting on an ongoing basis, which may result in the discovery of deficiencies, some of which may be significant, and changes its internal control over financial reporting as needed to maintain their effectiveness, correcting any deficiencies, as needed, in order to ensure the continued effectiveness of the Company's internal controls. The Company's internal control over financial reporting changed when the Company acquired Providian Financial Corporation on October 1, 2005, to include the key controls inherent within the credit card operations it acquired. Except for this change, there have not been any other changes in the Company's internal control over financial reporting during the fourth quarter of 2005 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting. For management's assessment of the Company's internal control over financial reporting, refer to Management's Report on Internal Control Over Financial Reporting on page 89.

## Overview

Net income for 2005 was $3.43 billion, or $3.73 per diluted share, an increase from $2.88 billion, or $3.26 per diluted share for 2004. Included in earnings for 2004 was an after-tax gain of $399 million, or 45 cents per diluted share, from the first quarter sale and disposal of the Company's former consumer finance subsidiary, Washington Mutual Finance Corporation.

Net interest income was $7.89 billion in 2005, compared with $7.12 billion in 2004. The increase was primarily due to growth in the average total loan portfolio and loans held for sale, which collectively increased by 16% during 2005. Largely offsetting the growth in interest-earning assets was contraction in the net interest margin. The net interest margin in 2005 was 2.67%, a decline of 15 basis points from 2004. The decrease in the net interest margin was due to an increase in the cost of the Company's interest-bearing liabilities, which was driven by continuous increases in short-term interest rates since June of 2004.

16

92

As the U.S. economy rebounded in 2004 and 2005 from the downturn in the early part of the decade, the Federal Reserve Board initiated a series of 25 basis point increases in the targeted federal funds rate. This benchmark interest rate has increased from 1.00% in the second quarter of 2004 to 4.50% at the end of January 2006. These increases gradually shifted the Federal Reserve's monetary policy from a position that provided a stimulus effect on the domestic economy towards a more neutral fiscal policy that reduces the potential threat of inflation. Although the Federal Reserve has not stated that a 4.50% rate represents a position of neutrality, it did recently imply, for the first time since the current series of increases began, that the current rate is no longer at a level that would stimulate economic expansion. Accordingly, the current rate appears to be close to entering the Federal Reserve's target zone for fiscal policy neutrality. Until rates move into that zone, additional increases are likely. Since the Company's adjustable-rate home loans and securities reprice to current market rates more slowly than its wholesale borrowing sources, the Company expects the net interest margin will continue to be pressured until the federal funds rate stabilizes.

Partially mitigating the disparity in repricing speeds is the growth in home equity line of credit balances, which have repricing frequencies that are more closely aligned with the faster repricing behavior of the Company's wholesale borrowings. The average balance of home equity lines of credit was $36.14 billion in 2005, an increase of $9.71 billion, or 37% from 2004, while the yield on this portfolio increased from 4.23% to 5.85%. Additionally, the margin benefited from the fourth quarter addition of the credit card portfolio acquired from Providian Financial Corporation and from the partial restructuring of the available-for-sale securities portfolio in the first quarter of 2005, which resulted in the sale of approximately $3 billion of lower-yielding debt securities and the subsequent purchase of securities with comparatively higher yields.

Noninterest income in 2005 was $5.74 billion, an increase of $1.13 billion from 2004. The increase was largely due to consumer loan sales and servicing income of $413 million and credit card fee income of $139 million, all of which resulted from the Company's new Card Services segment, and improved revenues from the Company's home loan banking operations. At December 31, 2005, total managed credit card receivables were approximately $19.96 billion, an increase of nearly $700 million during the fourth quarter of 2005. A significant portion of this increase was the result of cross-selling credit card products to the Company's retail banking customer base.

Revenue from sales and servicing of home mortgage loans, including the effects of all MSR risk management instruments, was $1.79 billion in 2005, an increase from $1.47 billion in 2004. The increase was primarily due to higher levels of gains from the sale of mortgage loans and originated mortgage backed securities, net of gains and losses from risk management instruments. This increase was fostered by the strength of the U.S. housing market, which fueled strong customer demand for fixed-rate mortgages and the Company's Option ARM portfolio. In particular, the sustained liquidity of the Option ARM product in the secondary market enabled the Company to sell approximately $48.13 billion of Option ARM volume during 2005, compared with $14.12 billion in 2004. The Company also sells substantially all of its fixed-rate and medium-term adjustable-rate home loan volume.

As the yield curve continued to flatten throughout 2005 (and ended the year virtually flat), the interest rate differential between short-term adjustable-rate loans, such as the Option ARM, and fixed-rate loans continued to compress, which increases the desirability of fixed-rate loan products. Accordingly, short-term adjustable-rate loans, as a percentage of total home loan volume, declined from 39% in the fourth quarter of 2004 to 26% in the final quarter of 2005, while fixed-rate loans, as a percentage of total home loan volume, increased from 32% to 44% during the same periods.

The Company recorded a provision for loan and lease losses of $316 million in 2005, compared with a provision of $209 million in 2004. Reflecting the higher risk profile associated with the unsecured, higher-yielding lending activities conducted by Card Services, the 2005 provision included $195 million that was

17

related to the credit card portfolio in the fourth quarter. A relatively benign credit risk environment for the Company's real estate secured lending activities existed through most of 2005, reflecting the positive effects of a low mortgage interest rate environment, stable or appreciating housing prices in most of the Company's markets, and a relatively low national unemployment rate.

Depositor and other retail banking fees were $2.19 billion in 2005, a 10% increase from 2004. The growth was driven by strong increases in the number of retail checking accounts as well as an increase in debit card interchange and ATM-related income. The number of retail checking accounts at December 31, 2005 totaled approximately 9.9 million, compared with approximately 9.0 million at December 31, 2004, an increase of over 900,000 accounts. Total retail transaction accounts, which include checking, money market and savings accounts, increased by nearly 1.5 million in 2005.

The Company continues to grow its retail banking business by opening new stores and enhancing its products and services. The Company opened 210 new stores in 2005, and has established a target of opening between 150 and 200 new stores within its existing markets during 2006. Although the Company expects total noninterest expense to be higher in 2006 as a result of the continuing expansion of the retail banking franchise and the full-year effect of absorbing the Card Services Group into the Company's cost structure, those efforts will also be accompanied by rigorous expense management discipline and the implementation of operational efficiencies and productivity improvements, including the redeployment of certain back-office support operations to more cost-effective labor markets and the consolidation of other administrative support facilities.

## Critical Accounting Estimates

The preparation of financial statements in accordance with the accounting principles generally accepted in the United States of America requires management to make a number of judgments, estimates and assumptions that affect the reported amount of assets, liabilities, income and expenses in the Consolidated Financial Statements. Various elements of the Company's accounting policies, by their nature, involve the application of highly sensitive and judgmental estimates and assumptions. Some of these policies and estimates relate to matters that are highly complex and contain inherent uncertainties. In some instances, different estimates and assumptions could have been reasonably used to supplant those that were applied. Had those alternative estimates and assumptions been applied, the differences that may result from those alternative applications could have a material effect on the financial statements.

The Company has identified three accounting estimates that, due to the judgments and assumptions inherent in those estimates, and the potential sensitivity of its Consolidated Financial Statements to those judgments and assumptions, are critical to an understanding of its Consolidated Financial Statements. These estimates are: the fair value of certain financial instruments and other assets; derivatives and hedging activities; and the allowance for loan and lease losses and contingent credit risk liabilities.

Management has discussed the development and selection of these critical accounting estimates with the Company's Audit Committee. The Company believes that the judgments, estimates and assumptions used in the preparation of its Consolidated Financial Statements are appropriate given the facts and circumstances as of December 31, 2005. These judgments, estimates and assumptions are described in greater detail in subsequent sections of Management's Discussion and Analysis and in Note 1 to the Consolidated Financial Statements – "Summary of Significant Accounting Policies."

The discussion below presents information about the nature of the Company's critical accounting estimates:

## Fair Value of Certain Financial Instruments and Other Assets

A portion of the Company's assets are carried at fair value, including: certain retained interests from securitization activities (which are classified as trading assets), available-for-sale securities and derivatives.

