# EXHIBIT 5

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE FISCAL YEAR ENDED DECEMBER 31, 2006**

Commission File Number 1-14667

# WASHINGTON MUTUAL, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Washington** | 91-1653725 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| **1301 Second Avenue, Seattle, Washington** | **98101** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(206) 461-2000**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock | New York Stock Exchange |
| Depositary Shares | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Litigation Tracking Warrants™ | NASDAQ |

Indicate by check mark if the registrant is a well-known seasoned issuer as defined in Rule 405 of the Securities Act. Yes ☒ No ☐.

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act. Yes ☐ No ☒.

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐.

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐.

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act.
(Check one): Large accelerated filer ☒   Accelerated filer ☐   Non-accelerated filer ☐.

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒.

The aggregate market value of voting stock held by non-affiliates of the registrant as of June 30, 2006, based on the closing sale price as reported on the New York Stock Exchange:

**Common Stock – $43,477,379,735**[1]

[1] Does not include any value attributable to 6,000,000 shares held in escrow.

The number of shares outstanding of the issuer's classes of common stock as of January 31, 2007:

**Common Stock – 889,034,725**[2]

[2] Includes 6,000,000 shares held in escrow.

**Documents Incorporated by Reference**

Portions of the definitive proxy statement for the Annual Meeting of Shareholders to be held April 17, 2007, are incorporated by reference into Part III.

# MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### Discontinued Operations

In July 2006, the Company announced its exit from the retail mutual fund management business and on December 31, 2006, completed the sale of WM Advisors, Inc. WM Advisors provided investment management, distribution and shareholder services to the WM Group of Funds. During the first quarter of 2004 the Company sold its consumer finance subsidiary, Washington Mutual Finance Corporation. These former subsidiaries have been accounted for as discontinued operations and, accordingly, their results of operations are separately disclosed from the Company's results of continuing operations presented on the Consolidated Statements of Income and in Notes 24 and 25 to the Consolidated Financial Statements – "Condensed Consolidating Financial Statements" and "Operating Segments."

## Controls and Procedures

### Disclosure Controls and Procedures

The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report. Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, the Company's disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or furnishes under the Securities Exchange Act of 1934.

Management reviews and evaluates the design and effectiveness of the Company's disclosure controls and procedures on an ongoing basis, which may result in the discovery of deficiencies, and improves its controls and procedures over time, correcting any deficiencies, as needed, that may have been discovered.

### Changes in Internal Control Over Financial Reporting

Management reviews and evaluates the design and effectiveness of the Company's internal control over financial reporting on an ongoing basis, which may result in the discovery of deficiencies, some of which may be significant, and changes its internal control over financial reporting as needed to maintain its effectiveness, correcting any deficiencies, as needed, in order to ensure the continued effectiveness of the Company's internal control over financial reporting. There have not been any changes in the Company's internal control over financial reporting during the fourth quarter of 2006 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting. For management's assessment of the Company's internal control over financial reporting, refer to Management's Report on Internal Control Over Financial Reporting on page 79.

### Overview

Washington Mutual, through its subsidiaries, is one of the nation's leading consumer and small business banks. At December 31, 2006, Washington Mutual and its subsidiaries had assets of $346 billion. The Company has a history dating back to 1889 and its subsidiary banks currently operate nearly 2,700 consumer and small business banking stores throughout the nation. When we refer to "the Company," "we," "our" and "us" in this Annual Report on Form 10-K, we mean Washington Mutual, Inc. and subsidiaries. When we refer to "the Parent," we mean Washington Mutual, Inc.

