# EXHIBIT 10



# AU Section 316

*Consideration of Fraud in a Financial Statement Audit*

(.01 - .04) Introduction and Overview
(.05 - .12) Description and Characteristics of Fraud
(.13) The Importance of Exercising Professional Skepticism
(.14 - .18) Discussion Among Engagement Personnel Regarding the Risks of Material Misstatement Due to Fraud
(.19 - .34) Obtaining the Information Needed to Identify the Risks of Material Misstatement Due to Fraud
(.35 - .42) ) Identifying Risks That May Result in a Material Misstatement Due to Fraud
(.43 - .45) Assessing the Identified Risks After Taking Into Account an Evaluation of the Entity's Programs and Controls That Address the Risks
(.46 - .67) Responding to the Results of the Assessment
(.68 - .78) Evaluating Audit Evidence
(.79 - .82) Communicating About Possible Fraud to Management, the Audit Committee, and Others
(.83) Documenting the Auditor's Consideration of Fraud
(.84) Effective Date
(.85) Appendix — Examples of Fraud Risk Factors
(.86) Appendix — Amendment to Section 230, Due Professional Care in the Performance of Work
(.87) Appendix — Amendment to Section 333, Management Representations, paragraph .06 and Appendix A [paragraph .16]
(.88) Appendix — Exhibit

**(Supersedes SAS No. 82)**

**Source: SAS No. 99.**

**Effective for audits of financial statements for periods beginning on or after December 15, 2002.**

## INTRODUCTION AND OVERVIEW

**.01**

Section 110, *Responsibilities and Functions of the Independent Auditor*, paragraph .02, states, "The auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud. [footnote omitted]" **fn 1** This section establishes standards and provides guidance to auditors in fulfilling that responsibility, as it relates to fraud, in an audit of financial statements conducted in accordance with generally accepted auditing standards (GAAS). **fn 2**

*[The following note is effective for audits of fiscal years ending on or after November 15, 2007. See PCAOB Release 2007-005A. For audits of fiscal years ending before November 15, 2007, click here.]*

Note: When performing an integrated audit of financial statements and internal control over financial reporting, refer to paragraphs 14-15 of PCAOB Auditing Standard No. 5, *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements*, regarding fraud considerations, in addition to the fraud consideration set forth in this section.

**.02**

The following is an overview of the organization and content of this section:

- *Description and characteristics of fraud.* This section describes fraud and its characteristics. (See paragraphs .05 through .12.)

- *The importance of exercising professional skepticism.* This section discusses the need for auditors to exercise professional skepticism when considering the possibility that a material misstatement due to fraud could be

**151**

present. (See paragraph .13.)

- *Discussion among engagement personnel regarding the risks of material misstatement due to fraud.* This section requires, as part of planning the audit, that there be a discussion among the audit team members to consider how and where the entity's financial statements might be susceptible to material misstatement due to fraud and to reinforce the importance of adopting an appropriate mindset of professional skepticism. (See paragraphs .14 through .18.)

- *Obtaining the information needed to identify risks of material misstatement due to fraud.* This section requires the auditor to gather information necessary to identify risks of material misstatement due to fraud, by

  a.   Inquiring of management and others within the entity about the risks of fraud. (See paragraphs .20 through .27.)

  b.   Considering the results of the analytical procedures performed in planning the audit. (See paragraphs .28 through .30.)

  c.   Considering fraud risk factors. (See paragraphs .31 through .33, and the Appendix, "Examples of Fraud Risk Factors" [paragraph .85].)

  d.   Considering certain other information. (See paragraph .34.)

- *Identifying risks that may result in a material misstatement due to fraud.* This section requires the auditor to use the information gathered to identify risks that may result in a material misstatement due to fraud. (See paragraphs .35 through .42.)

- *Assessing the identified risks after taking into account an evaluation of the entity's programs and controls.* This section requires the auditor to evaluate the entity's programs and controls that address the identified risks of material misstatement due to fraud, and to assess the risks taking into account this evaluation. (See paragraphs .43 through .45.)

- *Responding to the results of the assessment.* This section emphasizes that the auditor's response to the risks of material misstatement due to fraud involves the application of professional skepticism when gathering and evaluating audit evidence. (See paragraph .46 through .49.) The section requires the auditor to respond to the results of the risk assessment in three ways:

  a.   A response that has an overall effect on how the audit is conducted, that is, a response involving more general considerations apart from the specific procedures otherwise planned. (See paragraph .50.)

  b.   A response to identified risks that involves the nature, timing, and extent of the auditing procedures to be performed. (See paragraphs .51 through .56.)

  c.   A response involving the performance of certain procedures to further address the risk of material misstatement due to fraud involving management override of controls. (See paragraphs .57 through .67.)

- *Evaluating audit evidence.* This section requires the auditor to assess the risks of material misstatement due to fraud throughout the audit and to evaluate at the completion of the audit whether the accumulated results of auditing procedures and other observations affect the assessment. (See paragraphs .68 through .74.) It also requires the auditor to consider whether identified misstatements may be indicative of fraud and, if so, directs the auditor to evaluate their implications. (See paragraphs .75 through .78.)

- *Communicating about fraud to management, the audit committee, and others.* This section provides guidance regarding the auditor's communications about fraud to management, the audit committee, and others. (See paragraphs .79 through .82.)

- *Documenting the auditor's consideration of fraud.* This section describes related documentation requirements. (See paragraph .83.)

**.03**

The requirements and guidance set forth in this section are intended to be integrated into an overall audit process, in a

152

logical manner that is consistent with the requirements and guidance provided in other sections, including section 311, *Planning and Supervision*; section 312, *Audit Risk and Materiality in Conducting an Audit*; and section 319, *Consideration of Internal Control in a Financial Statement Audit*. Even though some requirements and guidance set forth in this section are presented in a manner that suggests a sequential audit process, auditing in fact involves a continuous process of gathering, updating, and analyzing information throughout the audit. Accordingly the sequence of the requirements and guidance in this section may be implemented differently among audit engagements.

**.04**

Although this section focuses on the auditor's consideration of fraud in an audit of financial statements, it is management's responsibility to design and implement programs and controls to prevent, deter, and detect fraud. [fn 3] That responsibility is described in section 110.03, which states, "Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements." Management, along with those who have responsibility for oversight of the financial reporting process (such as the audit committee, board of trustees, board of directors, or the owner in owner-managed entities), should set the proper tone; create and maintain a culture of honesty and high ethical standards; and establish appropriate controls to prevent, deter, and detect fraud. When management and those responsible for the oversight of the financial reporting process fulfill those responsibilities, the opportunities to commit fraud can be reduced significantly.

## DESCRIPTION AND CHARACTERISTICS OF FRAUD

**.05**

Fraud is a broad legal concept and auditors do not make legal determinations of whether fraud has occurred. Rather, the auditor's interest specifically relates to acts that result in a material misstatement of the financial statements. The primary factor that distinguishes fraud from error is whether the underlying action that results in the misstatement of the financial statements is intentional or unintentional. For purposes of the section, *fraud* is an intentional act that results in a material misstatement in financial statements that are the subject of an audit. [fn 4]

**.06**

Two types of misstatements are relevant to the auditor's consideration of fraud—misstatements arising from fraudulent financial reporting and misstatements arising from misappropriation of assets.

- *Misstatements arising from fraudulent financial reporting* are intentional misstatements or omissions of amounts or disclosures in financial statements designed to deceive financial statement users where the effect causes the financial statements not to be presented, in all material respects, in conformity with generally accepted accounting principles (GAAP). [fn 5] Fraudulent financial reporting may be accomplished by the following:

  - Manipulation, falsification, or alteration of accounting records or supporting documents from which financial statements are prepared

  - Misrepresentation in or intentional omission from the financial statements of events, transactions, or other significant information

  - Intentional misapplication of accounting principles relating to amounts, classification, manner of presentation, or disclosure

  Fraudulent financial reporting need not be the result of a grand plan or conspiracy. It may be that management representatives rationalize the appropriateness of a material misstatement, for example, as an aggressive rather than indefensible interpretation of complex accounting rules, or as a temporary misstatement of financial statements, including interim statements, expected to be corrected later when operational results improve.

- *Misstatements arising from misappropriation of assets* (sometimes referred to as theft or defalcation) involve the theft of an entity's assets where the effect of the theft causes the financial statements not to be presented, in all material respects, in conformity with GAAP. Misappropriation of assets can be accomplished in various ways, including embezzling receipts, stealing assets, or causing an entity to pay for goods or services that have not been received. Misappropriation of assets may be accompanied by false or misleading records or documents, possibly created by circumventing controls. The scope of this section includes only those

misappropriations of assets for which the effect of the misappropriation causes the financial statements not to be fairly presented, in all material respects, in conformity with GAAP.

**.07**

Three conditions generally are present when fraud occurs. First, management or other employees have an *incentive* or are under *pressure*, which provides a reason to commit fraud. Second, circumstances exist—for example, the absence of controls, ineffective controls, or the ability of management to override controls—that provide an *opportunity* for a fraud to be perpetrated. Third, those involved are able to *rationalize* committing a fraudulent act. Some individuals possess an *attitude*, character, or set of ethical values that allow them to knowingly and intentionally commit a dishonest act. However, even otherwise honest individuals can commit fraud in an environment that imposes sufficient pressure on them. The greater the incentive or pressure, the more likely an individual will be able to rationalize the acceptability of committing fraud.

**.08**

Management has a unique ability to perpetrate fraud because it frequently is in a position to directly or indirectly manipulate accounting records and present fraudulent financial information. Fraudulent financial reporting often involves management override of controls that otherwise may appear to be operating effectively. [fn 6] Management can either direct employees to perpetrate fraud or solicit their help in carrying it out. In addition, management personnel at a component of the entity may be in a position to manipulate the accounting records of the component in a manner that causes a material misstatement in the consolidated financial statements of the entity. Management override of controls can occur in unpredictable ways.

**.09**

Typically, management and employees engaged in fraud will take steps to conceal the fraud from the auditors and others within and outside the organization. Fraud may be concealed by withholding evidence or misrepresenting information in response to inquiries or by falsifying documentation. For example, management that engages in fraudulent financial reporting might alter shipping documents. Employees or members of management who misappropriate cash might try to conceal their thefts by forging signatures or falsifying electronic approvals on disbursement authorizations. An audit conducted in accordance with GAAS rarely involves the authentication of such documentation, nor are auditors trained as or expected to be experts in such authentication. In addition, an auditor may not discover the existence of a modification of documentation through a side agreement that management or a third party has not disclosed.

**.10**

Fraud also may be concealed through collusion among management, employees, or third parties. Collusion may cause the auditor who has properly performed the audit to conclude that evidence provided is persuasive when it is, in fact, false. For example, through collusion, false evidence that controls have been operating effectively may be presented to the auditor, or consistent misleading explanations may be given to the auditor by more than one individual within the entity to explain an unexpected result of an analytical procedure. As another example, the auditor may receive a false confirmation from a third party that is in collusion with management.

**.11**

Although fraud usually is concealed and management's intent is difficult to determine, the presence of certain conditions may suggest to the auditor the possibility that fraud may exist. For example, an important contract may be missing, a subsidiary ledger may not be satisfactorily reconciled to its control account, or the results of an analytical procedure performed during the audit may not be consistent with expectations. However, these conditions may be the result of circumstances other than fraud. Documents may legitimately have been lost or misfiled; the subsidiary ledger may be out of balance with its control account because of an unintentional accounting error; and unexpected analytical relationships may be the result of unanticipated changes in underlying economic factors. Even reports of alleged fraud may not always be reliable because an employee or outsider may be mistaken or may be motivated for unknown reasons to make a false allegation.

**.12**

As indicated in paragraph .01, the auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by fraud or error. [fn 7] However, absolute assurance is not attainable and thus even a properly planned and performed audit may not detect a material misstatement resulting from fraud. A material misstatement may not be detected because of the nature of audit evidence or because the characteristics of fraud as discussed above may cause the auditor to rely unknowingly on audit evidence that appears to be valid, but is, in fact, false and fraudulent. Furthermore, audit procedures that are

<mark>effective for detecting an error may be ineffective for detecting fraud.</mark>

## THE IMPORTANCE OF EXERCISING PROFESSIONAL SKEPTICISM

**.13**

Due professional care requires the auditor to exercise professional skepticism. See section 230, *Due Professional Care in the Performance of Work*, paragraphs .07 through .09. Because of the characteristics of fraud, the auditor's exercise of professional skepticism is important when considering the risk of material misstatement due to fraud. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor should conduct the engagement with a mindset that recognizes the possibility that a material misstatement due to fraud could be present, regardless of any past experience with the entity and regardless of the auditor's belief about management's honesty and integrity. Furthermore, professional skepticism requires an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred. In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest.

## DISCUSSION AMONG ENGAGEMENT PERSONNEL REGARDING THE RISKS OF MATERIAL MISSTATEMENT DUE TO FRAUD

**.14**

Prior to or in conjunction with the information-gathering procedures described in paragraphs .19 through .34 of this section, members of the audit team should discuss the potential for material misstatement due to fraud. The discussion should include:

- An exchange of ideas or "brainstorming" among the audit team members, including the auditor with final responsibility for the audit, about how and where they believe the entity's financial statements might be susceptible to material misstatement due to fraud, how management could perpetrate and conceal fraudulent financial reporting, and how assets of the entity could be misappropriated. (See paragraph .15.)

- An emphasis on the importance of maintaining the proper state of mind throughout the audit regarding the potential for material misstatement due to fraud. (See paragraph .16.)

**.15**

The discussion among the audit team members about the susceptibility of the entity's financial statements to material misstatement due to fraud should include a consideration of the known external and internal factors affecting the entity that might (*a*) create incentives/pressures for management and others to commit fraud, (*b*) provide the opportunity for fraud to be perpetrated, and (*c*) indicate a culture or environment that enables management to rationalize committing fraud. The discussion should occur with an attitude that includes a questioning mind as described in paragraph .16 and, for this purpose, setting aside any prior beliefs the audit team members may have that management is honest and has integrity. In this regard, the discussion should include a consideration of the risk of management override of controls. **fn 8** Finally, the discussion should include how the auditor might respond to the susceptibility of the entity's financial statements to material misstatement due to fraud.

**.16**

The discussion among the audit team members should emphasize the need to maintain a questioning mind and to exercise professional skepticism in gathering and evaluating evidence throughout the audit, as described in paragraph .13. This should lead the audit team members to continually be alert for information or other conditions (such as those presented in paragraph .68) that indicate a material misstatement due to fraud may have occurred. It should also lead audit team members to thoroughly probe the issues, acquire additional evidence as necessary, and consult with other team members and, if appropriate, experts in the firm, rather than rationalize or dismiss information or other conditions that indicate a material misstatement due to fraud may have occurred.

**.17**

Although professional judgment should be used in determining which audit team members should be included in the discussion, the discussion ordinarily should involve the key members of the audit team. A number of factors will influence the extent of the discussion and how it should occur. For example, if the audit involves more than one location, there could be multiple discussions with team members in differing locations. Another factor to consider in planning the

discussions is whether to include specialists assigned to the audit team. For example, if the auditor has determined that a professional possessing information technology skills is needed on the audit team (see section 319.32), it may be useful to include that individual in the discussion.

**.18**

Communication among the audit team members about the risks of material misstatement due to fraud also should continue throughout the audit—for example, in evaluating the risks of material misstatement due to fraud at or near the completion of the field work. (See paragraph .74 and footnote 28.)

## OBTAINING THE INFORMATION NEEDED TO IDENTIFY THE RISKS OF MATERIAL MISSTATEMENT DUE TO FRAUD

**.19**

Section 311.06–.08 provides guidance about how the auditor obtains knowledge about the entity's business and the industry in which it operates. In performing that work, information may come to the auditor's attention that should be considered in identifying risks of material misstatement due to fraud. As part of this work, the auditor should perform the following procedures to obtain information that is used (as described in paragraphs .35 through .42) to identify the risks of material misstatement due to fraud:

  *a.*   Make inquiries of management and others within the entity to obtain their views about the risks of fraud and how they are addressed. (See paragraphs .20 through .27.)