18

94

Mortgage servicing rights and loans held for sale are recorded at the lower of carrying value or fair value. For those that qualify as hedged items under fair value hedge accounting, their changes in fair value are recognized in earnings and offset the changes in fair value of derivatives used as hedge accounting instruments.

Fair value is defined as the amount at which a financial instrument could be exchanged in a hypothetical transaction between willing, unrelated parties, other than in a forced or liquidation sale. Generally, for assets that are reported at fair value, the Company uses quoted market prices or internal valuation models that utilize market data inputs and other assumptions, such as loan prepayment speeds, forward interest rate yield curves, market volatilities and pricing spreads to determine their fair values. The degree of management judgment involved in determining the fair value of a financial instrument or other asset is dependent upon the availability of quoted market prices or observable market value inputs. For financial instruments that are actively traded in the marketplace or whose values are based on readily available market value data, little, if any, subjectivity is applied when determining the instrument's fair value. When observable market prices and data do not exist, significant management judgment is necessary to estimate fair value. In those cases, small changes in assumptions could result in significant changes in valuation.

The following financial instruments and other assets require the Company's most complex judgments and assumptions when estimating fair value:

*Mortgage Servicing Rights and Certain Other Retained Interests in Securitizations*

MSRs and certain other retained interests from securitization activities do not trade in an active, open market with readily quoted prices. Although sales do occur from time to time, the terms of such sales are generally not readily available. Consequently, the Company estimates the fair value of MSRs and certain other retained interests in securitization activities utilizing internal discounted cash flow models.

For MSRs, the discounted cash flow model calculates the present value of the expected future net cash flows of the servicing portfolio based on various assumptions, such as estimated future servicing costs, expected servicing portfolio prepayment speeds and discount rates that are commensurate with the risk profile of the serviced assets. This model is highly sensitive to changes in certain assumptions. Different anticipated prepayment speeds, in particular, can result in substantial changes in the estimated fair value of MSR. If actual prepayment experience differs from the anticipated rates used in the Company's model, this difference would likely result in a material change in MSR fair value. While the Company's model estimates a value, the specific value used is based on a variety of market-based factors, such as documented observable data and anticipated changes in prepayment speeds. The reasonableness of management's assumptions about these factors is evaluated through quarterly independent broker surveys. Independent appraisals of the fair value of the servicing portfolio are obtained periodically, but not less frequently than quarterly, and are used by management to evaluate the reasonableness of the fair value conclusions. Changes in MSR value are reported in the Consolidated Statements of Income under the noninterest income caption "Revenue from sales and servicing of home mortgage loans." Additional discussion regarding the estimation of MSR fair value, including limitations to the MSR fair value measurement process, are described in the subsequent section of Management's Discussion and Analysis – "Earnings Performance". Key economic assumptions and the sensitivity of MSR fair value to immediate changes in those assumptions are described in Note 7 to the Consolidated Financial Statements – "Mortgage Banking Activities."

For other retained interests in securitization activities (such as interest-only strips and residual interests) the discounted cash flow model used in determining fair value utilizes projections of expected cash flows that are greatly influenced by anticipated prepayment speeds and, in some cases, expected net credit losses or finance charges related to the securitized assets. Changes in those and other assumptions used could have a significant effect on the valuation of these retained interests. Changes in the value of

19

other retained interests in securitization activities are reported in the Consolidated Statements of Income under the noninterest income caption "Trading assets income (loss)" and on the Consolidated Statements of Financial Condition as "Trading assets."

*Loans held for sale*

The fair value of loans designated as held-for-sale is generally based on observable market prices of securities that are similar to those that will be collateralized by such loans. If market prices are not readily available, fair value is based on a discounted cash flow model, which takes into account prepayment factors and the degree of credit risk associated with the loans and the estimated effects of changes in market interest rates. When the estimated fair value of loans held for sale is lower than their carrying value or, for those that achieve fair value hedge accounting under Statement No. 133, as amended, when the estimated fair value is greater than their carrying value, a valuation adjustment that accounts for this difference is reported on the Consolidated Statements of Income as a component within the noninterest income caption "Revenue from sales and servicing of home mortgage loans." Valuation adjustments for consumer loans held for sale are recorded under the noninterest income caption "Revenue from sales and servicing of consumer loans."

*Goodwill Impairment*

Under FASB Statement No. 142, *Goodwill and Other Intangibles,* goodwill must be allocated to reporting units and tested for impairment. The Company tests goodwill for impairment at least annually or more frequently if events or circumstances, such as adverse changes in the business, indicate that there may be justification for conducting an interim test. Impairment testing is performed at the reporting-unit level (which is the same level as the Company's four major operating segments identified in Note 26 to the Consolidated Financial Statements). The first part of the test is a comparison, at the reporting unit level, of the fair value of each reporting unit to its carrying value, including goodwill. If the fair value is less than the carrying value, then the second part of the test is needed to measure the amount of potential goodwill impairment. The implied fair value of the reporting unit goodwill is calculated and compared to the actual carrying value of goodwill recorded within the reporting unit. If the carrying value of reporting unit goodwill exceeds the implied fair value of that goodwill, then the Company would recognize an impairment loss for the amount of the difference, which would be recorded as a charge against net income.

The fair values of the reporting units are determined primarily using discounted cash flow models based on each reporting unit's internal forecasts. In addition, analysis using market-based trading and transaction multiples, where available, is used to assess the reasonableness of the valuations derived from the discounted cash flow models.

Goodwill was not impaired as of December 31, 2005 or December 31, 2004, nor was any goodwill written off during the years ended December 31, 2005, 2004 and 2003. For additional information regarding the carrying values of goodwill by operating segment, see Note 8 to the Consolidated Financial Statements – "Goodwill and Other Intangible Assets."

*Other Intangible assets*

As part of a business combination accounted for under the purchase method, the Company must record all acquired assets and liabilities at fair value as of the acquisition date. Acquired assets include any identified intangible assets, such as purchased credit card relationships or core deposit intangibles. The fair value of those intangible assets usually is determined based on a discounted cash flow model that considers the expected net cash inflows resulting from those intangible relationships. If the intangible asset has a determinable finite life, the asset is amortized through earnings over its estimated life. Such amortization expense generally is recognized in the Consolidated Statements of Income under the noninterest expense

caption, "Other Expense." For additional information regarding other intangible assets, see Note 8 to the Consolidated Financial Statements – "Goodwill and Other Intangible Assets."

**Derivatives and Hedging Activities**

The Company enters into derivative contracts to manage the various risks associated with certain assets, liabilities, or probable forecasted transactions. When the Company enters into derivative contracts, the derivative instrument is designated as: (1) a hedge of the fair value of a recognized asset or liability or of an unrecognized firm commitment (a "fair value" hedge); (2) a hedge of the variability in expected future cash flows associated with an existing recognized asset or liability or a probable forecasted transaction (a "cash flow" hedge); or (3) held for other risk management purposes ("risk management derivatives").

All derivatives, whether designated in hedging relationships or not, are recorded at fair value as either assets or liabilities on the Consolidated Statements of Financial Condition. Changes in fair value of derivatives that are not in hedge accounting relationships (as in (3) above) are recorded within the Consolidated Statements of Income in the period in which the change in value occurs. Changes in the fair value of derivatives that are designated as cash flow hedges (as in (2) above), to the extent such hedges are deemed highly effective, are recorded as a separate component of accumulated other comprehensive income and reclassified into earnings when the earnings effect of the hedged cash flows is recognized. Changes in the fair value of derivatives in qualifying fair value hedge accounting relationships (as in (1) above) are recorded each period in earnings along with the change in fair value of the hedged item.

The determination of whether a derivative qualifies for hedge accounting requires judgment about the application of Statement No. 133, as amended. Statement No. 133, as amended, requires contemporaneous documentation of the Company's hedge relationships. Such documentation includes the nature of the risk being hedged, the identification of the asset or cash flow, or the group of assets or cash flows, that share the risk exposure that is designated as being hedged (i.e., the hedged item), the selection of the instrument that will be used to hedge the identified risk, and the method used to assess the effectiveness of the hedge relationship. The effectiveness assessment requires calculations that utilize standard statistical methods of correlation that must support the determination that the hedging relationship is expected to be highly effective, during the period that the hedge is designated, in achieving offsetting changes in fair value or cash flows attributable to the hedged risk. If the Company's documentation and assessment of effectiveness are not considered to be adequate to achieve hedge accounting treatment, the derivative is treated as a free-standing risk management instrument.