During 2006, the Company took actions intended to reduce its sensitivity to market risk and correspondingly increase its tolerance for credit risk, to diversify its funding sources, which included the restructuring of its core capital base, and to enhance its operating cost structure. Among the actions taken by the Company were:

- Selling $2.53 billion of mortgage servicing rights, which represented approximately 25% of its mortgage servicing portfolio. The sale included substantially all of the Company's government loan servicing and a portion of its conforming, fixed-rate servicing portfolio;

- Transferring $17.79 billion of lower-yielding, medium-term adjustable rate home loans to loans held for sale. Substantially all of these loans are expected to be sold in the first quarter of 2007;

- Leveraging the consumer lending activities of the Company's Card Services Group across the retail banking customer base. The managed credit card portfolio totaled $23.50 billion at December 31, 2006, an increase of 18% from the prior year end;

- Reducing its advances obtained through the Federal Home Loan Bank system by 36%, while increasing its borrowings from more cost-effective and capital efficient funding sources, such as brokered consumer deposits, hybrid capital instruments and foreign currency-denominated borrowings;

- Repurchasing over 67 million common shares through accelerated and conventional share repurchase transactions. Additionally, in January 2007 the Company announced a new accelerated share repurchase transaction that, at its inception, resulted in the immediate retirement of approximately 60 million common shares;

- Reducing employee headcount by more than 10,000, or 18%, and consolidating and outsourcing various back-office and administrative functions; and

- Selling WM Advisors, Inc., the Company's retail mutual fund management business. The sale was completed at the end of the year and resulted in an after-tax gain of $415 million.

The Company's earnings are driven by lending and deposit-taking activities which generate net interest income and the provision of financial services which generate noninterest income. A summary of the Company's key financial results are presented below:

Net income for 2006 was $3.56 billion, an increase from $3.43 billion in 2005. Diluted earnings per common share were $3.64, compared with $3.73 in the prior year. Included in earnings for 2006 was an after-tax gain of $415 million, or 43 cents per diluted share, from the fourth quarter sale of the Company's retail mutual fund management business. Weighted average common shares outstanding were higher in 2006, as compared with the prior year, as a result of the shares issued in the fourth quarter of 2005 to complete the acquisition of Providian Financial Corporation ("Providian"). Return on average total assets was 1.02% and return on average common equity was 13.52% in 2006, and 1.05% and 14.91% respectively, in 2005.

Net interest income was $8.12 billion in 2006, compared with $8.22 billion in the prior year. The decline was the result of contraction in the net interest margin. The net interest margin in 2006 was 2.60%, a decline of 19 basis points from the prior year. The decrease was due to an increase in the cost of the Company's interest-bearing liabilities, which was driven by continual increases in short-term interest rates from June 2004 through the first half of 2006, and the ensuing higher competitive deposit pricing environment. As economic growth decelerated in the latter part of 2006, the Federal Reserve decided to hold the targeted federal funds rate at 5.25% during the second half of the year, ending its methodical program of continuous increases after 17 consecutive adjustments. Accordingly, the Company's net interest margin began to recover in the fourth quarter of 2006, rising to 2.58% in that period, up 5 basis points from the third quarter.

Noninterest income totaled $6.38 billion in 2006, compared with $5.10 billion in the prior year. The increase is primarily due to the full year effect of consumer loan sales and servicing revenue and credit card fee income in 2006, which resulted from the Company's October 1, 2005 acquisition of Providian. The strong consumer response to the Company's new free checking product, which was launched early in 2006, also contributed to the growth in noninterest income, with depositor and other retail banking fees totaling $2.57 billion in 2006, a 17% increase from the 2005 total of $2.19 billion. Partially offsetting these increases was a significant decline in revenue from the Company's home mortgage loan operations. Revenue from sales and servicing of home mortgage loans, including the effects of all MSR risk management instruments, was $712 million, compared with $1.78 billion in 2005. The decline was associated with the flat-to-inverted yield curve that existed throughout 2006, which resulted in a significant increase in MSR risk management costs, as compared with 2005. Additionally, a 24% year-over-year decline in home loan volume in 2006, reflecting the slowdown in the housing market, along with an industry-wide decline in subprime mortgage secondary market performance during the latter part of the year, led to lower gain on sale results.