  *b.*   Consider any unusual or unexpected relationships that have been identified in performing analytical procedures in planning the audit. (See paragraphs .28 through .30.)

  *c.*   Consider whether one or more fraud risk factors exist. (See paragraphs .31 through .33, and the Appendix [paragraph .85].)

  *d.*   Consider other information that may be helpful in the identification of risks of material misstatement due to fraud. (See paragraph .34.)

### Making Inquiries of Management and Others Within the Entity About the Risks of Fraud

**.20**

The auditor should inquire of management about: [fn 9]

  - Whether management has knowledge of any fraud or suspected fraud affecting the entity

  - Whether management is aware of allegations of fraud or suspected fraud affecting the entity, for example, received in communications from employees, former employees, analysts, regulators, short sellers, or others

  - Management's understanding about the risks of fraud in the entity, including any specific fraud risks the entity has identified or account balances or classes of transactions for which a risk of fraud may be likely to exist

  - Programs and controls [fn 10] the entity has established to mitigate specific fraud risks the entity has identified, or that otherwise help to prevent, deter, and detect fraud, and how management monitors those programs and controls. For examples of programs and controls an entity may implement to prevent, deter, and detect fraud, see the exhibit titled "Management Antifraud Programs and Controls" [paragraph .88] at the end of this section.

  - For an entity with multiple locations, (*a*) the nature and extent of monitoring of operating locations or business segments, and (*b*) whether there are particular operating locations or business segments for which a risk of fraud may be more likely to exist

  - Whether and how management communicates to employees its views on business practices and ethical behavior

**.21**

The inquiries of management also should include whether management has reported to the audit committee or others

with equivalent authority and responsibility [fn 11] (hereafter referred to as the audit committee) on how the entity's internal control [fn 12] serves to prevent, deter, or detect material misstatements due to fraud.

**.22**

The auditor also should inquire directly of the audit committee (or at least its chair) regarding the audit committee's views about the risks of fraud and whether the audit committee has knowledge of any fraud or suspected fraud affecting the entity. An entity's audit committee sometimes assumes an active role in oversight of the entity's assessment of the risks of fraud and the programs and controls the entity has established to mitigate these risks. The auditor should obtain an understanding of how the audit committee exercises oversight activities in that area.

**.23**

For entities that have an internal audit function, the auditor also should inquire of appropriate internal audit personnel about their views about the risks of fraud, whether they have performed any procedures to identify or detect fraud during the year, whether management has satisfactorily responded to any findings resulting from these procedures, and whether the internal auditors have knowledge of any fraud or suspected fraud.

**.24**

In addition to the inquiries outlined in paragraphs .20 through .23, the auditor should inquire of others within the entity about the existence or suspicion of fraud. The auditor should use professional judgment to determine those others within the entity to whom inquiries should be directed and the extent of such inquiries. In making this determination, the auditor should consider whether others within the entity may be able to provide information that will be helpful to the auditor in identifying risks of material misstatement due to fraud—for example, others who may have additional knowledge about or be able to corroborate risks of fraud identified in the discussions with management (see paragraph .20) or the audit committee (see paragraph .22).

**.25**

Examples of others within the entity to whom the auditor may wish to direct these inquiries include:

- Employees with varying levels of authority within the entity, including, for example, entity personnel with whom the auditor comes into contact during the course of the audit in obtaining (*a*) an understanding of the entity's systems and internal control, (*b*) in observing inventory or performing cutoff procedures, or (*c*) in obtaining explanations for fluctuations noted as a result of analytical procedures

- Operating personnel not directly involved in the financial reporting process

- Employees involved in initiating, recording, or processing complex or unusual transactions—for example, a sales transaction with multiple elements, or a significant related party transaction

- In-house legal counsel

**.26**

The auditor's inquiries of management and others within the entity are important because fraud often is uncovered through information received in response to inquiries. One reason for this is that such inquiries may provide individuals with an opportunity to convey information to the auditor that otherwise might not be communicated. Making inquiries of others within the entity, in addition to management, may be useful in providing the auditor with a perspective that is different from that of individuals involved in the financial reporting process. The responses to these other inquiries might serve to corroborate responses received from management, or alternatively, might provide information regarding the possibility of management override of controls—for example, a response from an employee indicating an unusual change in the way transactions have been processed. In addition, the auditor may obtain information from these inquiries regarding how effectively management has communicated standards of ethical behavior to individuals throughout the organization.

**.27**

The auditor should be aware when evaluating management's responses to the inquiries discussed in paragraph .20 that management is often in the best position to perpetrate fraud. The auditor should use professional judgment in deciding when it is necessary to corroborate responses to inquiries with other information. However, when responses are inconsistent among inquiries, the auditor should obtain additional audit evidence to resolve the inconsistencies.

157

**Considering the Results of the Analytical Procedures Performed in Planning the Audit**

**.28**

Section 329, *Analytical Procedures,* paragraphs .04 and .06, requires that analytical procedures be performed in planning the audit with an objective of identifying the existence of unusual transactions or events, and amounts, ratios, and trends that might indicate matters that have financial statement and audit planning implications. In performing analytical procedures in planning the audit, the auditor develops expectations about plausible relationships that are reasonably expected to exist, based on the auditor's understanding of the entity and its environment. When comparison of those expectations with recorded amounts or ratios developed from recorded amounts yields unusual or unexpected relationships, the auditor should consider those results in identifying the risks of material misstatement due to fraud.

**.29**

In planning the audit, the auditor also should perform analytical procedures relating to revenue with the objective of identifying unusual or unexpected relationships involving revenue accounts that may indicate a material misstatement due to fraudulent financial reporting. An example of such an analytical procedure that addresses this objective is a comparison of sales volume, as determined from recorded revenue amounts, with production capacity. An excess of sales volume over production capacity may be indicative of recording fictitious sales. As another example, a trend analysis of revenues by month and sales returns by month during and shortly after the reporting period may indicate the existence of undisclosed side agreements with customers to return goods that would preclude revenue recognition. [fn 13]

**.30**

Analytical procedures performed during planning may be helpful in identifying the risks of material misstatement due to fraud. However, because such analytical procedures generally use data aggregated at a high level, the results of those analytical procedures provide only a broad initial indication about whether a material misstatement of the financial statements may exist. Accordingly, the results of analytical procedures performed during planning should be considered along with other information gathered by the auditor in identifying the risks of material misstatement due to fraud.

**Considering Fraud Risk Factors**

**.31**

Because fraud is usually concealed, material misstatements due to fraud are difficult to detect. Nevertheless, the auditor may identify events or conditions that indicate incentives/pressures to perpetrate fraud, opportunities to carry out the fraud, or attitudes/rationalizations to justify a fraudulent action. Such events or conditions are referred to as "fraud risk factors." Fraud risk factors do not necessarily indicate the existence of fraud; however, they often are present in circumstances where fraud exists.

**.32**

When obtaining information about the entity and its environment, the auditor should consider whether the information indicates that one or more fraud risk factors are present. The auditor should use professional judgment in determining whether a risk factor is present and should be considered in identifying and assessing the risks of material misstatement due to fraud.

**.33**

Examples of fraud risk factors related to fraudulent financial reporting and misappropriation of assets are presented in the Appendix [paragraph .85]. These illustrative risk factors are classified based on the three conditions generally present when fraud exists: *incentive/pressure* to perpetrate fraud, an *opportunity* to carry out the fraud, and *attitude/rationalization* to justify the fraudulent action. Although the risk factors cover a broad range of situations, they are only examples and, accordingly, the auditor may wish to consider additional or different risk factors. Not all of these examples are relevant in all circumstances, and some may be of greater or lesser significance in entities of different size or with different ownership characteristics or circumstances. Also, the order of the examples of risk factors provided is not intended to reflect their relative importance or frequency of occurrence.

**Considering Other Information That May Be Helpful in Identifying Risks of Material Misstatement Due to Fraud**

**.34**

The auditor should consider other information that may be helpful in identifying risks of material misstatement due to fraud. Specifically, the discussion among the engagement team members (see paragraphs .14 through .18) may provide information helpful in identifying such risks. In addition, the auditor should consider whether information from the results

158

of (*a*) procedures relating to the acceptance and continuance of clients and engagements [fn 14] and (*b*) reviews of interim financial statements may be relevant in the identification of such risks. Finally, as part of the consideration of audit risk at the individual account balance or class of transaction level (see section 312.24 through .33), the auditor should consider whether identified inherent risks would provide useful information in identifying the risks of material misstatement due to fraud (see paragraph .39).

## IDENTIFYING RISKS THAT MAY RESULT IN A MATERIAL MISSTATEMENT DUE TO FRAUD

### Using the Information Gathered to Identify Risk of Material Misstatements Due to Fraud

.35

In identifying risks of material misstatement due to fraud, it is helpful for the auditor to consider the information that has been gathered (see paragraphs .19 through .34) in the context of the three conditions present when a material misstatement due to fraud occurs—that is, incentives/pressures, opportunities, and attitudes/rationalizations (see paragraph .07). However, the auditor should not assume that all three conditions must be observed or evident before concluding that there are identified risks. Although the risk of material misstatement due to fraud may be greatest when all three fraud conditions are observed or evident, the auditor cannot assume that the inability to observe one or two of these conditions means there is no risk of material misstatement due to fraud. In fact, observing that individuals have the requisite attitude to commit fraud, or identifying factors that indicate a likelihood that management or other employees will rationalize committing a fraud, is difficult at best.

.36

In addition, the extent to which each of the three conditions referred to above are present when fraud occurs may vary. In some instances the significance of incentives/pressures may result in a risk of material misstatement due to fraud, apart from the significance of the other two conditions. For example, an incentive/pressure to achieve an earnings level to preclude a loan default, or to "trigger" incentive compensation plan awards, may alone result in a risk of material misstatement due to fraud. In other instances, an easy opportunity to commit the fraud because of a lack of controls may be the dominant condition precipitating the risk of fraud, or an individual's attitude or ability to rationalize unethical actions may be sufficient to motivate that individual to engage in fraud, even in the absence of significant incentives/pressures or opportunities.

.37

The auditor's identification of fraud risks also may be influenced by characteristics such as the size, complexity, and ownership attributes of the entity. For example, in the case of a larger entity, the auditor ordinarily considers factors that generally constrain improper conduct by management, such as the effectiveness of the audit committee and the internal audit function, and the existence and enforcement of a formal code of conduct. In the case of a smaller entity, some or all of these considerations may be inapplicable or less important, and management may have developed a culture that emphasizes the importance of integrity and ethical behavior through oral communication and management by example. Also, the risks of material misstatement due to fraud may vary among operating locations or business segments of an entity, requiring an identification of the risks related to specific geographic areas or business segments, as well as for the entity as a whole. [fn 15]

.38

The auditor should evaluate whether identified risks of material misstatement due to fraud can be related to specific financial-statement account balances or classes of transactions and related assertions, or whether they relate more pervasively to the financial statements as a whole. Relating the risks of material misstatement due to fraud to the individual accounts, classes of transactions, and assertions will assist the auditor in subsequently designing appropriate auditing procedures.

.39

Certain accounts, classes of transactions, and assertions that have high inherent risk because they involve a high degree of management judgment and subjectivity also may present risks of material misstatement due to fraud because they are susceptible to manipulation by management. For example, liabilities resulting from a restructuring may be deemed to have high inherent risk because of the high degree of subjectivity and management judgment involved in their estimation. Similarly, revenues for software developers may be deemed to have high inherent risk because of the complex accounting principles applicable to the recognition and measurement of software revenue transactions. Assets resulting from investing activities may be deemed to have high inherent risk because of the subjectivity and management

159

judgment involved in estimating fair values of those investments.

**.40**

In summary, the identification of a risk of material misstatement due to fraud involves the application of professional judgment and includes the consideration of the attributes of the risk, including:

- The *type* of risk that may exist, that is, whether it involves fraudulent financial reporting or misappropriation of assets

- The *significance* of the risk, that is, whether it is of a magnitude that could lead to result in a possible material misstatement of the financial statements

- The *likelihood of the risk, that is, the likelihood that it will result in a material misstatement in the financial statements* [fn 16].

- The *pervasiveness* of the risk, that is, whether the potential risk is pervasive to the financial statements as a whole or specifically related to a particular assertion, account, or class of transactions.

**A Presumption That Improper Revenue Recognition Is a Fraud Risk**

**.41**

Material misstatements due to fraudulent financial reporting often result from an overstatement of revenues (for example, through premature revenue recognition or recording fictitious revenues) or an understatement of revenues (for example, through improperly shifting revenues to a later period). Therefore, the auditor should ordinarily presume that there is a risk of material misstatement due to fraud relating to revenue recognition. (See paragraph .54 for examples of auditing procedures related to the risk of improper revenue recognition.) [fn 17]

**A Consideration of the Risk of Management Override of Controls**

**.42**

Even if specific risks of material misstatement due to fraud are not identified by the auditor, there is a possibility that management override of controls could occur, and accordingly, the auditor should address that risk (see paragraph .57) apart from any conclusions regarding the existence of more specifically identifiable risks.

## ASSESSING THE IDENTIFIED RISKS AFTER TAKING INTO ACCOUNT AN EVALUATION OF THE ENTITY'S PROGRAMS AND CONTROLS THAT ADDRESS THE RISKS

**.43**

Section 319 requires the auditor to obtain an understanding of each of the five components of internal control sufficient to plan the audit. It also notes that such knowledge should be used to identify types of potential misstatements, consider factors that affect the risk of material misstatement, design tests of controls when applicable, and design substantive tests. Additionally, section 319 notes that controls, whether manual or automated, can be circumvented by collusion of two or more people or inappropriate management override of internal control.

**.44**

As part of the understanding of internal control sufficient to plan the audit, the auditor should evaluate whether entity programs and controls that address identified risks of material misstatement due to fraud have been suitably designed and placed in operation. [fn 18] These programs and controls may involve (*a*) specific controls designed to mitigate specific risks of fraud—for example, controls to address specific assets susceptible to misappropriation, and (*b*) broader programs designed to prevent, deter, and detect fraud—for example, programs to promote a culture of honesty and ethical behavior. The auditor should consider whether such programs and controls mitigate the identified risks of material misstatement due to fraud or whether specific control deficiencies may exacerbate the risks (see paragraph .80). The exhibit at the end of this section [paragraph .88] discusses examples of programs and controls an entity might implement to create a culture of honesty and ethical behavior, and that help to prevent, deter, and detect fraud.

**.45**

After the auditor has evaluated whether the entity's programs and controls that address identified risks of material

160

misstatement due to fraud have been suitably designed and placed in operation, the auditor should assess these risks taking into account that evaluation. This assessment should be considered when developing the auditor's response to the identified risks of material misstatement due to fraud (see paragraphs .46 through .67). **fn 19**

## RESPONDING TO THE RESULTS OF THE ASSESSMENT

**.46**

The auditor's response to the assessment of the risks of material misstatement due to fraud involves the application of professional skepticism in gathering and evaluating audit evidence. As noted in paragraph .13, professional skepticism is an attitude that includes a critical assessment of the competency and sufficiency of audit evidence. Examples of the application of professional skepticism in response to the risks of material misstatement due to fraud are (*a*) designing additional or different auditing procedures to obtain more reliable evidence in support of specified financial statement account balances, classes of transactions, and related assertions, and (*b*) obtaining additional corroboration of management's explanations or representations concerning material matters, such as through third-party confirmation, the use of a specialist, analytical procedures, examination of documentation from independent sources, or inquiries of others within or outside the entity.