**Allowance for Loan and Lease Losses and Contingent Credit Risk Liabilities**

*Allowance for loan and lease losses*

The allowance for loan and lease losses represents management's estimate of incurred credit losses inherent in the Company's loan and lease portfolios as of the balance sheet date. The estimation of the allowance is based on a variety of factors, including past loan loss experience, the current credit profile of the Company's borrowers, adverse situations that have occurred that may affect the borrowers' ability to repay, the estimated value of underlying collateral, the interest rate climate as it affects adjustable-rate loans and general economic conditions. Determining the adequacy of the allowance is complex and requires judgment by management about the effect of matters that are inherently uncertain. Subsequent evaluations of the loan portfolio, in light of the factors then prevailing may result in significant changes in the allowance for loan and lease losses in future periods.

The allowance for loan and lease losses is reported within the Consolidated Statements of Financial Condition and the provision for loan and lease losses is reported within the Consolidated Statements of Income.

21

97

The estimates and judgments are described in further detail in the subsequent section of Management's Discussion and Analysis – "Credit Risk Management" and in Note 1 to the Consolidated Financial Statements – "Summary of Significant Accounting Policies."

*Contingent Credit Risk Liabilities*

In the ordinary course of business, the Company sells loans to third parties but retains credit risk exposure on those loans. When loans are sold with retained credit risk provisions attached to the sale, the Company commits to stand ready to perform, if the loan defaults, by making payments to remedy the default or repurchasing the loan. The Company also sells loans without retained credit risk that it may be required to repurchase for violation of a representation or warranty made in connection with the sale of the loan that has a material adverse effect on the value of the loan, or if the Company agreed to repurchase the loan in the event of a first payment or early payment default. When a loan sold to an investor without retained credit risk fails to perform according to its contractual terms, the investor will typically review the loan file to search for errors that may have been made in the process of originating the loan. If errors are discovered and it is determined that such errors constitute a violation of a representation or warranty made to the investor in connection with the loan's sale, then the Company will be required to either repurchase the loan or indemnify the investor for losses sustained if the violation had a material adverse effect on the value of the loan.

In 2004 and 2005, the Company's Long Beach Mortgage Company subsidiary engaged in whole loan sale transactions of originated subprime loans in which it agreed to repurchase from the investor each "early payment default" loan at a price equal to the loan's face value plus the amount of any premium paid by the investor. An early payment default occurs when the borrower fails to make the first post-sale payment due on the loan by a contractually specified date. Usually when such an event occurs, the fair value of the loan at the time of its repurchase is lower than the face value. In the fourth quarter of 2005, the Company experienced increased incidents of repurchases of early payment default loans sold by Long Beach Mortgage Company and this trend is expected to continue in the first part of 2006.

Reserves are established for the Company's exposure to these contingent credit risk liabilities in the aforementioned circumstances when it becomes probable that a loss has been incurred and the amount can be reasonably estimated. Throughout the life of these contingent credit risk liabilities, the Company may learn of additional information that can affect the assessment of loss probability or the estimation of the amounts involved. Changes in these assessments can lead to significant changes in the recorded reserves. Contingent credit risk liabilities are recorded within other liabilities on the Consolidated Statements of Financial Condition, and losses are recorded on the Consolidated Statements of Income under the noninterest income caption "Revenue from sales and servicing of home mortgage loans."

## Recently Issued Accounting Standards

In December 2004, the Financial Accounting Standards Board ("FASB") issued a revised version of the original Statement of Financial Accounting Standards ("Statement") No. 123, *Accounting for Stock-Based Compensation*. Statement No. 123R, *Share-Based Payment*, supersedes Accounting Principles Board ("APB") Opinion No. 25, *Accounting for Stock Issued to Employees*. This Statement requires that the cost resulting from all share-based payment transactions be recognized in the financial statements. This Statement establishes fair value as the measurement objective in accounting for share-based payment arrangements and requires all entities to apply a fair value-based measurement method in accounting for share-based payment transactions with employees, except for equity instruments held by employee stock ownership plans. Effective January 1, 2003 and in accordance with the transitional guidance of Statement No. 148, *Accounting for Stock-Based Compensation – Transition and Disclosure*, the Company elected to prospectively apply the fair value method of accounting for stock-based awards granted subsequent to December 31, 2002. The Company will prospectively apply Statement No. 123R to its financial statements as of January 1, 2006. However, as the Company has already adopted Statement No. 148 and substantially

22

98

all stock-based awards granted prior to its adoption have fully vested as of December 31, 2005, Statement No. 123R will not have a significant effect on the Consolidated Statements of Income or the Consolidated Statements of Financial Condition.

In March 2005, Securities and Exchange Commission ("SEC") Staff Accounting Bulletin No. 107 ("SAB 107") was issued, which expresses views of the staff regarding the interaction between Statement No. 123R, *Share-Based Payment*, and certain SEC rules and regulations and provides the staff's views regarding the valuation of share-based payment arrangements for public companies. The Company will consider the guidance provided by SAB 107 as part of its adoption of Statement No. 123R.

In May 2005, the FASB issued Statement No. 154, *Accounting Changes and Error Corrections – a replacement of APB Opinion No. 20 and FASB Statement No. 3*. This Statement replaces APB Opinion No. 20, *Accounting Changes, and Statement No. 3, Reporting Accounting Changes in Interim Financial Statements*, and changes the requirements for the accounting and reporting of a change in accounting principle. This Statement requires changes in accounting principles to be retrospectively applied to the prior periods presented in the financial statements, unless it is impracticable to determine either the period-specific effects or the cumulative effect of the change. This Statement applies to all voluntary changes in accounting principles and also applies to changes required by an accounting pronouncement in the unusual instance that the pronouncement does not include specific transition provisions. This Statement also carries forward, without substantive change, the provisions for the correction of an error from APB Opinion No. 20. Statement No. 154 is effective for accounting changes and corrections of errors made after December 31, 2005. The Company does not expect the application of this Statement to have a significant effect on the Consolidated Statements of Income or the Consolidated Statements of Financial Condition.

In February 2006, the FASB issued Statement No. 155, *Accounting for Certain Hybrid Financial Instruments*. This Statement amends Statements No. 133, *Accounting for Derivative Instruments and Hedging Activities and No. 140, Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities* to simplify and make more consistent the accounting for certain financial instruments. This Statement permits fair value remeasurement for any hybrid financial instrument with an embedded derivative that otherwise would require bifurcation, provided that the whole instrument is accounted for on a fair value basis and establishes a requirement to evaluate interests in securitized financial assets to identify interests that are freestanding derivatives or that are hybrid financial instruments that contain an embedded derivative requiring bifurcation. This Statement also allows a qualifying special purpose entity to hold a derivative financial instrument that pertains to a beneficial interest. Statement No. 155 is effective for all of the Company's financial instruments acquired or issued after December 31, 2006. Earlier adoption is permitted as of the beginning of an entity's fiscal year, provided the entity has not yet issued financial statements, including financial statements for any interim period for that fiscal year. The Company is currently evaluating the impact this guidance will have on the Consolidated Statements of Income or the Consolidated Statements of Financial Condition.

23

**Loans**

Total loans consisted of the following:

| | December 31, | | | | |
| | 2005 | 2004 | 2003 (in millions) | 2002 | 2001 |
|---|---|---|---|---|---|
| Loans held for sale | $ 33,582 | $ 42,743 | $ 20,837 | $ 39,623 | $ 27,574 |
| Loans held in portfolio: | | | | | |
| Loans secured by real estate: | | | | | |
| Home loans[1] | 135,290 | 129,134 | 113,016 | 92,970 | 87,833 |
| Home equity loans and lines of credit | 50,851 | 43,650 | 27,647 | 16,168 | 7,970 |
| Home construction[2] | 2,037 | 2,344 | 2,220 | 1,949 | 2,602 |
| Multi-family[3] | 25,601 | 22,282 | 20,324 | 18,000 | 15,608 |
| Other real estate[4] | 5,035 | 5,664 | 6,649 | 7,986 | 6,089 |
| Total loans secured by real estate | 218,814 | 203,074 | 169,856 | 137,073 | 120,102 |
| Consumer: | | | | | |
| Credit card | 8,043 | – | – | – | – |
| Other | 638 | 792 | 1,028 | 1,663 | 2,009 |
| Commercial business | 2,137 | 3,205 | 4,266 | 4,292 | 4,285 |
| Total loans held in portfolio[5] | $229,632 | $207,071 | $175,150 | $143,028 | $126,396 |

[1]    Includes specialty mortgage finance loans, which are comprised of purchased subprime home loans and subprime home loans originated by Long Beach Mortgage Company and held in its investment portfolio. Specialty mortgage finance loans were $21.15 billion, $19.18 billion, $12.98 billion, $10.13 billion and $8.21 billion at December 31, 2005, 2004, 2003, 2002 and 2001.