The provision for loan and lease losses was $816 million in 2006, a $500 million increase from the $316 million provision that was recorded in the prior year. This increase was substantially the result of the Company's entry into credit card lending that resulted from the Providian acquisition and the ensuing growth in the on-balance sheet credit card portfolio, which accelerated during the fourth quarter of 2006. On-balance sheet net credit card charge-offs as a percentage of the average credit card portfolio in 2006 were 3.08%, compared with an annualized fourth quarter 2005 net charge-off rate of 4.75%, reflecting a sharp reduction in charge-offs early in 2006 after the fourth quarter 2005 change in consumer bankruptcy law, and the sale of higher risk credit card accounts during the latter part of 2006. With the slowdown in the housing market, weaker credit performance in the Company's real-estate secured portfolios developed during the second half of 2006. Nonperforming assets, as a percentage of total assets, increased from 0.57% at December 31, 2005 to 0.80% at December 31, 2006, reflecting higher delinquency rates in the home loans, subprime mortgage channel and home equity portfolios. Early stage delinquencies continued to rise during the fourth quarter of 2006 as declines in home sales, longer marketing periods and growing inventories continued to exert downward pressure on the housing sector.

Noninterest expense totaled $8.81 billion in 2006, compared with $7.62 billion in the prior year. The increase was primarily due to a full year of credit card operating expenses after acquiring Providian in the fourth quarter of 2005, and costs associated with the expansion of the retail banking franchise. The Company's retail banking network increased from 2,140 stores at December 31, 2005 to 2,225 stores at the end of 2006.

On October 1, 2006 the Company completed its acquisition of Commercial Capital Bancorp, Inc. ("CCB") in a cash transaction with an initial purchase price of approximately $1 billion. CCB stockholders received $16.00 in cash for each share of CCB common stock. Most of the business activities of CCB are conducted through the Company's Commercial Group operating segment.

**Critical Accounting Estimates**

The preparation of financial statements in accordance with the accounting principles generally accepted in the United States of America ("GAAP") requires management to make a number of judgments, estimates and assumptions that affect the reported amount of assets, liabilities, income and expenses in the financial statements. Various elements of the Company's accounting policies, by their nature, involve the application of highly sensitive and judgmental estimates and assumptions. Some of these policies and estimates relate to matters that are highly complex and contain inherent uncertainties. It is possible that, in some instances, different estimates and assumptions could reasonably have been made and used by management, instead of those the Company applied, which might have produced different results that could have had a material effect on the financial statements.

The Company has identified three accounting estimates that, due to the judgments and assumptions inherent in those estimates, and the potential sensitivity of its financial statements to those judgments and assumptions, are critical to an understanding of its financial statements. These estimates are: the fair value of certain financial instruments and other assets; the determination of whether a derivative qualifies for hedge accounting; and the allowance for loan and lease losses and contingent credit risk liabilities.

Management has discussed the development and selection of these critical accounting estimates with the Audit Committee of the Company's Board of Directors. The Company believes that the judgments, estimates and assumptions used in the preparation of its financial statements are appropriate given the facts and circumstances as of December 31, 2006. These judgments, estimates and assumptions are described in greater detail in subsequent sections of Management's Discussion and Analysis and in Note 1 to the Consolidated Financial Statements – "Summary of Significant Accounting Policies."

The discussion below presents information about the nature of the Company's critical accounting estimates:

### Fair Value of Certain Financial Instruments and Other Assets

A portion of the Company's assets are carried at fair value, including: mortgage servicing rights, certain retained interests from securitization activities (which are classified as trading assets), available-for-sale securities and derivatives. In addition, loans held for sale are recorded at the lower of carrying value or fair value. Changes in fair value of those instruments that qualify as hedged items under fair value hedge accounting are recognized in earnings and offset the changes in fair value of derivatives used as hedge accounting instruments.

Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Generally, for assets that are reported at fair value, the Company uses quoted market prices or internal valuation models that utilize market data inputs where readily available and other assumptions, such as loan prepayment speeds, forward interest rate yield curves, market volatilities and pricing spreads to determine their fair values. The degree of management judgment involved in determining the fair value of a financial instrument or other asset is dependent upon the availability of quoted market prices or observable market value inputs. For financial instruments that are actively traded in the marketplace or whose values are based on readily available market value data, little, if any, subjectivity is applied when determining the instrument's fair value. When observable market prices and data are not readily available, significant management judgment often is necessary to estimate fair value. In those cases, different assumptions could result in significant changes in valuation.