**.47**

The auditor's response to the assessment of the risks of material misstatement of the financial statements due to fraud is influenced by the nature and significance of the risks identified as being present (paragraphs .35 through .42) and the entity's programs and controls that address these identified risks (paragraphs .43 through .45).

**.48**

The auditor responds to risks of material misstatement due to fraud in the following three ways:

  *a.*   A response that has an overall effect on how the audit is conducted—that is, a response involving more general considerations apart from the specific procedures otherwise planned (see paragraph .50).

  *b.*   A response to identified risks involving the nature, timing, and extent of the auditing procedures to be performed (see paragraphs .51 through .56).

  *c.*   A response involving the performance of certain procedures to further address the risk of material misstatement due to fraud involving management override of controls, given the unpredictable ways in which such override could occur (see paragraphs .57 through .67).

**.49**

The auditor may conclude that it would not be practicable to design auditing procedures that sufficiently address the risks of material misstatement due to fraud. In that case, withdrawal from the engagement with communication to the appropriate parties may be an appropriate course of action (see paragraph .78).

**Overall Responses to the Risk of Material Misstatement**

**.50**

Judgments about the risk of material misstatement due to fraud have an overall effect on how the audit is conducted in the following ways:

  • *Assignment of personnel and supervision.* The knowledge, skill, and ability of personnel assigned significant engagement responsibilities should be commensurate with the auditor's assessment of the risks of material misstatement due to fraud for the engagement (see section 210, *Training and Proficiency of the Independent Auditor*, paragraph .03). For example, the auditor may respond to an identified risk of material misstatement due to fraud by assigning additional persons with specialized skill and knowledge, such as forensic and information technology (IT) specialists, or by assigning more experienced personnel to the engagement. In addition, the extent of supervision should reflect the risks of material misstatement due to fraud (see section 311.11).

  • *Accounting principles.* The auditor should consider management's selection and application of significant accounting principles, particularly those related to subjective measurements and complex transactions. In this respect, the auditor may have a greater concern about whether the accounting principles selected and policies

adopted are being applied in an inappropriate manner to create a material misstatement of the financial statements. In developing judgments about the quality of such principles (see section 380, *Communication With Audit Committees*, paragraph .11), the auditor should consider whether their collective application indicates a bias that may create such a material misstatement of the financial statements.

- *Predictability of auditing procedures.* The auditor should incorporate an element of unpredictability in the selection from year to year of auditing procedures to be performed—for example, performing substantive tests of selected account balances and assertions not otherwise tested due to their materiality or risk, adjusting the timing of testing from that otherwise expected, using differing sampling methods, and performing procedures at different locations or at locations on an unannounced basis.

**Responses Involving the Nature, Timing, and Extent of Procedures to Be Performed to Address the Identified Risks**

.51

The auditing procedures performed in response to identified risks of material misstatement due to fraud will vary depending upon the types of risks identified and the account balances, classes of transactions, and related assertions that may be affected. These procedures may involve both substantive tests and tests of the operating effectiveness of the entity's programs and controls. However, because management may have the ability to override controls that otherwise appear to be operating effectively (see paragraph .08), it is unlikely that audit risk can be reduced to an appropriately low level by performing only tests of controls.

.52

The auditor's responses to address specifically identified risks of material misstatement due to fraud may include changing the nature, timing, and extent of auditing procedures in the following ways:

- The *nature* of auditing procedures performed may need to be changed to obtain evidence that is more reliable or to obtain additional corroborative information. For example, more evidential matter may be needed from independent sources outside the entity, such as public-record information about the existence and nature of key customers, vendors, or counterparties in a major transaction. Also, physical observation or inspection of certain assets may become more important (see section 326, *Evidential Matter*, paragraphs .15 through .21). Furthermore, the auditor may choose to employ computer-assisted audit techniques to gather more extensive evidence about data contained in significant accounts or electronic transaction files. Finally, inquiry of additional members of management or others may be helpful in identifying issues and corroborating other evidential matter (see paragraphs .24 through .26 and paragraph .53).

- The *timing* of substantive tests may need to be modified. The auditor might conclude that substantive testing should be performed at or near the end of the reporting period to best address an identified risk of material misstatement due to fraud (see section 313, *Substantive Tests Prior to the Balance-Sheet Date*). That is, the auditor might conclude that, given the risks of intentional misstatement or manipulation, tests to extend audit conclusions from an interim date to the period-end reporting date would not be effective.

    In contrast, because an intentional misstatement—for example, a misstatement involving inappropriate revenue recognition—may have been initiated in an interim period, the auditor might elect to apply substantive tests to transactions occurring earlier in or throughout the reporting period.

- The *extent* of the procedures applied should reflect the assessment of the risks of material misstatement due to fraud. For example, increasing sample sizes or performing analytical procedures at a more detailed level may be appropriate (see section 350, *Audit Sampling*, paragraph .23, and section 329). Also, computer-assisted audit techniques may enable more extensive testing of electronic transactions and account files. Such techniques can be used to select sample transactions from key electronic files, to sort transactions with specific characteristics, or to test an entire population instead of a sample.

.53

The following are examples of modification of the nature, timing, and extent of tests in response to identified risks of material misstatements due to fraud.

- Performing procedures at locations on a surprise or unannounced basis, for example, observing inventory on unexpected dates or at unexpected locations or counting cash on a surprise basis.

- Requesting that inventories be counted at the end of the reporting period or on a date closer to period end to

162

minimize the risk of manipulation of balances in the period between the date of completion of the count and the end of the reporting period.

- Making oral inquiries of major customers and suppliers in addition to sending written confirmations, or sending confirmation requests to a specific party within an organization.

- Performing substantive analytical procedures using disaggregated data, for example, comparing gross profit or operating margins by location, line of business, or month to auditor-developed expectations. [fn 20]

- Interviewing personnel involved in activities in areas where a risk of material misstatement due to fraud has been identified to obtain their insights about the risk and how controls address the risk (also see paragraph .24).

- If other independent auditors are auditing the financial statements of one or more subsidiaries, divisions, or branches, discussing with them the extent of work that needs to be performed to address the risk of material misstatement due to fraud resulting from transactions and activities among these components.

***Additional Examples of Responses to Identified Risks of Misstatements Arising From Fraudulent Financial Reporting***

**.54**

The following are additional examples of responses to identified risks of material misstatements relating to fraudulent financial reporting:

- *Revenue recognition.* Because revenue recognition is dependent on the particular facts and circumstances, as well as accounting principles and practices that can vary by industry, the auditor ordinarily will develop auditing procedures based on the auditor's understanding of the entity and its environment, including the composition of revenues, specific attributes of the revenue transactions, and unique industry considerations. If there is an identified risk of material misstatement due to fraud that involves improper revenue recognition, the auditor also may want to consider:

  - Performing substantive analytical procedures relating to revenue using disaggregated data, for example, comparing revenue reported by month and by product line or business segment during the current reporting period with comparable prior periods. Computer-assisted audit techniques may be useful in identifying unusual or unexpected revenue relationships or transactions.

  - Confirming with customers certain relevant contract terms and the absence of side agreements, because the appropriate accounting often is influenced by such terms or agreements. [fn 21] For example, acceptance criteria, delivery and payment terms, the absence of future or continuing vendor obligations, the right to return the product, guaranteed resale amounts, and cancellation or refund provisions often are relevant in such circumstances.

  - Inquiring of the entity's sales and marketing personnel or in-house legal counsel regarding sales or shipments near the end of the period and their knowledge of any unusual terms or conditions associated with these transactions.

  - Being physically present at one or more locations at period end to observe goods being shipped or being readied for shipment (or returns awaiting processing) and performing other appropriate sales and inventory cutoff procedures.

  - For those situations for which revenue transactions are electronically initiated, processed, and recorded, testing controls to determine whether they provide assurance that recorded revenue transactions occurred and are properly recorded.

- *Inventory quantities.* If there is an identified risk of material misstatement due to fraud that affects inventory quantities, examining the entity's inventory records may help identify locations or items that require specific attention during or after the physical inventory count. Such a review may lead to a decision to observe inventory counts at certain locations on an unannounced basis (see paragraph .53) or to conduct inventory counts at all locations on the same date. In addition, it may be appropriate for inventory counts to be conducted at or near the end of the reporting period to minimize the risk of inappropriate manipulation during

163

the period between the count and the end of the reporting period.

It also may be appropriate for the auditor to perform additional procedures during the observation of the count, for example, more rigorously examining the contents of boxed items, the manner in which the goods are stacked (for example, hollow squares) or labeled, and the quality (that is, purity, grade, or concentration) of liquid substances such as perfumes or specialty chemicals. Using the work of a specialist may be helpful in this regard. [fn 22] Furthermore, additional testing of count sheets, tags, or other records, or the retention of copies of these records, may be warranted to minimize the risk of subsequent alteration or inappropriate compilation.

Following the physical inventory count, the auditor may want to employ additional procedures directed at the quantities included in the priced out inventories to further test the reasonableness of the quantities counted—for example, comparison of quantities for the current period with prior periods by class or category of inventory, location or other criteria, or comparison of quantities counted with perpetual records. The auditor also may consider using computer-assisted audit techniques to further test the compilation of the physical inventory counts—for example, sorting by tag number to test tag controls or by item serial number to test the possibility of item omission or duplication.

- *Management estimates.* The auditor may identify a risk of material misstatement due to fraud involving the development of management estimates. This risk may affect a number of accounts and assertions, including asset valuation, estimates relating to specific transactions (such as acquisitions, restructurings, or disposals of a segment of the business), and other significant accrued liabilities (such as pension and other postretirement benefit obligations, or environmental remediation liabilities). The risk may also relate to significant changes in assumptions relating to recurring estimates. As indicated in section 342, *Auditing Accounting Estimates,* estimates are based on subjective as well as objective factors and there is a potential for bias in the subjective factors, even when management's estimation process involves competent personnel using relevant and reliable data.

  In addressing an identified risk of material misstatement due to fraud involving accounting estimates, the auditor may want to supplement the audit evidence otherwise obtained (see section 342.09 through .14). In certain circumstances (for example, evaluating the reasonableness of management's estimate of the fair value of a derivative), it may be appropriate to engage a specialist or develop an independent estimate for comparison to management's estimate. Information gathered about the entity and its environment may help the auditor evaluate the reasonableness of such management estimates and underlying judgments and assumptions.

  A retrospective review of similar management judgments and assumptions applied in prior periods (see paragraphs .63 through .65) may also provide insight about the reasonableness of judgments and assumptions supporting management estimates.

### Examples of Responses to Identified Risks of Misstatements Arising From Misappropriations of Assets

**.55**

The auditor may have identified a risk of material misstatement due to fraud relating to misappropriation of assets. For example, the auditor may conclude that the risk of asset misappropriation at a particular operating location is significant because a large amount of easily accessible cash is maintained at that location, or there are inventory items such as laptop computers at that location that can easily be moved and sold.

**.56**

The auditor's response to a risk of material misstatement due to fraud relating to misappropriation of assets usually will be directed toward certain account balances. Although some of the audit responses noted in paragraphs .52 through .54 may apply in such circumstances, such as the procedures directed at inventory quantities, the scope of the work should be linked to the specific information about the misappropriation risk that has been identified. For example, if a particular asset is highly susceptible to misappropriation and a potential misstatement would be material to the financial statements, obtaining an understanding of the controls related to the prevention and detection of such misappropriation and testing the operating effectiveness of such controls may be warranted. In certain circumstances, physical inspection of such assets (for example, counting cash or securities) at or near the end of the reporting period may be appropriate. In addition, the use of substantive analytical procedures, such as the development by the auditor of an expected dollar amount at a high level of precision, to be compared with a recorded amount, may be effective in certain circumstances.

### Responses to Further Address the Risk of Management Override of Controls

**164**

**.57**

As noted in paragraph .08, management is in a unique position to perpetrate fraud because of its ability to directly or indirectly manipulate accounting records and prepare fraudulent financial statements by overriding established controls that otherwise appear to be operating effectively. By its nature, management override of controls can occur in unpredictable ways. Accordingly, in addition to overall responses (paragraph .50) and responses that address specifically identified risks of material misstatement due to fraud (see paragraphs .51 through .56), the procedures described in paragraphs .58 through .67 should be performed to further address the risk of management override of controls.

**.58**

***Examining journal entries and other adjustments for evidence of possible material misstatement due to fraud.***
Material misstatements of financial statements due to fraud often involve the manipulation of the financial reporting process by (*a*) recording inappropriate or unauthorized journal entries throughout the year or at period end, or (*b*) making adjustments to amounts reported in the financial statements that are not reflected in formal journal entries, such as through consolidating adjustments, report combinations, and reclassifications. Accordingly, the auditor should design procedures to test the appropriateness of journal entries recorded in the general ledger and other adjustments (for example, entries posted directly to financial statement drafts) made in the preparation of the financial statements. More specifically, the auditor should:

    *a.*    Obtain an understanding of the entity's financial reporting process **fn 23** and the controls over journal entries and other adjustments. (See paragraphs .59 and .60.)

    *b.*    Identify and select journal entries and other adjustments for testing. (See paragraph .61.)

    *c.*    Determine the timing of the testing. (See paragraph .62.)<

    *d.*    Inquire of individuals involved in the financial reporting process about inappropriate or unusual activity relating to the processing of journal entries and other adjustments.

**.59**

The auditor's understanding of the entity's financial reporting process may help in identifying the type, number, and monetary value of journal entries and other adjustments that typically are made in preparing the financial statements. For example, the auditor's understanding may include the sources of significant debits and credits to an account, who can initiate entries to the general ledger or transaction processing systems, what approvals are required for such entries, and how journal entries are recorded (for example, entries may be initiated and recorded online with no physical evidence, or may be prepared in paper form and entered in batch mode).

**.60**

An entity may have implemented specific controls over journal entries and other adjustments. For example, an entity may use journal entries that are preformatted with account numbers and specific user approval criteria, and may have automated controls to generate an exception report for any entries that were unsuccessfully proposed for recording or entries that were recorded and processed outside of established parameters. The auditor should obtain an understanding of the design of such controls over journal entries and other adjustments and determine whether they are suitably designed and have been placed in operation.

**.61**

The auditor should use professional judgment in determining the nature, timing, and extent of the testing of journal entries and other adjustments. For purposes of identifying and selecting specific entries and other adjustments for testing, and determining the appropriate method of examining the underlying support for the items selected, the auditor should consider:

    ●    *The auditor's assessment of the risk of material misstatement due to fraud.* The presence of fraud risk factors or other conditions may help the auditor to identify specific classes of journal entries for testing and indicate the extent of testing necessary.

    ●    *The effectiveness of controls that have been implemented over journal entries and other adjustments.* Effective controls over the preparation and posting of journal entries and adjustments may affect the extent of substantive testing necessary, provided that the auditor has tested the operating effectiveness of those controls. However, even though controls might be implemented and operating effectively, the auditor's

procedures for testing journal entries and other adjustments should include the identification and testing of specific items.

- *The entity's financial reporting process and the nature of the evidence that can be examined.* The auditor's procedures for testing journal entries and other adjustments will vary based on the nature of the financial reporting process. For many entities, routine processing of transactions involves a combination of manual and automated steps and procedures. Similarly, the processing of journal entries and other adjustments might involve both manual and automated procedures and controls. Regardless of the method, the auditor's procedures should include selecting from the general ledger journal entries to be tested and examining support for those items. In addition, the auditor should be aware that journal entries and other adjustments might exist in either electronic or paper form. When information technology (IT) is used in the financial reporting process, journal entries and other adjustments might exist only in electronic form. Electronic evidence often requires extraction of the desired data by an auditor with IT knowledge and skills or the use of an IT specialist. In an IT environment, it may be necessary for the auditor to employ computer-assisted audit techniques (for example, report writers, software or data extraction tools, or other systems-based techniques) to identify the journal entries and other adjustments to be tested.