[2]    Represents loans to builders for the purpose of financing the acquisition, development and construction of single-family residences for sale and construction loans made directly to the intended occupant of a single-family residence.

[3]    Includes multi-family construction balances of $632 million in 2005, $333 million in 2004, $325 million in 2003, $491 million in 2002 and $385 million in 2001.

[4]    Includes other commercial real estate construction balances of $208 million in 2005, $277 million in 2004, $382 million in 2003, $469 million in 2002 and $608 million in 2001.

[5]    Includes net unamortized deferred loan origination costs of $1.53 billion, $1.25 billion, $1.01 billion, $587 million and $433 million at December 31, 2005, 2004, 2003, 2002 and 2001.

Total home loans consisted of the following:

| | December 31, | |
| | 2005 | 2004 |
| | (in millions) | |
|---|---|---|
| Home loans: | | |
| Short-term adjustable-rate loans[1] | | |
| Option ARMs[2] | $ 70,191 | $ 66,310 |
| Other ARMs | 14,666 | 9,065 |
| Total short-term adjustable-rate loans | 84,857 | 75,375 |
| Medium-term adjustable-rate loans[3] | 41,511 | 45,197 |
| Fixed-rate loans | 8,922 | 8,562 |
| Total home loans | $135,290 | $129,134 |

[1]    Short-term is defined as adjustable-rate loans that reprice within one year or less.

[2]    The total amount by which the unpaid principal balance ("UPB") of Option ARM loans exceeded their original principal amount was $157 million and $11 million at December 31, 2005 and 2004.

[3]    Medium-term is defined as adjustable-rate loans that reprice after one year.

During most of 2005, loans held for sale remained at elevated levels, with an average balance during 2005 of $44.85 billion compared with $29.72 billion during 2004. As the yield curve continued to flatten during 2005, it began to influence the product mix of loans originated, steering customers towards fixed-rate products, which the Company generally designates for sale. Additionally, during 2005 the

36

## Nonaccrual Loans, Foreclosed Assets and Restructured Loans

Loans, excluding credit card loans, are generally placed on nonaccrual status upon reaching 90 days past due. Additionally, loans in non-homogeneous portfolios are placed on nonaccrual status prior to becoming 90 days past due when payment in full of principal or interest is not expected. Management's classification of a loan as nonaccrual or restructured does not necessarily indicate that the principal or interest of the loan is uncollectible in whole or in part. Nonaccrual loans and foreclosed assets ("nonperforming assets") and restructured loans, in each instance excluding credit card loans, consisted of the following:

| | December 31, | | | | |
|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2002 | 2001 |
| | | | (dollars in millions) | | |
| Nonperforming assets and restructured loans: | | | | | |
| Nonaccrual loans[1][2]: | | | | | |
| Loans secured by real estate: | | | | | |
| Home | $ 565 | $ 534 | $ 736 | $1,068 | $1,010 |
| Specialty mortgage finance[3] | 872 | 682 | 597 | 438 | 292 |
| Total home nonaccrual loans | 1,437 | 1,216 | 1,333 | 1,506 | 1,302 |
| Home equity loans and lines of credit | 88 | 66 | 47 | 36 | 34 |
| Home construction[4] | 10 | 28 | 35 | 49 | 36 |
| Multi-family | 25 | 12 | 19 | 50 | 56 |
| Other real estate | 70 | 162 | 153 | 413 | 376 |
| Total nonaccrual loans secured by real estate | 1,630 | 1,484 | 1,587 | 2,054 | 1,804 |
| Consumer | 8 | 9 | 8 | 22 | 16 |
| Commercial business | 48 | 41 | 31 | 79 | 100 |
| Total nonaccrual loans held in portfolio | 1,686 | 1,534 | 1,626 | 2,155 | 1,920 |
| Foreclosed assets | 276 | 261 | 311 | 328 | 216 |
| Total nonperforming assets | $1,962 | $1,795 | $1,937 | $2,483 | $2,136 |
| As a percentage of total assets | 0.57% | 0.58% | 0.70% | 0.93% | 0.88% |
| Restructured loans | $ 22 | $ 34 | $ 111 | $ 98 | $ 118 |
| Total nonperforming assets and restructured loans | $1,984 | $1,829 | $2,048 | $2,581 | $2,254 |

[1] If interest on nonaccrual loans under the original terms had been recognized, such income is estimated to have been $79 million in 2005, $64 million in 2004, $86 million in 2003 and $118 million in 2002.

[2] Nonaccrual loans held for sale, which are excluded from the nonaccrual balances presented above, were $245 million, $76 million, $66 million, $119 million and $123 million at December 31, 2005, 2004, 2003, 2002 and 2001. Loans held for sale are accounted for at lower of aggregate cost or fair value, with valuation changes included as adjustments to gain from mortgage loans.

[3] Represents purchased subprime home loan portfolios and subprime home loans originated by Long Beach Mortgage Company and held in its investment portfolio.

[4] Represents loans to builders for the purpose of financing the acquisition, development and construction of single-family residences for sale and construction loans made directly to the intended occupant of a single-family residence.

51

Loans held in portfolio (excluding the allowance for loan and lease losses) and nonaccrual loans, in each instance excluding credit card loans, by geographic concentration at December 31, 2005 were as follows:

| | California | | Washington/Oregon | | New York/New Jersey | |
|---|---|---|---|---|---|---|
| | Portfolio | Nonaccrual | Portfolio | Nonaccrual | Portfolio | Nonaccrual |
| | | | (dollars in millions) | | | |
| Loans secured by real estate: | | | | | | |
| Home | $ 52,031 | $ 91 | $ 5,603 | $ 31 | $ 12,865 | $ 76 |
| Specialty mortgage finance[1] | 4,864 | 68 | 817 | 27 | 2,394 | 100 |
| Total home loans | 56,895 | 159 | 6,420 | 58 | 15,259 | 176 |
| Home equity loans and lines of credit | 27,088 | 29 | 5,880 | 13 | 3,663 | 7 |
| Home construction[2] | 1,141 | – | 326 | 2 | 98 | – |
| Multi-family | 17,609 | 7 | 1,552 | 7 | 3,673 | 3 |
| Other real estate | 1,926 | 10 | 913 | 15 | 830 | 4 |
| Total loans secured by real estate | 104,659 | 205 | 15,091 | 95 | 23,523 | 190 |
| Consumer. | 235 | 1 | 239 | 4 | 33 | – |
| Commercial business | 324 | 11 | 170 | 14 | 310 | 7 |
| Total loans held in portfolio | $ 105,218 | $ 217 | $ 15,500 | $ 113 | $ 23,866 | $ 197 |
| Loans and nonaccrual loans as a percentage of total loans and total nonaccrual loans | 48% | 13% | 7% | 7% | 11% | 11% |

[1]  Represents purchased subprime home loan portfolios and subprime home loans originated by Long Beach Mortgage Company and held in its investment portfolio.