The following financial instruments and other assets require the Company's most complex judgments and assumptions when estimating fair value:

*Mortgage Servicing Rights and Certain Other Retained Interests in Securitizations*

MSR and certain other retained interests from securitization activities do not trade in an active, open market with readily quoted prices. Although sales do occur from time to time, the terms of such sales are generally not readily available. Consequently, the Company estimates the fair value of MSR and certain other retained interests in securitization activities utilizing internal discounted cash flow models.

The discounted cash flow model for MSR calculates the present value of the expected future net cash flows of the servicing portfolio based on various assumptions, such as estimated future servicing costs, expected servicing portfolio prepayment speeds and discount rates that are commensurate with the risk profile of the serviced assets. This model is highly sensitive to changes in certain assumptions. Different expected prepayment speeds, in particular, can result in substantial changes in the estimated fair value of MSR. If actual prepayment experience differs materially from the expected prepayment speeds used in the Company's model, this difference would likely result in a material change in MSR fair value. While the

Company's model estimates a value, the specific value used is based on a variety of market-based factors, such as documented observable data and expected changes in prepayment speeds. The reasonableness of management's assumptions about these factors is evaluated through quarterly independent broker surveys. Independent appraisals of the fair value of the mortgage servicing rights are obtained at least quarterly, and are used by management to evaluate the reasonableness of the fair value conclusions. Changes in MSR value are reported in the Consolidated Statements of Income under the noninterest income caption "Revenue from sales and servicing of home mortgage loans." Additional discussion regarding the estimation of MSR fair value, including limitations to the MSR fair value measurement process, are described in the subsequent section of Management's Discussion and Analysis – "Earnings Performance." Key economic assumptions and the sensitivity of MSR fair value to immediate changes in those assumptions are described in Note 7 to the Consolidated Financial Statements – "Mortgage Banking Activities."

For other retained interests in securitization activities (such as interest-only strips and residual interests) the discounted cash flow model used in determining fair value utilizes projections of expected cash flows that are greatly influenced by expected prepayment speeds and, in some cases, expected net credit losses or finance charges related to the securitized assets. Changes in those and other assumptions used could have a significant effect on the valuation of these retained interests. Changes in the value of other retained interests in securitization activities are reported in the Consolidated Statements of Income under the noninterest income caption "Trading assets income (loss)" and on the Consolidated Statements of Financial Condition as "Trading assets."

*Loans held for sale*

The fair value of loans designated as held-for-sale is generally based on observable market prices of securities that have loan collateral or interests in loans that are similar to the held-for-sale loans or whole loan sale prices if formally committed. If market prices are not readily available, fair value is based on a discounted cash flow model, which takes into account expected prepayment factors and the degree of credit risk associated with the loans and the estimated effects of changes in market interest rates relative to the loans' interest rates. When the estimated fair value of loans held for sale is lower than their carrying value, including adjustments to carrying value if the loans were in a fair value hedge relationship under Financial Accounting Standards Board ("FASB") Statement No. 133, *Accounting for Derivative Instruments and Hedging Activities*, as amended ("Statement No. 133"), a valuation adjustment that accounts for this difference is reported on the Consolidated Statements of Income as a component within the noninterest income caption "Revenue from sales and servicing of home mortgage loans." Valuation adjustments for consumer loans held for sale are recorded under the noninterest income caption "Revenue from sales and servicing of consumer loans."