- *The characteristics of fraudulent entries or adjustments.* Inappropriate journal entries and other adjustments often have certain unique identifying characteristics. Such characteristics may include entries (*a*) made to unrelated, unusual, or seldom-used accounts, (*b*) made by individuals who typically do not make journal entries, (*c*) recorded at the end of the period or as post-closing entries that have little or no explanation or description, (*d*) made either before or during the preparation of the financial statements that do not have account numbers, or (*e*) containing round numbers or a consistent ending number.

- *The nature and complexity of the accounts.* Inappropriate journal entries or adjustments may be applied to accounts that (*a*) contain transactions that are complex or unusual in nature, (*b*) contain significant estimates and period-end adjustments, (*c*) have been prone to errors in the past, (*d*) have not been reconciled on a timely basis or contain unreconciled differences, (*e*) contain intercompany transactions, or (*f*) are otherwise associated with an identified risk of material misstatement due to fraud. The auditor should recognize, however, that inappropriate journal entries and adjustments also might be made to other accounts. In audits of entities that have several locations or components, the auditor should consider the need to select journal entries from locations based on the factors set forth in section 312.18.

- *Journal entries or other adjustments processed outside the normal course of business.* Standard journal entries used on a recurring basis to record transactions such as monthly sales, purchases, and cash disbursements, or to record recurring periodic accounting estimates generally are subject to the entity's internal controls. Nonstandard entries (for example, entries used to record nonrecurring transactions, such as a business combination, or entries used to record a nonrecurring estimate, such as an asset impairment) might not be subject to the same level of internal control. In addition, other adjustments such as consolidating adjustments, report combinations, and reclassifications generally are not reflected in formal journal entries and might not be subject to the entity's internal controls. Accordingly, the auditor should consider placing additional emphasis on identifying and testing items processed outside of the normal course of business.

**.62**

Because fraudulent journal entries often are made at the end of a reporting period, the auditor's testing ordinarily should focus on the journal entries and other adjustments made at that time. However, because material misstatements in financial statements due to fraud can occur throughout the period and may involve extensive efforts to conceal how it is accomplished, the auditor should consider whether there also is a need to test journal entries throughout the period under audit.

**.63**

***Reviewing accounting estimates for biases that could result in material misstatement due to fraud.*** In preparing financial statements, management is responsible for making a number of judgments or assumptions that affect significant accounting estimates [fn 24] and for monitoring the reasonableness of such estimates on an ongoing basis. Fraudulent financial reporting often is accomplished through intentional misstatement of accounting estimates. As discussed in section 312.36, the auditor should consider whether differences between estimates best supported by the audit evidence and the estimates included in the financial statements, even if they are individually reasonable, indicate a possible bias on the part of the entity's management, in which case the auditor should reconsider the estimates taken as a whole.

**.64**

166

The auditor also should perform a retrospective review of significant accounting estimates reflected in the financial statements of the prior year to determine whether management judgments and assumptions relating to the estimates indicate a possible bias on the part of management. The significant accounting estimates selected for testing should include those that are based on highly sensitive assumptions or are otherwise significantly affected by judgments made by management. With the benefit of hindsight, a retrospective review should provide the auditor with additional information about whether there may be a possible bias on the part of management in making the current-year estimates. This review, however, is not intended to call into question the auditor's professional judgments made in the prior year that were based on information available at the time.

**.65**

If the auditor identifies a possible bias on the part of management in making accounting estimates, the auditor should evaluate whether circumstances producing such a bias represent a risk of a material misstatement due to fraud. For example, information coming to the auditor's attention may indicate a risk that adjustments to the current-year estimates might be recorded at the instruction of management to arbitrarily achieve a specified earnings target.

**.66**

*Evaluating the business rationale for significant unusual transactions.* During the course of the audit, the auditor may become aware of significant transactions that are outside the normal course of business for the entity, or that otherwise appear to be unusual given the auditor's understanding of the entity and its environment. The auditor should gain an understanding of the business rationale for such transactions and whether that rationale (or the lack thereof) suggests that the transactions may have been entered into to engage in fraudulent financial reporting or conceal misappropriation of assets.

**.67**

In understanding the business rationale for the transactions, the auditor should consider:

- Whether the form of such transactions is overly complex (for example, involves multiple entities within a consolidated group or unrelated third parties).

- Whether management has discussed the nature of and accounting for such transactions with the audit committee or board of directors.

- Whether management is placing more emphasis on the need for a particular accounting treatment than on the underlying economics of the transaction.

- Whether transactions that involve unconsolidated related parties, including special purpose entities, have been properly reviewed and approved by the audit committee or board of directors.

- Whether the transactions involve previously unidentified related parties [fn 25] or parties that do not have the substance or the financial strength to support the transaction without assistance from the entity under audit.

## EVALUATING AUDIT EVIDENCE

**.68**

*Assessing risks of material misstatement due to fraud throughout the audit.* The auditor's assessment of the risks of material misstatement due to fraud should be ongoing throughout the audit. Conditions may be identified during fieldwork that change or support a judgment regarding the assessment of the risks, such as the following:

- Discrepancies in the accounting records, including:

  ○ Transactions that are not recorded in a complete or timely manner or are improperly recorded as to amount, accounting period, classification, or entity policy

  ○ Unsupported or unauthorized balances or transactions

  ○ Last-minute adjustments that significantly affect financial results

  ○ Evidence of employees' access to systems and records inconsistent with that necessary to

167

perform their authorized duties

- ○ Tips or complaints to the auditor about alleged fraud

- Conflicting or missing evidential matter, including:

  - ○ Missing documents

  - ○ Documents that appear to have been altered **fn 26**

  - ○ Unavailability of other than photocopied or electronically transmitted documents when documents in original form are expected to exist

  - ○ Significant unexplained items on reconciliations

  - ○ Inconsistent, vague, or implausible responses from management or employees arising from inquiries or analytical procedures (See paragraph .72.)

  - ○ Unusual discrepancies between the entity's records and confirmation replies

  - ○ Missing inventory or physical assets of significant magnitude

  - ○ Unavailable or missing electronic evidence, inconsistent with the entity's record retention practices or policies

  - ○ Inability to produce evidence of key systems development and program change testing and implementation activities for current-year system changes and deployments

- Problematic or unusual relationships between the auditor and management, including:

  - ○ Denial of access to records, facilities, certain employees, customers, vendors, or others from whom audit evidence might be sought **fn 27**

  - ○ Undue time pressures imposed by management to resolve complex or contentious issues

  - ○ Complaints by management about the conduct of the audit or management intimidation of audit team members, particularly in connection with the auditor's critical assessment of audit evidence or in the resolution of potential disagreements with management

  - ○ Unusual delays by the entity in providing requested information

  - ○ Unwillingness to facilitate auditor access to key electronic files for testing through the use of computer-assisted audit techniques

  - ○ Denial of access to key IT operations staff and facilities, including security, operations, and systems development personnel

  - ○ An unwillingness to add or revise disclosures in the financial statements to make them more complete and transparent

**.69**

***Evaluating whether analytical procedures performed as substantive tests or in the overall review stage of the audit indicate a previously unrecognized risk of material misstatement due to fraud.*** As discussed in paragraphs .28 through .30, the auditor should consider whether analytical procedures performed in planning the audit result in identifying any unusual or unexpected relationships that should be considered in assessing the risks of material misstatement due to fraud. The auditor also should evaluate whether analytical procedures that were performed as substantive tests or in the overall review stage of the audit (see section 329) indicate a previously unrecognized risk of material misstatement due to fraud.

**.70**

If not already performed during the overall review stage of the audit, the auditor should perform analytical procedures

relating to revenue, as discussed in paragraph .29, through the end of the reporting period.

**.71**

Determining which particular trends and relationships may indicate a risk of material misstatement due to fraud requires professional judgment. Unusual relationships involving year-end revenue and income often are particularly relevant. These might include, for example, (*a*) uncharacteristically large amounts of income being reported in the last week or two of the reporting period from unusual transactions, as well as (*b*) income that is inconsistent with trends in cash flow from operations.

**.72**

Some unusual or unexpected analytical relationships may have been identified and may indicate a risk of material misstatement due to fraud because management or employees generally are unable to manipulate certain information to create seemingly normal or expected relationships. Some examples are as follows:

- The relationship of net income to cash flows from operations may appear unusual because management recorded fictitious revenues and receivables but was unable to manipulate cash.

- Changes in inventory, accounts payable, sales, or cost of sales from the prior period to the current period may be inconsistent, indicating a possible employee theft of inventory, because the employee was unable to manipulate all of the related accounts.

- A comparison of the entity's profitability to industry trends, which management cannot manipulate, may indicate trends or differences for further consideration when identifying risks of material misstatement due to fraud.

- A comparison of bad debt write-offs to comparable industry data, which employees cannot manipulate, may provide unexplained relationships that could indicate a possible theft of cash receipts.

- An unexpected or unexplained relationship between sales volume as determined from the accounting records and production statistics maintained by operations personnel—which may be more difficult for management to manipulate—may indicate a possible misstatement of sales.

**.73**

The auditor also should consider whether responses to inquiries throughout the audit about analytical relationships have been vague or implausible, or have produced evidence that is inconsistent with other evidential matter accumulated during the audit.

**.74**

***Evaluating the risks of material misstatement due to fraud at or near the completion of fieldwork.*** At or near the completion of fieldwork, the auditor should evaluate whether the accumulated results of auditing procedures and other observations (for example, conditions and analytical relationships noted in paragraphs .69 through .73) affect the assessment of the risks of material misstatement due to fraud made earlier in the audit. This evaluation primarily is a qualitative matter based on the auditor's judgment. Such an evaluation may provide further insight about the risks of material misstatement due to fraud and whether there is a need to perform additional or different audit procedures. As part of this evaluation, the auditor with final responsibility for the audit should ascertain that there has been appropriate communication with the other audit team members throughout the audit regarding information or conditions indicative of risks of material misstatement due to fraud. [fn 28]

**.75**

***Responding to misstatements that may be the result of fraud.*** When audit test results identify misstatements in the financial statements, the auditor should consider whether such misstatements may be indicative of fraud. [fn 29] That determination affects the auditor's evaluation of materiality and the related responses necessary as a result of that evaluation. [fn 30]

**.76**

If the auditor believes that misstatements are or may be the result of fraud, but the effect of the misstatements is not material to the financial statements, the auditor nevertheless should evaluate the implications, especially those dealing with the organizational position of the person(s) involved. For example, fraud involving misappropriations of cash from a

small petty cash fund normally would be of little significance to the auditor in assessing the risk of material misstatement due to fraud because both the manner of operating the fund and its size would tend to establish a limit on the amount of potential loss, and the custodianship of such funds normally is entrusted to a nonmanagement employee. [fn 31] Conversely, if the matter involves higher-level management, even though the amount itself is not material to the financial statements, it may be indicative of a more pervasive problem, for example, implications about the integrity of management. [fn 32] In such circumstances, the auditor should reevaluate the assessment of the risk of material misstatement due to fraud and its resulting impact on (a) the nature, timing, and extent of the tests of balances or transactions and (b) the assessment of the effectiveness of controls if control risk was assessed below the maximum.

.77

If the auditor believes that the misstatement is or may be the result of fraud, and either has determined that the effect could be material to the financial statements or has been unable to evaluate whether the effect is material, the auditor should:

a.    Attempt to obtain additional evidential matter to determine whether material fraud has occurred or is likely to have occurred, and, if so, its effect on the financial statements and the auditor's report thereon. [fn 33]

b.    Consider the implications for other aspects of the audit (see paragraph .76).

c.    Discuss the matter and the approach for further investigation with an appropriate level of management that is at least one level above those involved, and with senior management and the audit committee. [fn 34]

d.    If appropriate, suggest that the client consult with legal counsel.

.78

The auditor's consideration of the risks of material misstatement and the results of audit tests may indicate such a significant risk of material misstatement due to fraud that the auditor should consider withdrawing from the engagement and communicating the reasons for withdrawal to the audit committee or others with equivalent authority and responsibility. [fn 35] Whether the auditor concludes that withdrawal from the engagement is appropriate may depend on (a) the implications about the integrity of management and (b) the diligence and cooperation of management or the board of directors in investigating the circumstances and taking appropriate action. Because of the variety of circumstances that may arise, it is not possible to definitively describe when withdrawal is appropriate. [fn 36] The auditor may wish to consult with legal counsel when considering withdrawal from an engagement.

## COMMUNICATING ABOUT POSSIBLE FRAUD TO MANAGEMENT, THE AUDIT COMMITTEE, AND OTHERS [fn 37]

.79

Whenever the auditor has determined that there is evidence that fraud may exist, that matter should be brought to the attention of an appropriate level of management. This is appropriate even if the matter might be considered inconsequential, such as a minor defalcation by an employee at a low level in the entity's organization. Fraud involving senior management and fraud (whether caused by senior management or other employees) that causes a material misstatement of the financial statements should be reported directly to the audit committee. In addition, the auditor should reach an understanding with the audit committee regarding the nature and extent of communications with the committee about misappropriations perpetrated by lower-level employees.

.80

*[The following paragraph is effective for audits of fiscal years ending on or after November 15, 2004, for accelerated filers, and on or after July 15, 2005, for all other issuers. See PCAOB Release No. 2004-008.*

*For audits of fiscal years ending before November 15, 2004, for accelerated filers, and before July 15, 2005, for all other issuers, click here.]*

If the auditor, as a result of the assessment of the risks of material misstatement, has identified risks of material misstatement due to fraud that have continuing control implications (whether or not transactions or adjustments that could be the result of fraud have been detected), the auditor should consider whether these risks represent significant deficiencies that must be communicated to senior management and the audit committee. [fn 38] (See section 325, "Communications About Control Deficiencies in An Audit of Financial Statements," paragraph 4.). The auditor also should consider whether the absence of or deficiencies in programs and controls to mitigate specific risks of fraud or to

170

otherwise help prevent, deter, and detect fraud (see paragraph .44) represent significant deficiencies that should be communicated to senior management and the audit committee.

**.81**

The auditor also may wish to communicate other risks of fraud identified as a result of the assessment of the risks of material misstatements due to fraud. Such a communication may be a part of an overall communication to the audit committee of business and financial statement risks affecting the entity and/or in conjunction with the auditor communication about the quality of the entity's accounting principles (see section 380.11).

**.82**

The disclosure of possible fraud to parties other than the client's senior management and its audit committee ordinarily is not part of the auditor's responsibility and ordinarily would be precluded by the auditor's ethical or legal obligations of confidentiality unless the matter is reflected in the auditor's report. The auditor should recognize, however, that in the following circumstances a duty to disclose to parties outside the entity may exist:

   a.    To comply with certain legal and regulatory requirements [fn 39]

   b.    To a successor auditor when the successor makes inquiries in accordance with section 315, *Communications Between Predecessor and Successor Auditors* [fn 40]

   c.    In response to a subpoena

   d.    To a funding agency or other specified agency in accordance with requirements for the audits of entities that receive governmental financial assistance [fn 41]

Because potential conflicts between the auditor's ethical and legal obligations for confidentiality of client matters may be complex, the auditor may wish to consult with legal counsel before discussing matters covered by paragraphs .79 through .81 with parties outside the client.

## DOCUMENTING THE AUDITOR'S CONSIDERATION OF FRAUD

**.83**

The auditor should document the following:

- The discussion among engagement personnel in planning the audit regarding the susceptibility of the entity's financial statements to material misstatement due to fraud, including how and when the discussion occurred, the audit team members who participated, and the subject matter discussed (See paragraphs .14 through .17.)

- The procedures performed to obtain information necessary to identify and assess the risks of material misstatement due to fraud (See paragraphs .19 through .34.)

- Specific risks of material misstatement due to fraud that were identified (see paragraphs .35 through .45), and a description of the auditor's response to those risks (See paragraphs .46 through .56.)

- If the auditor has not identified in a particular circumstance, improper revenue recognition as a risk of material misstatement due to fraud, the reasons supporting the auditor's conclusion (See paragraph .41.)