[2]  Represents loans to builders for the purpose of financing the acquisition. development and construction of single-family residences for sale and construction loans made directly to the intended occupant of a single-family residence.

| | Florida | | Texas | | Illinois | |
|---|---|---|---|---|---|---|
| | Portfolio | Nonaccrual | Portfolio | Nonaccrual | Portfolio | Nonaccrual |
| | | | (dollars in millions) | | | |
| Loans secured by real estate: | | | | | | |
| Home | $ 9.892 | $ 58 | $ 1,492 | $ 20 | $ 4,451 | $ 41 |
| Specialty mortgage finance[1] | 2,034 | 46 | 1,186 | 78 | 1,093 | 72 |
| Total home loans | 11,926 | 104 | 2,678 | 98 | 5,544 | 113 |
| Home equity loans and lines of credit | 3,789 | 4 | 3,634 | 11 | 999 | 1 |
| Home construction[2] | 126 | 1 | 32 | – | 23 | 1 |
| Multi-family | 313 | – | 311 | 4 | 562 | – |
| Other real estate | 80 | 4 | 539 | 30 | 4 | 1 |
| Total loans secured by real estate | 16,234 | 113 | 7,194 | 143 | 7,132 | 116 |
| Consumer. | 25 | 1 | 24 | – | 1 | – |
| Commercial business | 155 | 2 | 205 | 6 | 22 | – |
| Total loans held in portfolio | $ 16,414 | $ 116 | $ 7,423 | $ 149 | $ 7,155 | $ 116 |
| Loans and nonaccrual loans as a percentage of total loans and total nonaccrual loans | 7% | 7% | 3% | 9% | 3% | 7% |

[1]  Represents purchased subprime home loan portfolios and subprime home loans originated by Long Beach Mortgage Company and held in its investment portfolio.

[2]  Represents loans to builders for the purpose of financing the acquisition. development and construction of single-family residences for sale and construction loans made directly to the intended occupant of a single-family residence.

52

Underwriting and Risk Mitigation

The Company actively manages the credit risk inherent in its Option ARM portfolio primarily by ensuring compliance with its underwriting standards, monitoring loan performance and conducting risk modeling procedures. Risk attributes and compensating factors, which may include an applicant's credit score, the loan-to-value ratio, loan size and debt-to-income ratio, are taken into consideration as part of the underwriting process. The Company's practices of not offering Option ARM loans through its specialty mortgage finance lending program and of selectively selling Option ARM loans to secondary market participants have further limited the potential for credit risk in its Option ARM portfolio.

In the underwriting of loans, one of many factors the Company considers when deciding whether to approve or decline a loan is the applicant's debt-to-income ratio. The Company's underwriting process for Option ARM loans has historically involved calculating an applicant's debt-to-income ratio using an administratively set interest rate. Prior to 2004, the administratively set rate approximated the then-prevailing fully-indexed rate. However, as short-term interest rates (and hence the fully-indexed rate) increased in 2004 and 2005, the Company's administratively set qualifying rate was not adjusted upward, which resulted in loans being made to borrowers who were qualified based on debt-to-income ratios calculated using an interest rate below the fully-indexed rate. The administratively set rate was adjusted upward in October 2005, and beginning in mid-December 2005, it was replaced with a fully-indexed rate that adjusts monthly for changes in the index rate.

The Company's experience shows that debt-to-income ratios are less predictive of loan performance than credit scores and loan-to-value ratios, which the Company believes are the two key determinants in forecasting future loan performance. Therefore, having considered the credit scores and loan-to-value ratios of the Option ARM loans made to borrowers who were qualified based on debt-to-income ratios calculated using an interest rate below the fully-indexed rate, the Company expects that the credit performance of these loans will not differ materially from the expected performance of Option ARM loans qualified using the fully-indexed rate.

Option ARM loans originated in 2004 and 2005 and held in portfolio at December 31, 2005 had an unpaid principal balance of $42.87 billion, a weighted average FICO score of 681 and a weighted average loan-to-value ratio at origination of 72 percent. Of such loans, the unpaid principal balance for borrowers who were qualified at below the fully-indexed rate totaled $29.97 billion, with a weighted average FICO score of 685 and a weighted average loan-to-value ratio at origination of 72 percent.

Risk mitigation activities include proactive risk management strategies such as re-designating Option ARM loans from held in portfolio to held for sale (prior to selling the loans in the secondary market), such as occurred during 2005 when the Company sold approximately $3 billion of Option ARM loans that were originally held in its loan portfolio. Additionally, the 60-month recasting feature that is inherent within the Option ARM product serves to limit the amount of negative amortization. The Company did not conduct risk mitigation activities that involved the use of insurance arrangements, credit default agreements or credit derivatives during 2005.

Impact of External Factors

Certain external factors have, over the last five years, contributed to a reduction in the credit risk inherent in the Option ARM portfolio. The two most significant economic factors affecting the Option ARM portfolio are prepayment rates, which operate to reduce the risk of payment shock in the portfolio caused by the 60-month recasting event, and changes in housing prices, which affect current loan-to-value ratios. The risk of payment shock is reduced because many Option ARM borrowers will prepay their loans prior to the occurrence of the first 60-month recasting event. Furthermore, credit risk usually diminishes when housing prices appreciate. Option ARM loans originated prior to 2005 have benefited from a longer period of housing price appreciation than loans originated in 2005; with such earlier originations

56

103

accounting for 62% by balance and 71% by number of Option ARM loans held in portfolio at December 31, 2005, current loan-to-value ratios have generally improved – in many cases offsetting the credit risk associated with negative amortization that may have resulted from the borrower's use of the minimum payment option.

*Home Loans with Loan-to-Value Ratios Greater Than 80 percent Without Private Mortgage Insurance or Government Guarantees*

Loan-to-value ratios are a key determinant of future performance. Home loans with loan-to-value ratios of greater than 80 percent at origination without private mortgage insurance or government guarantees expose the Company to greater credit risk than home loans with loan-to-value ratios of 80 percent or less at origination. Credit risk is also reduced when the loan amount above 80 percent of the collateral value is guaranteed by the government or is insured under a policy of private mortgage insurance purchased by the borrower. This greater credit risk arises because, in general, both default risk and the severity of loss is higher when borrowers have less equity to protect in the event of foreclosure. At December 31, 2005, home loans held in portfolio with these features amounted to $9.01 billion and the weighted average loan-to-value ratio at origination of such loans was 88 percent. Substantially all of these loans were made to subprime borrowers, including $6.91 billion of purchased subprime loans. Total home loans with these features accounted for 10% of the Company's home loan volume in 2005.

The Company actively monitors conditions in housing markets in which it has a concentration of home loans. Geographic concentrations are taken into account when deciding which home loans to sell in the secondary market. Only $604 million, or 0.4% of home loans held in portfolio at December 31, 2005, had no private mortgage insurance or government guarantees and had loan-to-value ratios in excess of 90 percent at origination. The highest proportion of these loans was secured by properties in California, a market in which housing prices have generally appreciated over the last five years.

Typically, borrowers requesting financing with loan-to-value ratios of greater than 80 percent without government guarantees are required to purchase private mortgage insurance from a third party. In the event of default, the Company can recover losses from the private mortgage insurer. Alternatively, under certain loan programs, qualifying customers can elect to pay a higher interest rate to the Company in lieu of paying for private mortgage insurance. This higher interest rate is expected to compensate the Company for the incremental credit risk inherent in lending to borrowers without private mortgage insurance.

The Company seeks to mitigate credit risk in its purchased subprime loan portfolio by requiring minimum credit scores and by re-underwriting all such loans. Furthermore, with limited exceptions, the Company does not purchase loans through this program that have loan-to-value ratios of greater than 90 percent.

*Home Equity Loans and Lines of Credit where the Combined Loan-to-Value Ratio is Greater Than 80 percent*

Instead of undertaking cash-out refinance transactions, many borrowers have elected to leverage increasing amounts of equity in their homes by borrowing money through either a first or second lien home equity loan or line of credit. The existence of a first lien mortgage loan and second lien home equity loan or line of credit made to one borrower and secured by the same property, most often arises when the Company:

- Simultaneously originates the first lien mortgage loan and second lien home equity loan or line of credit (so called "piggyback" loans);

- Originates or purchases the first lien mortgage loan and at a subsequent date originates a second lien home equity loan or line of credit;

57

104

- Originates a second lien home equity loan or line of credit subordinate to another lender's first lien mortgage loan.

When the Company holds a lien on a property that is subordinate to a first lien mortgage held by another lender, both the probability of default and severity of loss risk is generally higher than when the Company holds both the first lien home loan and second lien home equity loan or line of credit. In the event of foreclosure, the probability of default is generally higher because the first lien holder does not have to take into consideration any losses the second lien holder may sustain when deciding whether to foreclose on a property. The severity of loss risk is higher principally because a second lien holder who exercises its right to foreclose on a property must ensure the first lien holder's investment is repaid in full. By taking this action, the second lien holder increases its exposure to greater loss on liquidation of the collateral.