*Fair Value of Reporting Units and Goodwill Impairment*

Under FASB Statement No. 142, *Goodwill and Other Intangible Assets*, goodwill must be allocated to reporting units and tested for impairment. The Company tests goodwill for impairment at least annually or more frequently if events or circumstances, such as adverse changes in the business, indicate that there may be justification for conducting an interim test. Impairment testing is performed at the reporting unit level (which is the same level as the Company's four major operating segments identified in Note 25 to the Consolidated Financial Statements – "Operating Segments"). The first part of the test is a comparison, at the reporting unit level, of the fair value of each reporting unit to its carrying value, including goodwill. If the fair value is less than the carrying value, then the second part of the test is needed to measure the amount of potential goodwill impairment. The implied fair value of the reporting unit goodwill is calculated and compared with the actual carrying value of goodwill recorded within the reporting unit. If the carrying value of reporting unit goodwill exceeds the implied fair value of that goodwill, then the Company would recognize an impairment loss for the amount of the difference, which would be recorded as a charge against net income.

The fair values of the reporting units are determined primarily using discounted cash flow models based on each reporting unit's internal forecasts. In addition, analysis using market-based trading and transaction multiples, where available, is used to assess the reasonableness of the valuations derived from the discounted cash flow models.

For additional information regarding the carrying values of goodwill by operating segment, see Note 8 to the Consolidated Financial Statements – "Goodwill and Other Intangible Assets."

*Other Intangible Assets*

As part of a business combination accounted for under the purchase method, the Company must record all acquired assets and liabilities at fair value as of the acquisition date. Acquired assets include any identified intangible assets, such as purchased credit card relationships or core deposit intangibles. The fair value of those intangible assets usually is determined based on a discounted cash flow model that considers the expected net cash inflows resulting from those intangible relationships. If the intangible asset has a determinable finite life, the asset is amortized through earnings over its estimated life. Such amortization expense generally is recognized in the Consolidated Statements of Income under the noninterest expense caption, "Other Expense." For additional information regarding other intangible assets, see Note 8 to the Consolidated Financial Statements – "Goodwill and Other Intangible Assets."

**Derivatives and Hedging Activities**

The Company enters into derivative contracts to manage the various risks associated with certain assets, liabilities, or probable forecasted transactions. When the Company enters into derivative contracts, the derivative instrument is designated as: (1) a hedge of the fair value of a recognized asset or liability or of an unrecognized firm commitment (a "fair value" hedge); (2) a hedge of the variability in expected future cash flows associated with an existing recognized asset or liability or a probable forecasted transaction (a "cash flow" hedge); or (3) held for other risk management purposes ("risk management derivatives").

All derivatives, whether designated in hedging relationships or not, are recorded at fair value as either assets or liabilities on the Consolidated Statements of Financial Condition. Changes in fair value of derivatives that are not in hedge accounting relationships (as in (3) above) are recorded within the Consolidated Statements of Income in the period in which the change in value occurs. Changes in the fair value of derivatives that are designated as cash flow hedges (as in (2) above), to the extent such hedges are deemed highly effective, are recorded as a separate component of accumulated other comprehensive income and reclassified into earnings when the earnings effect of the hedged cash flows is recognized. Changes in the fair value of derivatives in qualifying fair value hedge accounting relationships (as in (1) above) are recorded each period in earnings along with the change in fair value of the hedged item.

The determination of whether a derivative qualifies for hedge accounting requires complex judgments about the application of Statement No. 133. Additionally, this Statement requires contemporaneous documentation of the Company's hedge relationships. Such documentation includes the nature of the risk being hedged, the identification of the hedged item, or the group of hedged items, that share the risk exposure that is designated as being hedged, the selection of the instrument that will be used to hedge the identified risk, and the method used to assess the effectiveness of the hedge relationship. The effectiveness assessment requires calculations that utilize standard statistical methods of correlation that must support the determination that the hedging relationship is expected to be highly effective, during the period that the hedge is designated, in achieving offsetting changes in fair value or cash flows attributable to the hedged risk. If the Company's documentation and assessment of effectiveness are not considered to be adequate to achieve hedge accounting treatment, the derivative is treated as a free-standing risk management instrument.