- The results of the procedures performed to further address the risk of management override of controls (See paragraphs .58 through .67.)

- Other conditions and analytical relationships that caused the auditor to believe that additional auditing procedures or other responses were required and any further responses the auditor concluded were appropriate, to address such risks or other conditions (See paragraphs .68 through .73.)

- The nature of the communications about fraud made to management, the audit committee, and others (See paragraphs .79 through .82.)

## EFFECTIVE DATE

**.84**

This section is effective for audits of financial statements for periods beginning on or after December 15, 2002. Early application of the provisions of this section is permissible.

## APPENDIX

## EXAMPLES OF FRAUD RISK FACTORS

**.85**

**A.1**    This appendix contains examples of risk factors discussed in paragraphs .31 through .33 of the section. Separately presented are examples relating to the two types of fraud relevant to the auditor's consideration—that is, fraudulent financial reporting and misappropriation of assets. For each of these types of fraud, the risk factors are further classified based on the three conditions generally present when material misstatements due to fraud occur: (*a*) incentives/pressures, (*b*) opportunities, and (*c*) attitudes/rationalizations. Although the risk factors cover a broad range of situations, they are only examples and, accordingly, the auditor may wish to consider additional or different risk factors. Not all of these examples are relevant in all circumstances, and some may be of greater or lesser significance in entities of different size or with different ownership characteristics or circumstances. Also, the order of the examples of risk factors provided is not intended to reflect their relative importance or frequency of occurrence.

**Risk Factors Relating to Misstatements Arising From Fraudulent Financial Reporting**

**A.2**    The following are examples of risk factors relating to misstatements arising from fraudulent financial reporting.

**Incentives/Pressures**

    *a.*    Financial stability or profitability is threatened by economic, industry, or entity operating conditions, such as (or as indicated by):

- High degree of competition or market saturation, accompanied by declining margins

- High vulnerability to rapid changes, such as changes in technology, product obsolescence, or interest rates

- Significant declines in customer demand and increasing business failures in either the industry or overall economy

- Operating losses making the threat of bankruptcy, foreclosure, or hostile takeover imminent

- Recurring negative cash flows from operations or an inability to generate cash flows from operations while reporting earnings and earnings growth

- Rapid growth or unusual profitability, especially compared to that of other companies in the same industry

- New accounting, statutory, or regulatory requirements

    *b.*    Excessive pressure exists for management to meet the requirements or expectations of third parties due to the following:

- Profitability or trend level expectations of investment analysts, institutional investors, significant creditors, or other external parties (particularly expectations that are unduly aggressive or unrealistic), including expectations created by management in, for example, overly optimistic press releases or annual report messages

- Need to obtain additional debt or equity financing to stay competitive—including financing of major research and development or capital expenditures

- Marginal ability to meet exchange listing requirements or debt repayment or other debt covenant requirements

172

      ○  Perceived or real adverse effects of reporting poor financial results on significant pending transactions, such as business combinations or contract awards

c.    Information available indicates that management or the board of directors' personal financial situation is threatened by the entity's financial performance arising from the following:

      ○  Significant financial interests in the entity

      ○  Significant portions of their compensation (for example, bonuses, stock options, and earn-out arrangements) being contingent upon achieving aggressive targets for stock price, operating results, financial position, or cash flow [fn 1]

      ○  Personal guarantees of debts of the entity

d.    There is excessive pressure on management or operating personnel to meet financial targets set up by the board of directors or management, including sales or profitability incentive goals.

**Opportunities**

a.    The nature of the industry or the entity's operations provides opportunities to engage in fraudulent financial reporting that can arise from the following:

      ○  Significant related-party transactions not in the ordinary course of business or with related entities not audited or audited by another firm

      ○  A strong financial presence or ability to dominate a certain industry sector that allows the entity to dictate terms or conditions to suppliers or customers that may result in inappropriate or non-arm's-length transactions

      ○  Assets, liabilities, revenues, or expenses based on significant estimates that involve subjective judgments or uncertainties that are difficult to corroborate

      ○  Significant, unusual, or highly complex transactions, especially those close to period end that pose difficult "substance over form" questions

      ○  Significant operations located or conducted across international borders in jurisdictions where differing business environments and cultures exist

      ○  Significant bank accounts or subsidiary or branch operations in tax-haven jurisdictions for which there appears to be no clear business justification

b.    There is ineffective monitoring of management as a result of the following:

      ○  Domination of management by a single person or small group (in a nonowner-managed business) without compensating controls

      ○  Ineffective board of directors or audit committee oversight over the financial reporting process and internal control

c.    There is a complex or unstable organizational structure, as evidenced by the following:

      ○  Difficulty in determining the organization or individuals that have controlling interest in the entity

      ○  Overly complex organizational structure involving unusual legal entities or managerial lines of authority

      ○  High turnover of senior management, counsel, or board members

d.    Internal control components are deficient as a result of the following:

      ○  Inadequate monitoring of controls, including automated controls and controls over interim financial reporting (where external reporting is required)

173

    ○   High turnover rates or employment of ineffective accounting, internal audit, or information technology staff

    ○   Ineffective accounting and information systems, including situations involving reportable conditions

**Attitudes/Rationalizations**

Risk factors reflective of attitudes/rationalizations by board members, management, or employees, that allow them to engage in and/or justify fraudulent financial reporting, may not be susceptible to observation by the auditor. Nevertheless, the auditor who becomes aware of the existence of such information should consider it in identifying the risks of material misstatement arising from fraudulent financial reporting. For example, auditors may become aware of the following information that may indicate a risk factor:

- Ineffective communication, implementation, support, or enforcement of the entity's values or ethical standards by management or the communication of inappropriate values or ethical standards

- Nonfinancial management's excessive participation in or preoccupation with the selection of accounting principles or the determination of significant estimates

- Known history of violations of securities laws or other laws and regulations, or claims against the entity, its senior management, or board members alleging fraud or violations of laws and regulations

- Excessive interest by management in maintaining or increasing the entity's stock price or earnings trend

- A practice by management of committing to analysts, creditors, and other third parties to achieve aggressive or unrealistic forecasts

- Management failing to correct known reportable conditions on a timely basis

- An interest by management in employing inappropriate means to minimize reported earnings for tax-motivated reasons

- Recurring attempts by management to justify marginal or inappropriate accounting on the basis of materiality

- The relationship between management and the current or predecessor auditor is strained, as exhibited by the following:

    ○   Frequent disputes with the current or predecessor auditor on accounting, auditing, or reporting matters

    ○   Unreasonable demands on the auditor, such as unreasonable time constraints regarding the completion of the audit or the issuance of the auditor's report

    ○   Formal or informal restrictions on the auditor that inappropriately limit access to people or information or the ability to communicate effectively with the board of directors or audit committee

    ○   Domineering management behavior in dealing with the auditor, especially involving attempts to influence the scope of the auditor's work or the selection or continuance of personnel assigned to or consulted on the audit engagement

**Risk Factors Relating to Misstatements Arising From Misappropriation of Assets**

**A.3**    Risk factors that relate to misstatements arising from misappropriation of assets are also classified according to the three conditions generally present when fraud exists: incentives/pressures, opportunities, and attitudes/rationalizations. Some of the risk factors related to misstatements arising from fraudulent financial reporting also may be present when misstatements arising from misappropriation of assets occur. For example, ineffective monitoring of management and weaknesses in internal control may be present when misstatements due to either fraudulent financial reporting or misappropriation of assets exist. The following are examples of risk factors related to misstatements arising from misappropriation of assets.

**Incentives/Pressures**

**174**

a. Personal financial obligations may create pressure on management or employees with access to cash or other assets susceptible to theft to misappropriate those assets.

b. Adverse relationships between the entity and employees with access to cash or other assets susceptible to theft may motivate those employees to misappropriate those assets. For example, adverse relationships may be created by the following:

- Known or anticipated future employee layoffs

- Recent or anticipated changes to employee compensation or benefit plans

- Promotions, compensation, or other rewards inconsistent with expectations

**Opportunities**

a. Certain characteristics or circumstances may increase the susceptibility of assets to misappropriation. For example, opportunities to misappropriate assets increase when there are the following:

- Large amounts of cash on hand or processed

- Inventory items that are small in size, of high value, or in high demand

- Easily convertible assets, such as bearer bonds, diamonds, or computer chips

- Fixed assets that are small in size, marketable, or lacking observable identification of ownership

b. Inadequate internal control over assets may increase the susceptibility of misappropriation of those assets. For example, misappropriation of assets may occur because there is the following:

- Inadequate segregation of duties or independent checks

- Inadequate management oversight of employees responsible for assets, for example, inadequate supervision or monitoring of remote locations

- Inadequate job applicant screening of employees with access to assets

- Inadequate recordkeeping with respect to assets

- Inadequate system of authorization and approval of transactions (for example, in purchasing)

- Inadequate physical safeguards over cash, investments, inventory, or fixed assets

- Lack of complete and timely reconciliations of assets

- Lack of timely and appropriate documentation of transactions, for example, credits for merchandise returns

- Lack of mandatory vacations for employees performing key control functions

- Inadequate management understanding of information technology, which enables information technology employees to perpetrate a misappropriation

- Inadequate access controls over automated records, including controls over and review of computer systems event logs.

**Attitudes/Rationalizations**

Risk factors reflective of employee attitudes/rationalizations that allow them to justify misappropriations of assets, are generally not susceptible to observation by the auditor. Nevertheless, the auditor who becomes aware of the existence of such information should consider it in identifying the risks of material misstatement arising from misappropriation of

**175**

assets. For example, auditors may become aware of the following attitudes or behavior of employees who have access to assets susceptible to misappropriation:

- Disregard for the need for monitoring or reducing risks related to misappropriations of assets

- Disregard for internal control over misappropriation of assets by overriding existing controls or by failing to correct known internal control deficiencies

- Behavior indicating displeasure or dissatisfaction with the company or its treatment of the employee

- Changes in behavior or lifestyle that may indicate assets have been misappropriated

## AMENDMENT TO SECTION 230, *DUE PROFESSIONAL CARE IN THE PERFORMANCE OF WORK*

.86

1.   This section amends section 230, *Due Professional Care in the Performance of Work*, paragraphs .12 and .13, to include a discussion about the characteristics of fraud and a discussion about collusion. (The new language is shown in boldface italics; deleted language is shown by strikethrough.)

**Reasonable Assurance**

.10   The exercise of due professional care allows the auditor to obtain *reasonable assurance* that the financial statements are free of material misstatement, whether caused by error or fraud. Absolute assurance is not attainable because of the nature of audit evidence and the characteristics of fraud. Therefore, an audit conducted in accordance with generally accepted auditing standards may not detect a material misstatement.

.11   The independent auditor's objective is to obtain sufficient competent evidential matter to provide him or her with a reasonable basis for forming an opinion. The nature of most evidence derives, in part, from the concept of selective testing of the data being audited, which involves judgment regarding both the areas to be tested and the nature, timing, and extent of the tests to be performed. In addition, judgment is required in interpreting the results of audit testing and evaluating audit evidence. Even with good faith and integrity, mistakes and errors in judgment can be made. Furthermore, accounting presentations contain accounting estimates, the measurement of which is inherently uncertain and depends on the outcome of future events. The auditor exercises professional judgment in evaluating the reasonableness of accounting estimates based on information that could reasonably be expected to be available prior to the completion of field work. [fn 5] As a result of these factors, in the great majority of cases, the auditor has to rely on evidence that is persuasive rather than convincing. [fn 6]

.12   Because of the characteristics of fraud, ~~particularly those involving concealment and falsified documentation (including forgery),~~ a properly planned and performed audit may not detect a material misstatement. ***Characteristics of fraud include (a) concealment through collusion among management, employees, or third parties; (b) withheld, misrepresented, or falsified documentation; and (c) the ability of management to override or instruct others to override what otherwise appears to be effective controls.*** For example, ~~an audit conducted in accordance with generally accepted auditing standards rarely involves authentication of documentation, nor are auditors trained as or expected to be experts in such authentication. Also,~~ auditing procedures may be ineffective for detecting an intentional misstatement that is concealed through collusion among ~~client~~ personnel ***within the entity*** and third parties or among management or employees of the ~~client~~ ***entity***. ***Collusion may cause the auditor who has properly performed the audit to conclude that evidence provided is persuasive when it is, in fact, false. In addition, an audit conducted in accordance with generally accepted auditing standards rarely involves authentication of documentation, nor are auditors trained as or expected to be experts in such authentication. Furthermore, an auditor may not discover the existence of a modification of documentation through a side agreement that management or a third party has not disclosed. Finally, management has the ability to directly or indirectly manipulate accounting records and present fraudulent financial information by overriding controls in unpredictable ways.***

.13   Since the auditor's opinion on the financial statements is based on the concept of obtaining

reasonable assurance, the auditor is not an insurer and his or her report does not constitute a guarantee. Therefore, the subsequent discovery that a material misstatement, whether from error or fraud, exists in the financial statements does not, in and of itself, evidence (*a*) failure to obtain reasonable assurance, (*b*) inadequate planning, performance, or judgment, (*c*) the absence of due professional care, or (*d*) a failure to comply with generally accepted auditing standards.

## AMENDMENT TO SECTION 333, *MANAGEMENT REPRESENTATIONS*, PARAGRAPH .06 AND APPENDIX A [PARAGRAPH .16]

**.87**

1.  This section requires the auditor to make inquiries of management about fraud and the risk of fraud. In support of and consistent with these inquiries, this amendment revises the guidance for management representations about fraud currently found in section 333, *Management Representations*, paragraph .06h, and Appendix A [paragraph .16]). New language is shown in boldface italics; deleted language is shown by strikethrough.

> h.  **Management's acknowledgment of its responsibility for the design and implementation of programs and controls to prevent and detect fraud**

> ~~i.~~  **Knowledge of** fraud **or suspected fraud affecting the entity** involving (1) management, (2) employees who have significant roles in internal control, or (3) others where the fraud could have a material effect on the financial statements ~~fn 8~~

> j.  **Knowledge of any allegations of fraud or suspected fraud affecting the entity received in communications from employees, former employees, analysts, regulators, short sellers, or others**

2.  Subsequent subparagraphs and footnotes are to be renumbered accordingly.

> **Appendix A**

> **Illustrative Management Representation Letter**

> 2.  If matters exist that should be disclosed to the auditor, they should be indicated by ~~listing them following~~**modifying** the **related** representation. For example, if an event subsequent to the date of the balance sheet has been disclosed in the financial statements, the final paragraph could be modified as follows: "To the best of our knowledge and belief, except as discussed in Note X to the financial statements, no events have occurred...." ~~Similarly, i~~**I**n appropriate circumstances, item ~~9~~**7** could be modified as follows: "The company has no plans or intentions that may materially affect the carrying value or classification of assets and liabilities, except for ~~its~~**our** plans to dispose of segment A, as disclosed in ~~footn~~**N**ote X to the financial statements, which are discussed in the minutes of the December 7, ~~20X0~~**X1**, meeting of the board of directors." **Similarly, if management has received a communication regarding an allegation of fraud or suspected fraud, item 8 could be modified as follows: "Except for the allegation discussed in the minutes of the December 7, 20X1, meeting of the board of directors (or disclosed to you at our meeting on October 15, 20X1), we have no knowledge of any allegations of fraud or suspected fraud affecting the company received in communications from employees, former employees, analysts, regulators, short sellers, or others."**

> 3. The qualitative discussion of materiality used in the illustrative letter is adapted from FASB Statement of Financial Accounting Concepts No. 2, *Qualitative Characteristics of Accounting Information.*

> 4. Certain terms are used in the illustrative letter that are described elsewhere in authoritative literature. Examples are fraud, in section 316, and related parties, in section 334, footnote 1. To avoid misunderstanding concerning the meaning of such terms, the auditor may wish to furnish those definitions to management or request that the definitions be included in the written representations.