The balance of home equity loans and lines of credit with combined loan-to-value ratios of greater than 80 percent at origination totaled $12.31 billion at December 31, 2005 and accounted for 37% of the Company's home equity volume in 2005. Substantially all of this portfolio had a combined loan-to-value ratio at origination of between 80 and 90 percent.

To compensate for the increased credit risk in the home equity portfolio that arises where the combined loan-to-value ratio at origination is greater than 80 percent, the Company typically charges such borrowers a higher rate of interest than would be charged if the combined loan-to-value ratio at origination was less than 80 percent. The Company also buys pool mortgage insurance that insulates it from the risk of default on those home equity loans or lines of credit where the combined loan-to-value ratio at origination is greater than 90 percent.

*Interest-only Payment Home Loans*

Borrowers with interest-only loans are initially required to make monthly payments that are sufficient to cover the full amount of contractual interest accrued in the previous month. After a predetermined period of time (usually 5 years), the payment is reset to allow the loan to fully-amortize over its remaining life. The Company held $10.66 billion of interest-only home loans in portfolio at December 31, 2005. Loans with these features accounted for 8% of the Company's home loan volume in 2005. Borrowers with interest-only loans generally have the highest credit ratings, lowest weighted average loan-to-value ratios at origination and the most favorable delinquency statistics of all loan programs in the Company's home loan portfolio. Compared to fully-amortizing loan products, interest-only loans originated by the Company contain other restrictions such as lower maximum loan-to-value ratios and lower maximum loan levels. Borrowers with interest-only loans are also charged a higher interest rate to compensate for the potentially higher credit risk.

**Allowance for Loan and Lease Losses**

The allowance for loan and lease losses represents management's estimate of incurred credit losses inherent in the Company's loan and lease portfolios as of the balance sheet date. The estimation of the allowance is based on a variety of factors, including past loan loss experience, the current credit profile of borrowers, adverse situations that have occurred that may affect the borrowers' ability to repay, the estimated value of underlying collateral, the interest rate climate as it affects adjustable-rate loans and general economic conditions. Determining the adequacy of the allowance is complex and requires judgment by management about the effect of matters that are inherently uncertain. Subsequent evaluations of the loan portfolio, in light of the factors then prevailing, may result in significant changes in the allowance for loan and lease losses in future periods.

The allowance provides for incurred losses that are inherent in the loan portfolio. Losses are recognized when (a) available information indicates that it is probable that a loss has been incurred and (b) the amount of the loss can be reasonably estimated. Generally, borrowers are impacted by events that

58

result in loan default and eventual loss well in advance of a lender's knowledge of those events. Examples of such loss-causing events for home loans are borrower job loss, divorce and medical crisis. An example for commercial real estate loans would be the loss of a major tenant.

In determining the allowance for loan and lease losses, the Company allocates a portion of the allowance to its various loan product categories based on an analysis of individual loans and pools of loans. However, the entire allowance (both the allocated component and the portion that remains unallocated) is available to absorb credit losses inherent in the total loan portfolio as of the balance sheet date.

The allocated allowance for homogeneous loans (such as home loans, home equity loans and lines of credit, specialty mortgage finance loans and credit card loans) is determined using statistical forecasting models that estimate default and loss outcomes based on an evaluation of past performance of loans in the Company's portfolio and other factors as well as industry historical loan loss data. Management periodically reviews these models for reasonableness and updates the assumptions used in these models.

Non-homogeneous loans (such as multi-family and non-residential real estate loans) are individually reviewed and assigned a risk grade. The loans are then categorized by their risk grade into pools, with each pool having a pre-assigned loss factor commensurate with the applicable level of estimated risk. Loss factors are then multiplied by the unpaid principal balance of loans in each pool to determine the allocated allowance applicable to that pool.

The Company also evaluates certain loans on an individual basis for impairment (as defined by Statement No. 114, *Accounting by Creditors for Impairment of a Loan*) and records an allowance for impaired loans as appropriate. Such loans are excluded from other loan loss analyses so as to avoid double counting the loss exposure.

To mitigate the imprecision inherent in estimates of credit losses, the allocated component of the allowance is supplemented by an unallocated component. The unallocated component reflects management's assessment of various risk factors that are not adequately reflected in the models used to determine the allocated component of the allowance. These factors include general economic and business conditions affecting its key lending products and markets, credit quality and collateral value trends, loan concentrations, specific industry conditions within portfolio segments, recent loss experience in particular segments of the portfolio, duration of the current business cycle and the impact of new product initiatives and other such variables for which recent historical performance does not reflect the risk profile of the portfolio.

59

Changes in the allowance for loan and lease losses were as follows:

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2002 | 2001 |
| | (dollars in millions) | | | | |
| Balance, beginning of year | $ 1,301 | $ 1,250 | $ 1,503 | $ 1,278 | $ 909 |
| Allowance transferred to loans held for sale | (270) | (23) | (3) | (31) | – |
| Allowance acquired through business combinations | 592 | – | – | 148 | 120 |
| Other | – | – | 17 | (48) | – |
| Provision for loan and lease losses[1] | 316 | 209 | 42 | 404 | 426 |
| | 1,939 | 1,436 | 1,559 | 1,751 | 1,455 |
| Loans charged off: | | | | | |
| Loans secured by real estate: | | | | | |
| Home | (38) | (39) | (65) | (52) | (29) |
| Specialty mortgage finance[2] | (50) | (39) | (39) | (33) | (25) |
| Total home loans charged off | (88) | (78) | (104) | (85) | (54) |
| Home equity loans and lines of credit | (30) | (22) | (14) | (14) | (4) |
| Home construction[3] | (1) | (1) | (2) | (1) | – |
| Multi-family | (1) | (2) | (5) | (1) | – |
| Other real estate | (8) | (11) | (97) | (60) | (35) |
| Total loans secured by real estate | (128) | (114) | (222) | (161) | (93) |
| Consumer: | | | | | |
| Credit card | (138) | – | – | – | – |
| Other | (38) | (53) | (69) | (70) | (51) |
| Commercial business | (34) | (21) | (79) | (73) | (49) |
| Total loans charged off | (338) | (188) | (370) | (304) | (193) |
| Recoveries of loans previously charged off: | | | | | |
| Loans secured by real estate: | | | | | |
| Home | – | – | 10 | 2 | 2 |
| Specialty mortgage finance[2] | 3 | 3 | 3 | – | – |
| Total home loan recoveries | 3 | 3 | 13 | 2 | 2 |
| Home equity loans and lines of credit | 9 | 4 | 1 | 1 | 1 |
| Multi-family | 3 | 3 | 1 | 1 | – |
| Other real estate | 13 | 10 | 17 | 12 | 3 |
| Total loans secured by real estate | 28 | 20 | 32 | 16 | 6 |
| Consumer: | | | | | |
| Credit card | 40 | – | – | – | – |
| Other | 19 | 19 | 15 | 13 | 4 |
| Commercial business | 7 | 14 | 14 | 27 | 6 |
| Total recoveries of loans previously charged off | 94 | 53 | 61 | 56 | 16 |
| Net charge-offs | (244) | (135) | (309) | (248) | (177) |
| Balance, end of year | $ 1,695 | $ 1,301 | $ 1,250 | $ 1,503 | $ 1,278 |
| Net charge-offs as a percentage of average loans held in portfolio | 0.11% | 0.07% | 0.20% | 0.17% | 0.14% |
| Allowance as a percentage of total loans held in portfolio | 0.74 | 0.63 | 0.71 | 1.05 | 1.01 |

[1] Includes a $202 million reversal of provision for loan and lease losses recorded in the fourth quarter of 2003.
[2] Represents purchased subprime home loan portfolios and subprime home loans originated by Long Beach Mortgage Company and held in its investment portfolio.
[3] Represents loans to builders for the purpose of financing the acquisition, development and construction of single-family residences for sale and construction loans made directly to the intended occupant of a single-family residence.