**Allowance for Loan and Lease Losses and Contingent Credit Risk Liabilities**

*Allowance for loan and lease losses*

The allowance for loan and lease losses represents management's estimate of incurred credit losses inherent in the Company's loan and lease portfolios as of the balance sheet date. The estimation of the allowance is based on a variety of factors, including past loan loss experience, the current credit profile of the Company's borrowers, adverse situations that have occurred that may affect the borrowers' ability to repay, the estimated value of underlying collateral, the interest rate climate as it affects adjustable-rate loans and general economic conditions. Loans held in portfolio that are evaluated for collective impairment and loans held in portfolio that are individually reviewed for impairment but deemed not to be impaired may have both an allocated and unallocated allowance. Loans that are individually deemed to be impaired may only have an allocated allowance.

The allowance for loans evaluated for collective impairment is comprised of an allocated allowance that is computed for each portfolio based on specific loan portfolio metrics and an unallocated allowance that is computed based on certain environmental factors we believe are not adequately captured in the allocated allowance computations. Determining the adequacy of the allowance, particularly the unallocated allowance, is complex and requires judgment by management about the effect of matters that are inherently uncertain. Subsequent evaluations of the loan portfolio, in light of the factors then prevailing, may result in significant changes in the allowance for loan and lease losses in future periods.

The allowance is comprised of an allowance for individually impaired loans, as well as an allowance for other individually unimpaired loans that share common risk characteristics that, in the aggregate, have incurred a probable loss on a collective basis. The determination of common risk factors that indicate a probable loss on a collective basis is complex and requires significant judgment by management about the shared risk characteristics that suggest a probable loss.

The allowance for loan and lease losses is reported within the Consolidated Statements of Financial Condition and the provision for loan and lease losses is reported within the Consolidated Statements of Income.

The estimates and judgments are described in further detail in the subsequent section of Management's Discussion and Analysis – "Credit Risk Management" and in Note 1 to the Consolidated Financial Statements – "Summary of Significant Accounting Policies."

*Contingent Credit Risk Liabilities*

In the ordinary course of business, the Company sells loans to third parties and in certain circumstances, such as in the event of early or first payment default, retains credit risk exposure on those loans. The Company may also be required to repurchase sold loans when representations and warranties made by the Company in connection with those sales are breached. When a loan sold to an investor fails to perform according to its contractual terms, the investor will typically review the loan file to search for errors that may have been made in the process of originating the loan. If errors are discovered and it is determined that such errors constitute a violation of a representation or warranty made to the investor in connection with the Company's sale of the loan, then the Company will be required to either repurchase the loan or indemnify the investor for losses sustained if the violation had a material adverse effect on the value of the loan.

Reserves are established for the Company's exposure to the potential repurchase or indemnification liabilities described above as such liabilities are generally recorded at fair value. Throughout the life of these repurchase or indemnification liabilities, the Company may learn of additional information that can affect the assessment of loss probability or the estimation of the amounts involved. Changes in these assessments can lead to significant changes in the recorded reserves. Repurchase and indemnification

management is based on analyzing the creditworthiness of the borrower, the adequacy of underlying collateral given current events and conditions and the existence and strength of any guarantor support.

The Finance Committee of the Board of Directors, by means of a broad set of policies and principles contained in the Company's Enterprise Risk Management Policy, exercises oversight over the framework for the Company's credit risk management activities. The Credit Risk Management Committee, chaired by the Chief Credit Officer, is comprised of business line chief risk officers, and senior finance, treasury and portfolio management professionals. This Committee is responsible for management of the Company's credit risk within stated credit limits and portfolio performance metrics, to ensure alignment with the Company's credit risk appetite. The Credit Risk Management Committee is also responsible for developing credit policy and recommending credit concentration limits to the Enterprise Risk Management Committee, approving corporate credit standards, overseeing the delegation of credit authority and ensuring compliance with credit policy, standards and limits. The Chief Credit Officer's primary responsibilities include directing the activities of the Credit Risk Management Committee, monitoring the credit quality of the Company's loan portfolio, determining the reasonableness of the Company's allowance for loan and lease losses, reviewing and approving large credit exposures, and delegating credit approval authorities.