> 5. The illustrative letter assumes that management and the auditor have reached an understanding on the limits of materiality for purposes of the written representations. However, it should be noted that a materiality limit would not apply for certain representations, as explained in paragraph .08 of this section.

**177**

6.

[*Date*]

To [*Independent Auditor*]

We are providing this letter in connection with your audit(s) of the [*identification of financial statements*] of [*name of entity* as of [*dates*] and for the [*periods*] for the purpose of expressing an opinion as to whether the [*consolidated*] financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of [*name of entity*] in conformity with accounting principles generally accepted in the United States of America. We confirm that we are responsible for the fair presentation in the [*consolidated*] financial statements of financial position, results of operations, and cash flows in conformity with generally accepted accounting principles.

Certain representations in this letter are described as being limited to matters that are material. Items are considered material, regardless of size, if they involve an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would be changed or influenced by the omission or misstatement.

We confirm, to the best of our knowledge and belief, [*as of (date of auditor's report)*,] the following representations made to you during your audit(s).

   1. The financial statements referred to above are fairly presented in conformity with accounting principles generally accepted in the United States of America.

   2. We have made available to you all—

   a.   Financial records and related data.

   b.   Minutes of the meetings of stockholders, directors, and committees of directors, or summaries of actions of recent meetings for which minutes have not yet been prepared.

   3. There have been no communications from regulatory agencies concerning noncompliance with or deficiencies in financial reporting practices.

   4. There are no material transactions that have not been properly recorded in the accounting records underlying the financial statements.

   5. We believe that the effects of the uncorrected financial statement misstatements summarized in the accompanying schedule are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.[fn 1] [Footnote omitted]

   **6. We acknowledge our responsibility for the design and implementation of programs and controls to prevent and detect fraud.**

   **7~~6~~. We have no knowledge of any fraud or suspected fraud affecting the entity involving**~~There has been no~~

   a.   **Management,**~~Fraud involving management, or employees who have significant roles in the internal control~~

   b.   **Employees who have significant roles in internal control, or**

   c.  ~~Fraud involving o~~**O**thers where the fraud could have a material effect on the financial statements.

   **8. We have no knowledge of any allegations of fraud or suspected fraud affecting the entity received in communications from employees, former employees, analysts, regulators, short sellers, or others.**

3.   Subsequent subparagraphs are to be renumbered accordingly.

178

## EXHIBIT - MANAGEMENT ANTIFRAUD PROGRAMS AND CONTROLS

**Guidance to Help Prevent, Deter, and Detect Fraud**

**.88**

(This exhibit is reprinted for the reader's convenience but is not an integral part of the section.)

This document is being issued jointly by the following organizations:

American Institute of Certified Public Accountants

Association of Certified Fraud Examiners

Financial Executives International

Information Systems Audit and Control Association

The Institute of Internal Auditors

Institute of Management Accountants

Society for Human Resource Management

In addition, we would also like to acknowledge the American Accounting Association, the Defense Industry Initiative, and the National Association of Corporate Directors for their review of the document and helpful comments and materials.

We gratefully acknowledge the valuable contribution provided by the Anti-Fraud Detection Subgroup:

| | |
|---|---|
| Daniel D. Montgomery, *Chair* | David L. Landsittel |
| Toby J.F. Bishop | Carol A. Langelier |
| Dennis H. Chookaszian | Joseph T. Wells |
| Susan A. Finn | Janice Wilkins |
| Dana Hermanson | |

Finally, we thank the staff of the American Institute of Certified Public Accountants for their support on this project:

| | |
|---|---|
| Charles E. Landes | Kim M. Gibson |
| *Director* | *Senior Technical Manager* |
| *Audit and Attest Standards* | *Audit and Attest Standards* |
| Richard Lanza | Hugh Kelsey |
| *Senior Program Manager* | *Program Manager* |
| *Chief Operating Office* | *Knowledge Management* |

This document was commissioned by the Fraud Task Force of the AICPA's Auditing Standards Board. This

**179**

document has not been adopted, approved, disapproved, or otherwise acted upon by a board, committee, governing body, or membership of the above issuing organizations.

## Preface

Some organizations have significantly lower levels of misappropriation of assets and are less susceptible to fraudulent financial reporting than other organizations because these organizations take proactive steps to prevent or deter fraud. It is only those organizations that seriously consider fraud risks and take proactive steps to create the right kind of climate to reduce its occurrence that have success in preventing fraud. This document identifies the key participants in this antifraud effort, including the board of directors, management, internal and independent auditors, and certified fraud examiners.

Management may develop and implement some of these programs and controls in response to specific identified risks of material misstatement of financial statements due to fraud. In other cases, these programs and controls may be a part of the entity's enterprise-wide risk management activities.

Management is responsible for designing and implementing systems and procedures for the prevention and detection of fraud and, along with the board of directors, for ensuring a culture and environment that promotes honesty and ethical behavior. However, because of the characteristics of fraud, a material misstatement of financial statements due to fraud may occur notwithstanding the presence of programs and controls such as those described in this document.

## Introduction

Fraud can range from minor employee theft and unproductive behavior to misappropriation of assets and fraudulent financial reporting. Material financial statement fraud can have a significant adverse effect on an entity's market value, reputation, and ability to achieve its strategic objectives. A number of highly publicized cases have heightened the awareness of the effects of fraudulent financial reporting and have led many organizations to be more proactive in taking steps to prevent or deter its occurrence. Misappropriation of assets, though often not material to the financial statements, can nonetheless result in substantial losses to an entity if a dishonest employee has the incentive and opportunity to commit fraud.

The risk of fraud can be reduced through a combination of prevention, deterrence, and detection measures. However, fraud can be difficult to detect because it often involves concealment through falsification of documents or collusion among management, employees, or third parties. Therefore, it is important to place a strong emphasis on fraud prevention, which may reduce opportunities for fraud to take place, and fraud deterrence, which could persuade individuals that they should not commit fraud because of the likelihood of detection and punishment. Moreover, prevention and deterrence measures are much less costly than the time and expense required for fraud detection and investigation.

An entity's management has both the responsibility and the means to implement measures to reduce the incidence of fraud. The measures an organization takes to prevent and deter fraud also can help create a positive workplace environment that can enhance the entity's ability to recruit and retain high-quality employees.

Research suggests that the most effective way to implement measures to reduce wrongdoing is to base them on a set of core values that are embraced by the entity. These values provide an overarching message about the key principles guiding all employees' actions. This provides a platform upon which a more detailed code of conduct can be constructed, giving more specific guidance about permitted and prohibited behavior, based on applicable laws and the organization's values. Management needs to clearly articulate that all employees will be held accountable to act within the organization's code of conduct.

This document identifies measures entities can implement to prevent, deter, and detect fraud. It discusses these measures in the context of three fundamental elements. Broadly stated, these fundamental elements are (1) create and maintain a *culture* of honesty and high ethics; (2) *evaluate* the risks of fraud and implement the processes, procedures, and controls needed to mitigate the risks and reduce the opportunities for fraud; and (3) develop an appropriate *oversight* process. Although the entire management team shares the responsibility for implementing and monitoring these activities, with oversight from the board of directors, the entity's chief executive officer (CEO) should initiate and support such measures. Without the CEO's active support, these measures are less likely to be effective.

The information presented in this document generally is applicable to entities of all sizes. However, the degree to which certain programs and controls are applied in smaller, less-complex entities and the formality of their application are likely to differ from larger organizations. For example, management of a smaller entity (or the owner of an owner-managed entity), along with those charged with governance of the financial reporting process, are responsible for creating a culture

180

of honesty and high ethics. Management also is responsible for implementing a system of internal controls commensurate with the nature and size of the organization, but smaller entities may find that certain types of control activities are not relevant because of the involvement of and controls applied by management. However, all entities must make it clear that unethical or dishonest behavior will not be tolerated.

**Creating a Culture of Honesty and High Ethics**

It is the organization's responsibility to create a culture of honesty and high ethics and to clearly communicate acceptable behavior and expectations of each employee. Such a culture is rooted in a strong set of core values (or value system) that provides the foundation for employees as to how the organization conducts its business. It also allows an entity to develop an ethical framework that covers (1) fraudulent financial reporting, (2) misappropriation of assets, and (3) corruption as well as other issues. **fn 1**

Creating a culture of honesty and high ethics should include the following.

*Setting the Tone at the Top*

Directors and officers of corporations set the "tone at the top" for ethical behavior within any organization. Research in moral development strongly suggests that honesty can best be reinforced when a proper example is set—sometimes referred to as the tone at the top. The management of an entity cannot act one way and expect others in the entity to behave differently.

In many cases, particularly in larger organizations, it is necessary for management to both behave ethically and openly communicate its expectations for ethical behavior because most employees are not in a position to observe management's actions. Management must show employees through its words and actions that dishonest or unethical behavior will not be tolerated, even if the result of the action benefits the entity. Moreover, it should be evident that all employees will be treated equally, regardless of their position.

For example, statements by management regarding the absolute need to meet operating and financial targets can create undue pressures that may lead employees to commit fraud to achieve them. Setting unachievable goals for employees can give them two unattractive choices: fail or cheat. In contrast, a statement from management that says, "We are aggressive in pursuing our targets, while requiring truthful financial reporting at all times," clearly indicates to employees that integrity is a requirement. This message also conveys that the entity has "zero tolerance" for unethical behavior, including fraudulent financial reporting.

The cornerstone of an effective antifraud environment is a culture with a strong value system founded on integrity. This value system often is reflected in a code of conduct. **fn 2** The code of conduct should reflect the core values of the entity and guide employees in making appropriate decisions during their workday. The code of conduct might include such topics as ethics, confidentiality, conflicts of interest, intellectual property, sexual harassment, and fraud. **fn 3** For a code of conduct to be effective, it should be communicated to all personnel in an understandable fashion. It also should be developed in a participatory and positive manner that will result in both management and employees taking ownership of its content. Finally, the code of conduct should be included in an employee handbook or policy manual, or in some other formal document or location (for example, the entity's intranet) so it can be referred to when needed.

Senior financial officers hold an important and elevated role in corporate governance. While members of the management team, they are uniquely capable and empowered to ensure that all stakeholders' interests are appropriately balanced, protected, and preserved. For examples of codes of conduct, see Attachment 1, "AICPA 'CPA's Handbook of Fraud and Commercial Crime Prevention,' An Organizational Code of Conduct," and Attachment 2, "Financial Executives International Code of Ethics Statement" provided by Financial Executives International. In addition, visit the Institute of Management Accountant's Ethics Center at www.imanet.org for their members' standards of ethical conduct.

*Creating a Positive Workplace Environment*

Research results indicate that wrongdoing occurs less frequently when employees have positive feelings about an entity than when they feel abused, threatened, or ignored. Without a positive workplace environment, there are more opportunities for poor employee morale, which can affect an employee's attitude about committing fraud against an entity. Factors that detract from a positive work environment and may increase the risk of fraud include:

- Top management that does not seem to care about or reward appropriate behavior

- Negative feedback and lack of recognition for job performance

- Perceived inequities in the organization

181

- Autocratic rather than participative management

- Low organizational loyalty or feelings of ownership

- Unreasonable budget expectations or other financial targets

- Fear of delivering "bad news" to supervisors and/or management

- Less-than-competitive compensation

- Poor training and promotion opportunities

- Lack of clear organizational responsibilities

- Poor communication practices or methods within the organization

The entity's human resources department often is instrumental in helping to build a corporate culture and a positive work environment. Human resource professionals are responsible for implementing specific programs and initiatives, consistent with management's strategies, that can help to mitigate many of the detractors mentioned above. Mitigating factors that help create a positive work environment and reduce the risk of fraud may include:

- Recognition and reward systems that are in tandem with goals and results

- Equal employment opportunities

- Team-oriented, collaborative decision-making policies

- Professionally administered compensation programs

- Professionally administered training programs and an organizational priority of career development

Employees should be empowered to help create a positive workplace environment and support the entity's values and code of conduct. They should be given the opportunity to provide input to the development and updating of the entity's code of conduct, to ensure that it is relevant, clear, and fair. Involving employees in this fashion also may effectively contribute to the oversight of the entity's code of conduct and an environment of ethical behavior (see the section titled "Developing an Appropriate Oversight Process").

Employees should be given the means to obtain advice internally before making decisions that appear to have significant legal or ethical implications. They should also be encouraged and given the means to communicate concerns, anonymously if preferred, about potential violations of the entity's code of conduct, without fear of retribution. Many organizations have implemented a process for employees to report on a confidential basis any actual or suspected wrongdoing, or potential violations of the code of conduct or ethics policy. For example, some organizations use a telephone "hotline" that is directed to or monitored by an ethics officer, fraud officer, general counsel, internal audit director, or another trusted individual responsible for investigating and reporting incidents of fraud or illegal acts.

### Hiring and Promoting Appropriate Employees

Each employee has a unique set of values and personal code of ethics. When faced with sufficient pressure and a perceived opportunity, some employees will behave dishonestly rather than face the negative consequences of honest behavior. The threshold at which dishonest behavior starts, however, will vary among individuals. If an entity is to be successful in preventing fraud, it must have effective policies that minimize the chance of hiring or promoting individuals with low levels of honesty, especially for positions of trust.

Proactive hiring and promotion procedures may include:

- Conducting background investigations on individuals being considered for employment or for promotion to a position of trust [fn 4]

- Thoroughly checking a candidate's education, employment history, and personal references

- Periodic training of all employees about the entity's values and code of conduct, (training is addressed in the following section)

- Incorporating into regular performance reviews an evaluation of how each individual has contributed to creating an appropriate workplace environment in line with the entity's values and code of conduct

- Continuous objective evaluation of compliance with the entity's values and code of conduct, with violations being addressed immediately

### Training

New employees should be trained at the time of hiring about the entity's values and its code of conduct. This training should explicitly cover expectations of all employees regarding (1) their duty to communicate certain matters; (2) a list of the types of matters, including actual or suspected fraud, to be communicated along with specific examples; and (3) information on how to communicate those matters. There also should be an affirmation from senior management regarding employee expectations and communication responsibilities. Such training should include an element of "fraud awareness," the tone of which should be positive but nonetheless stress that fraud can be costly (and detrimental in other ways) to the entity and its employees.

In addition to training at the time of hiring, employees should receive refresher training periodically thereafter. Some organizations may consider ongoing training for certain positions, such as purchasing agents or employees with financial reporting responsibilities. Training should be specific to an employee's level within the organization, geographic location, and assigned responsibilities. For example, training for senior manager level personnel would normally be different from that of nonsupervisory employees, and training for purchasing agents would be different from that of sales representatives.

### Confirmation

Management needs to clearly articulate that all employees will be held accountable to act within the entity's code of conduct. All employees within senior management and the finance function, as well as other employees in areas that might be exposed to unethical behavior (for example, procurement, sales and marketing) should be required to sign a code of conduct statement annually, at a minimum.

Requiring periodic confirmation by employees of their responsibilities will not only reinforce the policy but may also deter individuals from committing fraud and other violations and might identify problems before they become significant. Such confirmation may include statements that the individual understands the entity's expectations, has complied with the code of conduct, and is not aware of any violations of the code of conduct other than those the individual lists in his or her response. Although people with low integrity may not hesitate to sign a false confirmation, most people will want to avoid making a false statement in writing. Honest individuals are more likely to return their confirmations and to disclose what they know (including any conflicts of interest or other personal exceptions to the code of conduct). Thorough follow-up by internal auditors or others regarding nonreplies may uncover significant issues.

### Discipline

The way an entity reacts to incidents of alleged or suspected fraud will send a strong deterrent message throughout the entity, helping to reduce the number of future occurrences. The following actions should be taken in response to an alleged incident of fraud:

- A thorough investigation of the incident should be conducted.  **fn 5**

- Appropriate and consistent actions should be taken against violators.