60

The risk profile of the Company's loan portfolio changed significantly during 2001 and 2002. In a five quarter span from January 2001 to March 31, 2002, the Company consummated four purchase business combinations: Bank United Corp. ("Bank United"), the mortgage operations of The PNC Financial Services Group, Inc., Fleet Mortgage Corp. and Dime Bancorp, Inc. ("Dime"). As a result of these acquisitions, the Company's loan portfolio contained substantially higher levels of credit risk. In particular, Bank United's commercial lending activities were concentrated in underperforming sectors of the economy, such as assisted living facilities, Small Business Administration loans and highly leveraged syndicated lending. This change in the loan portfolio composition was exacerbated by the downturn in the national economy, which continued to worsen following the events of September 11, 2001.

Although the national economy showed some intermittent signs of stabilizing performance in 2002, the overall climate was still one of significant uncertainty, as demonstrated by the continuing high levels of unemployment, distressed levels of consumer confidence and continuing concerns of housing price bubbles in some of the Company's real estate markets. After their substantial growth in 2001, nonperforming asset trends stabilized in 2002 but remained at elevated levels, decreasing slightly to $2.48 billion at December 31, 2002 after reaching a first quarter peak of $2.68 billion. Though the Company continued to provision at levels that exceeded net charge-offs as a result of the continuing economic malaise, the gap between these statistical measures had declined from $74 million in the first quarter of 2002 to $2 million by the fourth quarter of that year. This reflected the Company's cautious belief that, while the economy had not demonstrated signals of a sustained economic recovery, it at least did not appear to be deteriorating any further. This assessment was also evident in the quarterly trend of the allowance for loan and lease losses as a percentage of total loans held in portfolio. After growing steadily from 0.82% in the first quarter of 2001 to 1.08% in the second quarter of 2002, it stabilized during the remainder of that year, ending at 1.05% at December 31, 2002.

During 2003, nonperforming assets declined from $2.48 billion at the beginning of the year to $1.94 billion at December 31, 2003. Beginning in the fourth quarter of 2002, the Company initiated a program of periodically selling nonperforming assets in order to reduce its exposure to potential credit losses. This program continued throughout 2003 with the sale of $619 million of nonperforming loans and was substantially the reason for the decline in nonperforming assets. Charge-offs sustained from sales of these loans were, in general, at lower levels than the Company believes it would have incurred had these loans been allowed to season further.

As economic conditions improved during 2003, the Company's assessment of the economic climate progressed from one of continuing concern in the first quarter of 2003 to one of guarded optimism by the third quarter of that year. However, a discernable, positive trend was not evident until various economic statistics were released in the fourth quarter. Those statistics provided conclusive evidence that key economic indicators that affect the Company's credit risk profile had improved. Those indicators included a stable interest rate environment, a consistent pattern of stable or increasing housing prices, strong levels of residential home construction, lower unemployment levels, increasing capital expenditures, steady to improving corporate profits and stronger levels of exports from a weakening U.S. dollar. These favorable external factors were augmented by the Company's ability to sell its underperforming franchise finance loan portfolio in the fourth quarter of 2003 at a price that exceeded its carrying value by $82 million. As a result of all of these events, the Company determined that a $202 million reversal of the provision for loan and lease losses in the fourth quarter of 2003 was appropriate.

During 2004, strong loan portfolio growth, especially in the higher-risk purchased subprime portfolio, resulted in management recording a provision for loan and lease losses that exceeded net charge-offs by $74 million. However, as a reflection of the continuing favorable trend in key domestic economic indicators which facilitated a relatively benign credit environment throughout the year, the allowance for loan and lease losses as a percentage of loans held in portfolio declined from 0.71% at December 31, 2003 to 0.63% at December 31, 2004. The positive economic outlook was also affirmed by the Federal Reserve's decision

to initiate a series of measured increases in the targeted Federal Funds rate during the second half of 2004, thus reducing the degree of stimulus that the Federal Reserve believes is necessary to sustain continuing economic growth.

The allowance for loan and lease losses increased by $394 million from $1.30 billion at December 31, 2004 to $1.70 billion at December 31, 2005 largely reflecting the addition of the credit card portfolio of the former Providian Financial Corporation on October 1, 2005. Credit card loans are generally unsecured and typically generate significantly higher delinquency rates and charge-offs than real estate secured loans and the allocated allowance for losses on credit card loans, expressed as a percentage of the credit card portfolio, is consequently significantly higher than on real estate secured loans. Largely as a result of the addition of a credit card portfolio, the total allowance for loan and lease losses expressed as a percentage of total loans held in portfolio, increased from 0.63% at December 31, 2004 to 0.74% at December 31, 2005. The overall economic environment surrounding the Company's lending operations during 2005 was relatively stable despite increases in short-term interest rates, with a generally healthy business climate and continued strength in employment levels and real estate markets nationally.

An analysis of the allowance for loan and lease losses was as follows:

| | December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2005 | | | 2004 | | | 2003 | | |
| | Allowance for Loan and Lease Losses | Allocated Allowance as a % of Loan Category | Loan Category as a % of Total Loans[1] | Allowance for Loan and Lease Losses | Allocated Allowance as a % of Loan Category | Loan Category as a % of Total Loans[1] | Allowance for Loan and Lease Losses | Allocated Allowance as a % of Loan Category | Loan Category as a % of Total Loans[1] |
| | | | | (dollars in millions) | | | | | |
| Allocated allowance: | | | | | | | | | |
| Loans secured by real estate: | | | | | | | | | |
| Home .................... | $ 222 | 0.19% | 49.71% | $ 215 | 0.20% | 53.12% | $ 321 | 0.32% | 57.12% |
| Specialty mortgage finance[2].... | 373 | 1.77 | 9.21 | 242 | 1.26 | 9.24 | 84 | 0.65 | 7.41 |
| Total home loans ......... | 595 | 0.44 | 58.92 | 457 | 0.35 | 62.36 | 405 | 0.36 | 64.53 |
| Home equity loans and lines of | | | | | | | | | |
| credit.................... | 107 | 0.21 | 22.14 | 83 | 0.19 | 21.08 | 82 | 0.30 | 15.78 |
| Home construction[3] ........ | 6 | 0.29 | 0.89 | 12 | 0.51 | 1.13 | 18 | 0.81 | 1.27 |
| Multi-family.............. | 122 | 0.48 | 11.15 | 101 | 0.45 | 10.76 | 139 | 0.68 | 11.60 |
| Other real estate ........... | 69 | 1.37 | 2.19 | 116 | 2.05 | 2.74 | 110 | 1.65 | 3.80 |
| Total allocated allowance | | | | | | | | | |
| secured by real estate .... | 899 | 0.41 | 95.29 | 769 | 0.38 | 98.07 | 754 | 0.44 | 96.98 |
| Consumer: | | | | | | | | | |
| Credit card ............... | 328 | 4.08 | 3.50 | – | – | – | – | – | – |
| Other ................... | 27 | 4.25 | 0.28 | 36 | 4.55 | 0.38 | 49 | 4.77 | 0.59 |
| Commercial business .......... | 44 | 2.03 | 0.93 | 51 | 1.59 | 1.55 | 72 | 1.69 | 2.43 |
| Total allocated allowance | | | | | | | | | |
| held in portfolio ........ | 1,298 | 0.57 | 100.00 | 856 | 0.41 | 100.00 | 875 | 0.50 | 100.00 |
| Unallocated allowance .......... | 397 | 0.17 | – | 445 | 0.22 | – | 375 | 0.21 | – |
| Total allowance for loan and | | | | | | | | | |
| lease losses ............ | $1,695 | 0.74% | 100.00% | $1,301 | 0.63% | 100.00% | $1,250 | 0.71% | 100.00% |

(Continued on next table.)

---

[1] Excludes loans held for sale.

[2] Represents purchased subprime home loan portfolios and subprime home loans originated by Long Beach Mortgage Company and held in its investment portfolio.

[3] Represents loans to builders for the purpose of financing the acquisition, development and construction of single-family residences for sale and construction loans made directly to the intended occupant of a single-family residence.