In 2006, the Finance Committee of the Board of Directors approved a set of credit risk concentration limits. These limits facilitate a more rigorous and quantitative framework that better enables the credit risk management function to proactively manage credit risk. As an example of proactively managing credit risk, from time to time the Company sells delinquent and nonperforming loans. These sales have had the effect of accelerating the liquidation of these assets, thereby enabling the Company to deploy its capital more effectively, while assisting the Company in reducing the ratio of nonperforming assets to total assets.

Many factors or loan attributes are used to predict and to monitor credit risk in the Company's real estate secured loan portfolios, including borrowers' debt-to-income ratios when loans are made, borrowers' credit scores, loan-to-value ratios and, with respect to residential loans, housing prices. The Company actively monitors changes in borrowers' credit scores, changes in loan-to-value ratios and housing price trends across the country. A slowdown in housing price appreciation or declines in housing prices will likely have the effect of increasing credit risk in the Company's real estate secured portfolios. The Company believes that loan-to-value ratios and credit scores are more predictive of future loan performance than are other loan factors and attributes.

Certain categories of residential loans held in the Company's portfolio, the most significant being Option ARM loans, have features that may result in increased credit risk when compared with residential loans without these features. Loans with these features, to the extent material to the Company, as well as any compensating factors and mitigating circumstances that reduce the credit risk arising from these features, are discussed in more detail in the section of Management's Discussion and Analysis – "Features of Residential Loans."

As noted above, loan-to-value ratios and borrowers' credit scores are key determinants of future loan performance. The Company has also observed that, when comparing portfolios of prime mortgage loans and portfolios of subprime mortgage channel loans that possess comparable credit scores and loan-to-value ratios, the subprime mortgage channel portfolios generally experience higher delinquencies and losses. Consequently, the Company separately reports the performance of its subprime mortgage channel portfolios, and its subprime mortgage channel operations are discussed in more detail in the section of Management's Discussion and Analysis – "Subprime Mortgage Channel."

In addition, the Company's credit card lending activities are discussed in Management's Discussion and Analysis – "Credit Card Loans."

Underwriting and Risk Mitigation

The Company actively manages the credit risk inherent in its Option ARM portfolio primarily by ensuring compliance with its underwriting standards, monitoring loan performance and conducting risk modeling procedures. Risk attributes and compensating factors, which may include an applicant's credit score, the loan-to-value ratio, loan size, and debt-to-income ratio, are taken into consideration as part of the underwriting and pricing processes. The Company's practice of not offering Option ARM loans through its subprime mortgage channel and of selectively selling Option ARM loans to secondary market participants has further limited the potential for credit risk in its Option ARM portfolio.

In the underwriting of loans, one of many factors the Company considers when deciding whether to approve or decline a loan is the applicant's debt-to-income ratio. The Company's underwriting process for Option ARM loans has historically involved calculating an applicant's debt-to-income ratio using an administratively set interest rate. Prior to 2004, the administratively set rate approximated the then-prevailing fully-indexed rate. However, as short-term interest rates (and hence the fully-indexed rate) increased in 2004 and 2005, the Company's administratively set qualifying rate was not adjusted upward, which resulted in loans being made to borrowers who were qualified based on debt-to-income ratios calculated using an interest rate below the fully-indexed rate. As expected, Option ARMs originated in 2004 and 2005 with a qualifying rate below the fully-indexed rate are performing similarly to comparable loans underwritten at or above the fully-indexed rate from the same time period. The administratively set rate was adjusted upward in October 2005 and, beginning in mid-December 2005, was replaced with a fully-indexed rate that adjusts monthly for changes in the index rate.