- Relevant controls should be assessed and improved.

- Communication and training should occur to reinforce the entity's values, code of conduct, and expectations.

Expectations about the consequences of committing fraud must be clearly communicated throughout the entity. For example, a strong statement from management that dishonest actions will not be tolerated, and that violators may be terminated and referred to the appropriate authorities, clearly establishes consequences and can be a valuable deterrent to wrongdoing. If wrongdoing occurs and an employee is disciplined, it can be helpful to communicate that fact, on a no-name basis, in an employee newsletter or other regular communication to employees. Seeing that other people have been disciplined for wrongdoing can be an effective deterrent, increasing the perceived likelihood of violators being caught and punished. It also can demonstrate that the entity is committed to an environment of high ethical standards and integrity.

**Evaluating Antifraud Processes and Controls**

183

Neither fraudulent financial reporting nor misappropriation of assets can occur without a perceived opportunity to commit and conceal the act. Organizations should be proactive in reducing fraud opportunities by (1) identifying and measuring fraud risks, (2) taking steps to mitigate identified risks, and (3) implementing and monitoring appropriate preventive and detective internal controls and other deterrent measures.

### Identifying and Measuring Fraud Risks

Management has primary responsibility for establishing and monitoring all aspects of the entity's fraud risk-assessment and prevention activities. [fn 6] Fraud risks often are considered as part of an enterprise-wide risk management program, though they may be addressed separately. [fn 7] The fraud risk-assessment process should consider the vulnerability of the entity to fraudulent activity (fraudulent financial reporting, misappropriation of assets, and corruption) and whether any of those exposures could result in a material misstatement of the financial statements or material loss to the organization. In identifying fraud risks, organizations should consider organizational, industry, and country-specific characteristics that influence the risk of fraud.

The nature and extent of management's risk assessment activities should be commensurate with the size of the entity and complexity of its operations. For example, the risk assessment process is likely to be less formal and less structured in smaller entities. However, management should recognize that fraud can occur in organizations of any size or type, and that almost any employee may be capable of committing fraud given the right set of circumstances. Accordingly, management should develop a heightened "fraud awareness" and an appropriate fraud risk-management program, with oversight from the board of directors or audit committee.

### Mitigating Fraud Risks

It may be possible to reduce or eliminate certain fraud risks by making changes to the entity's activities and processes. An entity may choose to sell certain segments of its operations, cease doing business in certain locations, or reorganize its business processes to eliminate unacceptable risks. For example, the risk of misappropriation of funds may be reduced by implementing a central lockbox at a bank to receive payments instead of receiving money at the entity's various locations. The risk of corruption may be reduced by closely monitoring the entity's procurement process. The risk of financial statement fraud may be reduced by implementing shared services centers to provide accounting services to multiple segments, affiliates, or geographic locations of an entity's operations. A shared services center may be less vulnerable to influence by local operations managers and may be able to implement more extensive fraud detection measures cost-effectively.

### Implementing and Monitoring Appropriate Internal Controls

Some risks are inherent in the environment of the entity, but most can be addressed with an appropriate system of internal control. Once fraud risk assessment has taken place, the entity can identify the processes, controls, and other procedures that are needed to mitigate the identified risks. Effective internal control will include a well-developed control environment, an effective and secure information system, and appropriate control and monitoring activities. [fn 8] Because of the importance of information technology in supporting operations and the processing of transactions, management also needs to implement and maintain appropriate controls, whether automated or manual, over computer-generated information.

In particular, management should evaluate whether appropriate internal controls have been implemented in any areas management has identified as posing a higher risk of fraudulent activity, as well as controls over the entity's financial reporting process. Because fraudulent financial reporting may begin in an interim period, management also should evaluate the appropriateness of internal controls over interim financial reporting.

Fraudulent financial reporting by upper-level management typically involves override of internal controls within the financial reporting process. Because management has the ability to override controls, or to influence others to perpetrate or conceal fraud, the need for a strong value system and a culture of ethical financial reporting becomes increasingly important. This helps create an environment in which other employees will decline to participate in committing a fraud and will use established communication procedures to report any requests to commit wrongdoing. The potential for management override also increases the need for appropriate oversight measures by the board of directors or audit committee, as discussed in the following section.

Fraudulent financial reporting by lower levels of management and employees may be deterred or detected by appropriate monitoring controls, such as having higher-level managers review and evaluate the financial results reported by individual operating units or subsidiaries. Unusual fluctuations in results of particular reporting units, or the lack of expected fluctuations, may indicate potential manipulation by departmental or operating unit managers or staff.

### Developing an Appropriate Oversight Process

184

To effectively prevent or deter fraud, an entity should have an appropriate oversight function in place. Oversight can take many forms and can be performed by many within and outside the entity, under the overall oversight of the audit committee (or board of directors where no audit committee exists).

***Audit Committee or Board of Directors***

The audit committee (or the board of directors where no audit committee exists) should evaluate management's identification of fraud risks, implementation of antifraud measures, and creation of the appropriate "tone at the top." Active oversight by the audit committee can help to reinforce management's commitment to creating a culture with "zero tolerance" for fraud. An entity's audit committee also should ensure that senior management (in particular, the CEO) implements appropriate fraud deterrence and prevention measures to better protect investors, employees, and other stakeholders. The audit committee's evaluation and oversight not only helps make sure that senior management fulfills its responsibility, but also can serve as a deterrent to senior management engaging in fraudulent activity (that is, by ensuring an environment is created whereby any attempt by senior management to involve employees in committing or concealing fraud would lead promptly to reports from such employees to appropriate persons, including the audit committee).

The audit committee also plays an important role in helping the board of directors fulfill its oversight responsibilities with respect to the entity's financial reporting process and the system of internal control. [fn 9] In exercising this oversight responsibility, the audit committee should consider the potential for management override of controls or other inappropriate influence over the financial reporting process. For example, the audit committee may obtain from the internal auditors and independent auditors their views on management's involvement in the financial reporting process and, in particular, the ability of management to override information processed by the entity's financial reporting system (for example, the ability for management or others to initiate or record nonstandard journal entries). The audit committee also may consider reviewing the entity's reported information for reasonableness compared with prior or forecasted results, as well as with peers or industry averages. In addition, information received in communications from the independent auditors [fn 10] can assist the audit committee in assessing the strength of the entity's internal control and the potential for fraudulent financial reporting.

As part of its oversight responsibilities, the audit committee should encourage management to provide a mechanism for employees to report concerns about unethical behavior, actual or suspected fraud, or violations of the entity's code of conduct or ethics policy. The committee should then receive periodic reports describing the nature, status, and eventual disposition of any fraud or unethical conduct. A summary of the activity, follow-up and disposition also should be provided to the full board of directors.

If senior management is involved in fraud, the next layer of management may be the most likely to be aware of it. As a result, the audit committee (and other directors) should consider establishing an open line of communication with members of management one or two levels below senior management to assist in identifying fraud at the highest levels of the organization or investigating any fraudulent activity that might occur. [fn 11] The audit committee typically has the ability and authority to investigate any alleged or suspected wrongdoing brought to its attention. Most audit committee charters empower the committee to investigate any matters within the scope of its responsibilities, and to retain legal, accounting, and other professional advisers as needed to advise the committee and assist in its investigation.

All audit committee members should be financially literate, and each committee should have at least one financial expert. The financial expert should possess:

- An understanding of generally accepted accounting principles and audits of financial statements prepared under those principles. Such understanding may have been obtained either through education or experience. It is important for someone on the audit committee to have a working knowledge of those principles and standards.

- Experience in the preparation and/or the auditing of financial statements of an entity of similar size, scope and complexity as the entity on whose board the committee member serves. The experience would generally be as a chief financial officer, chief accounting officer, controller, or auditor of a similar entity. This background will provide a necessary understanding of the transactional and operational environment that produces the issuer's financial statements. It will also bring an understanding of what is involved in, for example, appropriate accounting estimates, accruals, and reserve provisions, and an appreciation of what is necessary to maintain a good internal control environment.

- Experience in internal governance and procedures of audit committees, obtained either as an audit committee member, a senior corporate manager responsible for answering to the audit committee, or an external auditor

responsible for reporting on the execution and results of annual audits.

### Management

Management is responsible for overseeing the activities carried out by employees, and typically does so by implementing and monitoring processes and controls such as those discussed previously. However, management also may initiate, participate in, or direct the commission and concealment of a fraudulent act. Accordingly, the audit committee (or the board of directors where no audit committee exists) has the responsibility to oversee the activities of senior management and to consider the risk of fraudulent financial reporting involving the override of internal controls or collusion (see discussion on the audit committee and board of directors above).

Public companies should include a statement in the annual report acknowledging management's responsibility for the preparation of the financial statements and for establishing and maintaining an effective system of internal control. This will help improve the public's understanding of the respective roles of management and the auditor. This statement has also been generally referred to as a "Management Report" or "Management Certificate." Such a statement can provide a convenient vehicle for management to describe the nature and manner of preparation of the financial information and the adequacy of the internal accounting controls. Logically, the statement should be presented in close proximity to the formal financial statements. For example, it could appear near the independent auditor's report, or in the financial review or management analysis section.

### Internal Auditors

An effective internal audit team can be extremely helpful in performing aspects of the oversight function. Their knowledge about the entity may enable them to identify indicators that suggest fraud has been committed. The *Standards for the Professional Practice of Internal Auditing* (IIA Standards), issued by the Institute of Internal Auditors, state, "The internal auditor should have sufficient knowledge to identify the indicators of fraud but is not expected to have the expertise of a person whose primary responsibility is detecting and investigating fraud." Internal auditors also have the opportunity to evaluate fraud risks and controls and to recommend action to mitigate risks and improve controls. Specifically, the IIA Standards require internal auditors to assess risks facing their organizations. This risk assessment is to serve as the basis from which audit plans are devised and against which internal controls are tested. The IIA Standards require the audit plan to be presented to and approved by the audit committee (or board of directors where no audit committee exists). The work completed as a result of the audit plan provides assurance on which management's assertion about controls can be made.

Internal audits can be both a detection and a deterrence measure. Internal auditors can assist in the deterrence of fraud by examining and evaluating the adequacy and the effectiveness of the system of internal control, commensurate with the extent of the potential exposure or risk in the various segments of the organization's operations. In carrying out this responsibility, internal auditors should, for example, determine whether:

- The organizational environment fosters control consciousness.

- Realistic organizational goals and objectives are set.

- Written policies (for example, a code of conduct) exist that describe prohibited activities and the action required whenever violations are discovered.

- Appropriate authorization policies for transactions are established and maintained.

- Policies, practices, procedures, reports, and other mechanisms are developed to monitor activities and safeguard assets, particularly in high-risk areas.

- Communication channels provide management with adequate and reliable information.

- Recommendations need to be made for the establishment or enhancement of cost-effective controls to help deter fraud.

Internal auditors may conduct proactive auditing to search for corruption, misappropriation of assets, and financial statement fraud. This may include the use of computer-assisted audit techniques to detect particular types of fraud. Internal auditors also can employ analytical and other procedures to isolate anomalies and perform detailed reviews of high-risk accounts and transactions to identify potential financial statement fraud. The internal auditors should have an independent reporting line directly to the audit committee, to enable them to express any concerns about management's commitment to appropriate internal controls or to report suspicions or allegations of fraud involving senior management.

**186**

### *Independent Auditors*

Independent auditors can assist management and the board of directors (or audit committee) by providing an assessment of the entity's process for identifying, assessing, and responding to the risks of fraud. The board of directors (or audit committee) should have an open and candid dialogue with the independent auditors regarding management's risk assessment process and the system of internal control. Such a dialogue should include a discussion of the susceptibility of the entity to fraudulent financial reporting and the entity's exposure to misappropriation of assets.

### *Certified Fraud Examiners*

Certified fraud examiners may assist the audit committee and board of directors with aspects of the oversight process either directly or as part of a team of internal auditors or independent auditors. Certified fraud examiners can provide extensive knowledge and experience about fraud that may not be available within a corporation. They can provide more objective input into management's evaluation of the risk of fraud (especially fraud involving senior management, such as financial statement fraud) and the development of appropriate antifraud controls that are less vulnerable to management override. They can assist the audit committee and board of directors in evaluating the fraud risk assessment and fraud prevention measures implemented by management. Certified fraud examiners also conduct examinations to resolve allegations or suspicions of fraud, reporting either to an appropriate level of management or to the audit committee or board of directors, depending upon the nature of the issue and the level of personnel involved.

### Other Information

To obtain more information on fraud and implementing antifraud programs and controls, please go to the following Web sites where additional materials, guidance, and tools can be found.

| | |
|---|---|
| American Institute of Certified Public Accountants | www.aicpa.org |
| Association of Certified Fraud Examiners | www.cfenet.com |
| Financial Executives International | www.fei.org |
| Information Systems Audit and Control Association | www.isaca.org |
| The Institute of Internal Auditors | www.theiia.org |
| Institute of Management Accountants | www.imanet.org |
| National Association of Corporate Directors | www.nacdonline.org |
| Society for Human Resource Management | www.shrm.org |

### Attachment 1: AICPA "CPA's Handbook of Fraud and Commercial Crime Prevention," An Organizational Code of Conduct

The following is an example of an organizational code of conduct, which includes definitions of what is considered unacceptable, and the consequences of any breaches thereof. The specific content and areas addressed in an entity's code of conduct should be specific to that entity.

#### *Organizational Code of Conduct*

The Organization and its employees must, at all times, comply with all applicable laws and regulations. The Organization will not condone the activities of employees who achieve results through violation of the law or unethical business dealings. This includes any payments for illegal acts, indirect contributions, rebates, and bribery. The Organization does not permit any activity that fails to stand the closest possible public scrutiny.

All business conduct should be well above the minimum standards required by law. Accordingly, employees must ensure that their actions cannot be interpreted as being, in any way, in contravention of the laws and regulations governing the Organization's worldwide operations.

Employees uncertain about the application or interpretation of any legal requirements should refer the matter to their superior, who, if necessary, should seek the advice of the legal department.

*General Employee Conduct*

The Organization expects its employees to conduct themselves in a businesslike manner. Drinking, gambling, fighting, swearing, and similar unprofessional activities are strictly prohibited while on the job.

Employees must not engage in sexual harassment, or conduct themselves in a way that could be construed as such, for example, by using inappropriate language, keeping or posting inappropriate materials in their work area, or accessing inappropriate materials on their computer.

*Conflicts of Interest*

The Organization expects that employees will perform their duties conscientiously, honestly, and in accordance with the best interests of the Organization. Employees must not use their position or the knowledge gained as a result of their position for private or personal advantage. Regardless of the circumstances, if employees sense that a course of action they have pursued, are presently pursuing, or are contemplating pursuing may involve them in a conflict of interest with their employer, they should immediately communicate all the facts to their superior.

*Outside Activities, Employment, and Directorships*

All employees share a serious responsibility for the Organization's good public relations, especially at the community level. Their readiness to help with religious, charitable, educational, and civic activities brings credit to the Organization and is encouraged. Employees must, however, avoid acquiring any business interest or participating in any other activity outside the Organization that would, or would appear to:

- Create an excessive demand upon their time and attention, thus depriving the Organization of their best efforts on the job.

- Create a conflict of interest—an obligation, interest, or distraction—that may interfere with the independent exercise of judgment in the Organization's best interest.

*Relationships With Clients and Suppliers*

Employees should avoid investing in or acquiring a financial interest for their own accounts in any business organization that has a contractual relationship with the Organization, or that provides goods or services, or both to the Organization, if such investment or interest could influence or create the impression of influencing their decisions in the performance of their duties on behalf of the Organization.

*Gifts, Entertainment, and Favors*

Employees must not accept entertainment, gifts, or personal favors that could, in any way, influence, or appear to influence, business decisions in favor of any person or organization with whom or with which the Organization has, or is likely to have, business dealings. Similarly, employees must not accept any other preferential treatment under these circumstances because their position with the Organization might be inclined to, or be perceived to, place them under obligation.