109

|  | December 31, | | | | | |
|  | 2002 | | | 2001 | | |
|  | Allowance for Loan and Lease Losses | Allocated Allowance as a % of Loan Category | Loan Category as a % of Total Loans[1] | Allowance for Loan and Lease Losses | Allocated Allowance as a % of Loan Category | Loan Category as a % of Total Loans[1] |
|  | | | (dollars in millions) | | | |
| Allocated allowance: | | | | | | |
| Loans secured by real estate: | | | | | | |
| Home . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $  251 | 0.30% | 57.92% | $  290 | 0.36% | 63.00% |
| Specialty mortgage finance[2] . . . . . . . . . . . . . | 169 | 1.67 | 7.08 | 97 | 1.18 | 6.49 |
| Total home loans. . . . . . . . . . . . . . . . . . . . | 420 | 0.45 | 65.00 | 387 | 0.44 | 69.49 |
| Home equity loans and lines of credit . . . . . . . | 46 | 0.29 | 11.31 | 27 | 0.34 | 6.31 |
| Home construction[3] . . . . . . . . . . . . . . . . . . . | 22 | 1.13 | 1.36 | 32 | 1.23 | 2.05 |
| Multi-family . . . . . . . . . . . . . . . . . . . . . . . . | 146 | 0.81 | 12.59 | 138 | 0.88 | 12.35 |
| Other real estate. . . . . . . . . . . . . . . . . . . . . . | 296 | 3.71 | 5.58 | 161 | 2.64 | 4.82 |
| Total allocated allowance secured by real estate . . . . . . . . . . . . . . . . . . . . . . . . . | 930 | 0.68 | 95.84 | 745 | 0.62 | 95.02 |
| Consumer: | | | | | | |
| Credit card . . . . . . . . . . . . . . . . . . . . . . . . . | – | – | – | – | – | – |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 70 | 4.21 | 1.16 | 71 | 3.53 | 1.59 |
| Commercial business. . . . . . . . . . . . . . . . . . . | 116 | 2.70 | 3.00 | 92 | 2.15 | 3.39 |
| Total allocated allowance held in portfolio. . | 1,116 | 0.78 | 100.00 | 908 | 0.72 | 100.00 |
| Unallocated allowance . . . . . . . . . . . . . . . . . . | 387 | 0.27 | – | 370 | 0.29 | – |
| Total allowance for loan and lease losses . . . | $1,503 | 1.05% | 100.00% | $1,278 | 1.01% | 100.00% |

[1]  Excludes loans held for sale.
[2]  Represents purchased subprime home loan portfolios and subprime home loans originated by Long Beach Mortgage Company and held in its investment portfolio.
[3]  Represents loans to builders for the purpose of financing the acquisition, development and construction of single-family residences for sale and construction loans made directly to the intended occupant of a single-family residence.

Growth in the Company's specialty mortgage finance portfolio since 2001 has resulted in a substantial increase in the allocated allowance attributable to this portfolio and a substantial increase in nonaccrual loans. The Company seeks to mitigate the credit risk in this portfolio by ensuring compliance with underwriting standards on loans originated to subprime borrowers and by re-underwriting all purchased subprime loans. During 2005, while the size of this portfolio grew by $1.97 billion or 10%, nonaccrual loans and net charge-offs expressed as a percentage of the loan category increased by 16% and 18%, and as a result, the allocated allowance increased from 1.26% of specialty mortgage finance loans held in portfolio to 1.77%.

Home equity loans and lines of credit increased from $7.97 billion at December 31, 2001 to $50.85 billion at December 31, 2005. With the strong housing market that has existed during the current decade, home equity loans and lines of credit have become an increasingly popular product as they enable homeowners to borrow a portion of their equity for personal expenditures. Although the allocated allowance for this portfolio increased from $27 million at December 31, 2001 to $107 million at the end of 2005, that allowance as a percentage of loans in this portfolio declined from 0.34% to 0.21% during that same period, reflecting generally high credit scores among borrowers, lower risk loan-to-value ratios and a significant portion of loans that are in a first lien position.

### 90 or More Days Past Due and Still Accruing

The total amount of loans held in portfolio, excluding credit card loans, that were 90 days or more contractually past due and still accruing interest was $107 million, $85 million, $46 million, $60 million and $86 million at December 31, 2005, 2004, 2003, 2002 and 2001. The majority of these loans are either VA- or FHA-insured with little or no risk of loss of principal or interest. Credit card loans held in portfolio that were 90 days or more contractually past due and still accruing interest were $87 million at

December 31, 2005. Credit card loans are charged-off when they are determined to be uncollectible or by the end of the month in which the account becomes 180 days past due.

As a result of regulatory guidelines issued in 2003, delinquent mortgages contained within GNMA servicing pools that are repurchased or are eligible to be repurchased by the Company must be reported as loans on the Consolidated Statements of Financial Condition. As the Company sells most of these repurchased loans to secondary market participants, they are classified as loans held for sale on the Consolidated Statements of Financial Condition. Substantially all of these loans are either guaranteed or insured by agencies of the federal government and, therefore, do not expose the Company to significant risk of credit loss. The Company's held for sale portfolio contained $1.06 billion, $1.60 billion, $2.50 billion, $3.22 billion and $692 million of such loans that were 90 days or more contractually past due and still accruing interest at December 31, 2005, 2004, 2003, 2002 and 2001.

111

# REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

**To the Board of Directors and Shareholders of**
**Washington Mutual, Inc.**

We have audited management's assessment, included in the accompanying Management's Report on Internal Control Over Financial Reporting, that Washington Mutual, Inc. and subsidiaries (the "Company") maintained effective internal control over financial reporting as of December 31, 2005, based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assessment that the Company maintained effective internal control over financial reporting as of December 31, 2005, is fairly stated, in all material respects, based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Also, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2005, based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

90

We have also audited, in accordance with the standards of the PCAOB, the consolidated financial statements as of and for the year ended December 31, 2005 of the Company, and our report dated March 8, 2006, expressed an unqualified opinion on those consolidated financial statements.

/s/ Deloitte & Touche LLP

Seattle, Washington
March 8, 2006

91

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

**To the Board of Directors and Shareholders of**
**Washington Mutual, Inc.**

We have audited the accompanying consolidated statements of financial condition of Washington Mutual, Inc. and subsidiaries (the "Company") as of December 31, 2005 and 2004, and the related consolidated statements of income, stockholders' equity and comprehensive income, and of cash flows for each of the three years in the period ended December 31, 2005. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2005 and 2004, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2005, in conformity with accounting principles generally accepted in the United States of America.

We have also audited, in accordance with the standards of the PCAOB, the effectiveness of the Company's internal control over financial reporting as of December 31, 2005, based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission, and our report dated March 8, 2006, expressed an unqualified opinion on management's assessment of the effectiveness of the Company's internal control over financial reporting and an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.


/s/  Deloitte & Touche LLP


Seattle, Washington
March 8, 2006 (August 4, 2006 as to the effects of restatement discussed in Note 2)

92

EXHIBIT 31.1

## CERTIFICATION

I, Kerry K. Killinger, certify that:

1.  I have reviewed this annual report on Form 10-K/A of Washington Mutual, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 9, 2006

/s/ KERRY K. KILLINGER
Kerry K. Killinger
*Chairman and Chief Executive Officer*
*of Washington Mutual, Inc.*

EXHIBIT 31.2

## CERTIFICATION

I, Thomas W. Casey, certify that:

1.  I have reviewed this annual report on Form 10-K/A of Washington Mutual, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 9, 2006                           /s/ THOMAS W. CASEY
                                               Thomas W. Casey
                                               *Executive Vice President and Chief Financial*
                                               *Officer of Washington Mutual, Inc.*

116

**EXHIBIT 32.1**

## WASHINGTON MUTUAL, INC.
### Certification of the Chief Executive Officer

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, Kerry K. Killinger, the Chief Executive Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10-K/A fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.

Date: August 9, 2006                       By: /s/ KERRY K. KILLINGER
                                           Kerry K. Killinger
                                           *Chairman and Chief Executive Officer*
                                           *of Washington Mutual, Inc.*

A signed original of this written statement required by Section 906 has been provided to Washington Mutual, Inc. and will be retained by Washington Mutual, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

117

**EXHIBIT 32.2**

## WASHINGTON MUTUAL, INC.
### Certification of the Chief Financial Officer

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, Thomas W. Casey, the Chief Financial Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10-K/A fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.

Date: August 9, 2006                                       By: /s/ THOMAS W. CASEY
                                                           ──────────────────────────
                                                           Thomas W. Casey
                                                           *Executive Vice President and Chief Financial Officer*
                                                           *of Washington Mutual, Inc.*

A signed original of this written statement required by Section 906 has been provided to Washington Mutual, Inc. and will be retained by Washington Mutual, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

118