Impact of External Factors

Certain external factors have, over the last five years, contributed to a reduction in the credit risk inherent in the Option ARM portfolio. Among the two most significant economic factors affecting the Option ARM portfolio are prepayment rates, which operate to reduce the risk of payment shock in the portfolio caused by recasting events, and changes in housing prices, which affect current loan-to-value ratios. The risk of payment shock is reduced when Option ARM borrowers prepay their loans prior to the occurrence of the first recasting event. Although in 2006 housing prices experienced a decrease in the rate of appreciation nationally and declines in some geographic markets in which the Company lends, over the past five years, housing prices have generally appreciated and have served to mitigate credit risk in the Option ARM portfolio. Housing price appreciation levels experienced during the past five years may not continue.

*Home Loans with Loan-to-Value Ratios Greater than 80 percent without Private Mortgage Insurance or Government Guarantees*

Loan-to-value ratios are a key determinant of future performance. Home loans with loan-to-value ratios of greater than 80 percent at origination without private mortgage insurance or government guarantees expose the Company to greater credit risk than home loans with loan-to-value ratios of 80 percent or less at origination. This greater credit risk arises because, in general, both default risk and the severity of loss is higher when borrowers have less equity to protect in the event of foreclosure. At December 31, 2006, home loans held in portfolio with these features amounted to $7.48 billion and the weighted average loan-to-value ratio at origination of such loans was 88 percent. Substantially all of these loans were made to subprime borrowers, including $5.56 billion of loans purchased from recognized subprime lenders. Total home loans with these features accounted for 16% of the Company's home loan volume in 2006. Home loans held in portfolio with loan-to-value ratios in excess of 90 percent at origination without private mortgage insurance or government guarantees amounted to $847 million, or 0.7%, of home loans held in portfolio at December 31, 2006.

54

128

# REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Shareholders of
Washington Mutual, Inc.

We have audited management's assessment, included in the accompanying Management's Report on Internal Control Over Financial Reporting, that Washington Mutual, Inc. and subsidiaries (the "Company") maintained effective internal control over financial reporting as of December 31, 2006, based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assessment that the Company maintained effective internal control over financial reporting as of December 31, 2006, is fairly stated, in all material respects, based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Also, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2006, based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

==We have also audited, in accordance with the standards of the PCAOB, the consolidated financial statements as of and for the year ended December 31, 2006 of the Company and our report dated February 26, 2007, expressed an unqualified opinion on those consolidated financial statements.==

*/s/ Deloitte & Touche LLP*

Seattle, Washington
February 26, 2007

81

EXHIBIT 31.1

## CERTIFICATION

I, Kerry K. Killinger, certify that:

1. I have reviewed this annual report on Form 10-K of Washington Mutual, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 1, 2007

/s/ KERRY K. KILLINGER
Kerry K. Killinger
*Chairman and Chief Executive Officer
of Washington Mutual, Inc.*

EXHIBIT 31.2

## CERTIFICATION

I, Thomas W. Casey, certify that:

1. I have reviewed this annual report on Form 10-K of Washington Mutual, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 1, 2007

/s/ THOMAS W. CASEY
Thomas W. Casey
*Executive Vice President and Chief Financial Officer of Washington Mutual, Inc.*

132

EXHIBIT 32.1

**WASHINGTON MUTUAL, INC.**
**Certification of the Chief Executive Officer**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, Kerry K. Killinger, the Chief Executive Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.

Date: March 1, 2007          By:   /s/ KERRY K. KILLINGER
                                   Kerry K. Killinger
                                   *Chairman and Chief Executive Officer*
                                   *of Washington Mutual, Inc.*

A signed original of this written statement required by Section 906 has been provided to Washington Mutual, Inc. and will be retained by Washington Mutual, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

EXHIBIT 32.2

# WASHINGTON MUTUAL, INC.
## Certification of the Chief Financial Officer

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, Thomas W. Casey, the Chief Financial Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.

Date: March 1, 2007         By:   /s/ THOMAS W. CASEY
                                  _____
                                  Thomas W. Casey
                                  *Executive Vice President and Chief Financial Officer*
                                  *of Washington Mutual, Inc.*

A signed original of this written statement required by Section 906 has been provided to Washington Mutual, Inc. and will be retained by Washington Mutual, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

134