*Kickbacks and Secret Commissions*

Regarding the Organization's business activities, employees may not receive payment or compensation of any kind, except as authorized under the Organization's remuneration policies. In particular, the Organization strictly prohibits the acceptance of kickbacks and secret commissions from suppliers or others. Any breach of this rule will result in immediate termination and prosecution to the

188

fullest extent of the law.

*Organization Funds and Other Assets*

Employees who have access to Organization funds in any form must follow the prescribed procedures for recording, handling, and protecting money as detailed in the Organization's instructional manuals or other explanatory materials, or both. The Organization imposes strict standards to prevent fraud and dishonesty. If employees become aware of any evidence of fraud and dishonesty, they should immediately advise their superior or the Law Department so that the Organization can promptly investigate further.

When an employee's position requires spending Organization funds or incurring any reimbursable personal expenses, that individual must use good judgment on the Organization's behalf to ensure that good value is received for every expenditure.

Organization funds and all other assets of the Organization are for Organization purposes only and not for personal benefit. This includes the personal use of organizational assets, such as computers.

*Organization Records and Communications*

Accurate and reliable records of many kinds are necessary to meet the Organization's legal and financial obligations and to manage the affairs of the Organization. The Organization's books and records must reflect in an accurate and timely manner all business transactions. The employees responsible for accounting and recordkeeping must fully disclose and record all assets, liabilities, or both, and must exercise diligence in enforcing these requirements.

Employees must not make or engage in any false record or communication of any kind, whether internal or external, including but not limited to:

- False expense, attendance, production, financial, or similar reports and statements

- False advertising, deceptive marketing practices, or other misleading representations

*Dealing With Outside People and Organizations*

Employees must take care to separate their personal roles from their Organization positions when communicating on matters not involving Organization business. Employees must not use organization identification, stationery, supplies, and equipment for personal or political matters.

When communicating publicly on matters that involve Organization business, employees must not presume to speak for the Organization on any topic, unless they are certain that the views they express are those of the Organization, and it is the Organization's desire that such views be publicly disseminated.

When dealing with anyone outside the Organization, including public officials, employees must take care not to compromise the integrity or damage the reputation of either the Organization, or any outside individual, business, or government body.

*Prompt Communications*

In all matters relevant to customers, suppliers, government authorities, the public and others in the Organization, all employees must make every effort to achieve complete, accurate, and timely communications—responding promptly and courteously to all proper requests for information and to all complaints.

*Privacy and Confidentiality*

When handling financial and personal information about customers or others with whom the Organization has dealings, observe the following principles:

1. Collect, use, and retain only the personal information necessary for the Organization's business. Whenever possible, obtain any relevant information directly from the person concerned. Use only reputable and reliable sources to supplement this information.

**189**

2.   Retain information only for as long as necessary or as required by law. Protect the physical security of this information.

3.   Limit internal access to personal information to those with a legitimate business reason for seeking that information. Use only personal information for the purposes for which it was originally obtained. Obtain the consent of the person concerned before externally disclosing any personal information, unless legal process or contractual obligation provides otherwise.

**Attachment 2: Financial Executives International Code of Ethics Statement**

The mission of Financial Executives International (FEI) includes significant efforts to promote ethical conduct in the practice of financial management throughout the world. Senior financial officers hold an important and elevated role in corporate governance. While members of the management team, they are uniquely capable and empowered to ensure that all stakeholders' interests are appropriately balanced, protected, and preserved. This code provides principles that members are expected to adhere to and advocate. They embody rules regarding individual and peer responsibilities, as well as responsibilities to employers, the public, and other stakeholders.

All members of FEI will:

1.   Act with honesty and integrity, avoiding actual or apparent conflicts of interest in personal and professional relationships.

2.   Provide constituents with information that is accurate, complete, objective, relevant, timely, and understandable.

3.   Comply with rules and regulations of federal, state, provincial, and local governments, and other appropriate private and public regulatory agencies.

4.   Act in good faith; responsibly; and with due care, competence, and diligence, without misrepresenting material facts or allowing one's independent judgment to be subordinated.

5.   Respect the confidentiality of information acquired in the course of one's work except when authorized or otherwise legally obligated to disclose. Confidential information acquired in the course of one's work will not be used for personal advantage.

6.   Share knowledge and maintain skills important and relevant to constituents' needs.

7.   Proactively promote ethical behavior as a responsible partner among peers, in the work environment, and in the community.

8.   Achieve responsible use of and control over all assets and resources employed or entrusted.

---

**Footnotes (AU Section 316 — Consideration of Fraud in a Financial Statement Audit):**

[fn 1] The auditor's consideration of illegal acts and responsibility for detecting misstatements resulting from illegal acts is defined in section 317, *Illegal Acts by Clients*. For those illegal acts that are defined in that section as having a direct and material effect on the determination of financial statement amounts, the auditor's responsibility to detect misstatements resulting from such illegal acts is the same as that for errors (see section 312, *Audit Risk and Materiality in Conducting an Audit*, or fraud).

[fn 2] Auditors are sometimes requested to perform other services related to fraud detection and prevention, for example, special investigations to determine the extent of a suspected or detected fraud. These other services usually include procedures that extend beyond or are different from the procedures ordinarily performed in an audit of financial statements in accordance with generally accepted auditing standards (GAAS). AT section 101, *Attest Engagements*, and CS section 100, *Consulting Services: Definitions and Standards*, provide guidance to accountants relating to the performance of such services.

[fn 3] In its October 1987 report, the National Commission on Fraudulent Financial Reporting, also known as the Treadway Commission, noted, "The responsibility for reliable financial reporting resides first and foremost at the corporate level. Top management, starting with the chief executive officer, sets the tone and establishes the financial reporting environment. Therefore, reducing the risk of fraudulent financial reporting must start with the reporting company."

[fn 4] Intent is often difficult to determine, particularly in matters involving accounting estimates and the application of accounting principles. For example, unreasonable accounting estimates may be unintentional or may be the result of an intentional attempt to misstate the financial statements. Although an audit is not designed to determine intent, the auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether the misstatement is intentional or not.

[fn 5] Reference to generally accepted accounting principles (GAAP) includes, where applicable, a comprehensive basis of accounting other than GAAP as defined in section 623, *Special Reports*, paragraph .04.

190

**fn 6** Frauds have been committed by management override of existing controls using such techniques as (*a*) recording fictitious journal entries, particularly those recorded close to the end of an accounting period to manipulate operating results, (*b*) intentionally biasing assumptions and judgments used to estimate account balances, and (*c*) altering records and terms related to significant and unusual transactions.

**fn 7** For a further discussion of the concept of reasonable assurance, see section 230, *Due Professional Care in the Performance of Work*, paragraphs .10 through .13.

**fn 8** See footnote 6.

**fn 9** In addition to these inquiries, section 333, *Management Representations*, requires the auditor to obtain selected written representations from management regarding fraud.

**fn 10** Section 319, *Consideration of Internal Control in a Financial Statement Audit*, paragraphs .06 and .07, defines internal control and its five interrelated components (the control environment, risk assessment, control activities, information and communication, and monitoring). Entity programs and controls intended to address the risks of fraud may be part of any of the five components discussed in section 319.

**fn 11** Examples of "others with equivalent authority and responsibility" may include the board of directors, the board of trustees, or the owner in an owner-managed entity, as appropriate.

**fn 12** See footnote 10.

**fn 13** See paragraph .70 for a discussion of the need to update these analytical procedures during the overall review stage of the audit.

**fn 14** See Statement on Quality Control Standards (SQCS) No. 2, *System of Quality Control for a CPA Firm's Accounting and Auditing Practice* [QC section 20.14–.16], as amended.

**fn 15** Section 312.18 provides guidance on the auditor's consideration of the extent to which auditing procedures should be performed at selected locations or components.

**fn 16** The occurrence of material misstatements of financial statements due to fraud is relatively infrequent in relation to the total population of published financial statements. However, the auditor should not use this as a basis to conclude that one or more risks of a material misstatement due to fraud are not present in a particular entity.

**fn 17** For a discussion of indicators of improper revenue recognition and common techniques for overstating revenue and illustrative audit procedures, see the AICPA Audit Guide *Auditing Revenue in Certain Industries*.

**fn 18** See footnote 10.

**fn 19** Notwithstanding that the auditor assesses identified risks of material misstatement due to fraud, the assessment need not encompass an overall judgment about whether risk for the entity is classified as *high*, *medium*, or *low* because such a judgment is too broad to be useful in developing the auditor's response described in paragraphs .46 through .67.

**fn 20** Section 329, *Analytical Procedures*, provides guidance on performing analytical procedures as substantive tests.

**fn 21** Section 330, *The Confirmation Process*, provides guidance about the confirmation process in audits performed in accordance with GAAS.

**fn 22** Section 336, *Using the Work of a Specialist*, provides guidance to an auditor who uses the work of a specialist in performing an audit in accordance with GAAS.

**fn 23** Section 319 requires the auditor to obtain an understanding of the automated and manual procedures an entity uses to prepare financial statements and related disclosures, and how misstatements may occur. This understanding includes (*a*) the procedures used to enter transaction totals into the general ledger; (*b*) the procedures used to initiate, record, and process journal entries in the general ledger; and (*c*) other procedures used to record recurring and nonrecurring adjustments to the financial statements.

**fn 24** See section 342, *Auditing Accounting Estimates*, paragraphs .02 and .16, for a definition of accounting estimates and a listing of examples.

**fn 25** Section 334, *Related Parties*, provides guidance with respect to the identification of related-party relationships and transactions, including transactions that may be outside the ordinary course of business (see, in particular, section 334.06).

**fn 26** As discussed in paragraph .09, auditors are not trained as or expected to be experts in the authentication of documents; however, if the auditor believes that documents may not be authentic, he or she should investigate further and consider using the work of a specialist to determine the authenticity.

**fn 27** Denial of access to information may constitute a limitation on the scope of the audit that may require the auditor to consider qualifying or disclaiming an opinion on the financial statements. (See section 508, *Reports on Audited Financial Statements*, paragraph .24.)

**fn 28** To accomplish this communication, the auditor with final responsibility for the audit may want to arrange another discussion among audit team members about the risks of material misstatement due to fraud (see paragraphs .14 through .18).

**fn 29** See footnote 4.

**fn 30** Section 312.34 states in part, "Qualitative considerations also influence the auditor in reaching a conclusion as to whether misstatements are material." Section 312.11 states, "As a result of the interaction of quantitative and qualitative considerations in materiality judgments, misstatements of relatively small amounts that come to the auditor's attention could have a material effect on the financial statements."

**fn 31** However, see paragraphs .79 through .82 of this section for a discussion of the auditor's communication responsibilities.

**fn 32** Section 312.08 states that there is a distinction between the auditor's response to detected misstatements due to error and those due to fraud. When fraud is detected, the auditor should consider the implications for the integrity of management or employees and the possible effect on other aspects of the audit.

**fn 33** See section 508 for guidance on auditors' reports issued in connection with audits of financial statements.

**fn 34** If the auditor believes senior management may be involved, discussion of the matter directly with the audit committee may be

appropriate.

**fn 35** See footnote 11.

**fn 36** If the auditor, subsequent to the date of the report on the audited financial statements, becomes aware that facts existed at that date that might have affected the report had the auditor been aware of such facts, the auditor should refer to section 561, *Subsequent Discovery of Facts Existing at the Date of the Auditor's Report*, for guidance. Furthermore, section 315, *Communications Between Predecessor and Successor Auditors*, paragraphs .21 and .22, provide guidance regarding communication with a predecessor auditor.

**fn 37** The requirements to communicate noted in paragraphs .79 through .82 extend to any intentional misstatement of financial statements (see paragraph .03). However, the communication may use terms other than fraud—for example, irregularity, intentional misstatement, misappropriation, or defalcations—if there is possible confusion with a legal definition of fraud or other reason to prefer alternative terms.

**fn 38** Alternatively, the auditor may decide to communicate solely with the audit committee.

**fn 39** These requirements include reports in connection with the termination of the engagement, such as when the entity reports an auditor change on Form 8-K and the fraud or related risk factors constitute a *reportable event* or is the source of a *disagreement*, as these terms are defined in Item 304 of Regulation S-K. These requirements also include reports that may be required, under certain circumstances, pursuant to Section 10A(b)1 of the Securities Exchange Act of 1934 relating to an illegal act that has a material effect on the financial statements.

**fn 40** Section 315 requires the specific permission of the client.

**fn 41** For example, *Government Auditing Standards* (the Yellow Book) require auditors to report fraud or illegal acts directly to parties outside the audited entity in certain circumstances.

**fn 1** Management incentive plans may be contingent upon achieving targets relating only to certain accounts or selected activities of the entity, even though the related accounts or activities may not be material to the entity as a whole.

**fn 5** See section 342, *Auditing Accounting Estimates.*

**fn 6** 6    See section 326, *Evidential Matter.*

**fn 8** ~~See section 316.~~

**fn 1** Corruption includes bribery and other illegal acts.

**fn 2** An entity's value system also could be reflected in an ethics policy, a statement of business principles, or some other concise summary of guiding principles.

**fn 3** Although the discussion in this document focuses on fraud, the subject of fraud often is considered in the context of a broader set of principles that govern an organization. Some organizations, however, may elect to develop a fraud policy separate from an ethics policy. Specific examples of topics in a fraud policy might include a requirement to comply with all laws and regulations and explicit guidance regarding making payments to obtain contracts, holding pricing discussions with competitors, environmental discharges, relationships with vendors, and maintenance of accurate books and records.

**fn 4** Some organizations also have considered follow-up investigations, particularly for employees in positions of trust, on a periodic basis (for example, every five years) or as circumstances dictate.

**fn 5** Many entities of sufficient size are employing antifraud professionals, such as certified fraud examiners, who are responsible for resolving allegations of fraud within the organization and who also assist in the detection and deterrence of fraud. These individuals typically report their findings internally to corporate security, legal, or internal audit departments. In other instances, such individuals may be empowered directly by the board of directors or its audit committee.

**fn 6** Management may elect to have internal audit play an active role in the development, monitoring, and ongoing assessment of the entity's fraud risk-management program. This may include an active role in the development and communication of the entity's code of conduct or ethics policy, as well as in investigating actual or alleged instances of noncompliance.

**fn 7** Some organizations may perform a periodic self-assessment using questionnaires or other techniques to identify and measure risks. Self-assessment may be less reliable in identifying the risk of fraud due to a lack of experience with fraud (although many organizations experience some form of fraud and abuse, material financial statement fraud or misappropriation of assets is a rare event for most) and because management may be unwilling to acknowledge openly that they might commit fraud given sufficient pressure and opportunity.

**fn 8** The report of the Committee of Sponsoring Organizations (COSO) of the Treadway Commission, *Internal Control—Integrated Framework*, provides reasonable criteria for management to use in evaluating the effectiveness of the entity's system of internal control.

**fn 9** See the Report of the NACD Blue Ribbon Commission on the Audit Committee, (Washington, D.C.: National Association of Corporate Directors, 2000). For the board's role in the oversight of risk management, see Report of the NACD Blue Ribbon Commission on Risk Oversight, (Washington, D.C.: National Association of Corporate Directors, 2002).

**fn 10** See section 325, *Communication of Internal Control Related Matters Noted in an Audit*, and section 380, *Communications With Audit Committees.*

**fn 11** *Report of the NACD Best Practices Council: Coping with Fraud and Other Illegal Activity, A Guide for Directors, CEOs, and Senior Managers* (1998) sets forth "basic principles" and "implementation approaches" for dealing with fraud and other illegal activity.

Copyright © 2002, American Institute of Certified Public Accountants, Inc.

© Copyright 2003 - 2010 Public Company Accounting Oversight Board. All Rights Reserved.